# Exhibit 1

> **This Opinion is Not a
> Precedent of the TTAB**

Mailed: July 18, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Rebel Wine Co., LLC*

*v.*

*ROAR Spirits, LLC*

————

Opposition No. 91268314

————

J. Scott Gerien and Joy L. Durand of Dickenson, Peatman & Fogarty
    for Rebel Wine Co., LLC.

Robert A Rivas and Eric Levinrad of Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
    for ROAR Spirits, LLC f/k/a El Bandido Yankee, LLC.

————

Before Zervas, Goodman and Hudis,
    Administrative Trademark Judges.

Opinion by Hudis, Administrative Trademark Judge:

    ROAR Spirits, LLC ("Applicant") seeks registration on the Principal Register of

the standard character word mark EL BANDIDO YANKEE for "[d]istilled blue agave

Opposition No. 91268314

liquor" in International Class 33.[1] Applicant also seeks registration on the Principal Register of the composite mark:



for "[b]lue distilled agave tequilana weber liquor" in International Class 33.[2]

In its Notice of Opposition,[3] Rebel Wine Co., LLC ("Opposer") opposes registration of Applicant's word and composite marks under Trademark Act Section 2(d), 15

---

[1] Application Serial No. 90028911 (the "'911 Application") was filed on June 30, 2020, based upon Applicant's allegation of a bona fide intention to use the mark in commerce under Trademark Act Section 1(b), 15 U.S.C. §1051(b). The '911 Application also recites goods in International Classes 18, 20, 21 and 25. However, Opposer only opposes registration of Applicant's EL BANDIDO YANKEE mark for the goods in International Class 33.

[2] Application Serial No. 90029117 (the "'917 Application") also was filed on June 30, 2020, based upon Applicant's allegation of a bona fide intention to use the mark in commerce under Trademark Act Section 1(b).

In the '917 Application, "TEQUILA COMPANY" and "BLANCO" are disclaimed. The '917 Application also contains the following description of the mark: "The mark consists of the upper chest, neck and head of a person that is wearing a western hat and bandana which covers the persons nose, mouth, chin and most of the neck, which is above the words 'EL' and 'BANDIDO', that are separated by a small diamond shaped object and are level across the top, but underneath curve up toward the middle letters from the 'E' and the 'O', which is above the word 'YANKEE', which is above the words 'TEQUILA' and 'COMPANY' which are in [a] banner and is curved downward above the wording 'BLANCO' all of which are on a background of parchment paper."

[3] Notice of Opposition, 1 TTABVUE. Citations to the record or briefs in this opinion also include citations to the publicly available documents on TTABVUE, the Board's electronic docketing system. The number preceding "TTABVUE" corresponds to the docket entry number; the number(s) following "TTABVUE" refer to the page number(s) of that particular

Opposition No. 91268314

U.S.C. § 1052(d), on the ground that Applicant's marks, as applied to the goods identified in the Applications in International Class 33, so resemble Opposer's standard character BANDIT mark, registered on the Principal Register in connection with "[a]lcoholic beverages except beers,"[4] as to be likely to cause confusion, mistake or deception. Opposer also asserts common law rights in the BANDIT mark in connection with wine.[5] Applicant denied the salient allegations of the Notice of Opposition in its Answer.[6]

The case is fully briefed. Opposer bears the burden of proving its Trademark Act Section 2(d) claim by a preponderance of the evidence. *Sabhnani v. Mirage Brands, LLC*, 2021 USPQ2d 1241, at *16 (TTAB 2021). Having considered the evidentiary record, the parties' arguments and applicable authorities, as explained below, we find that Opposer has carried this burden, and sustain the Opposition as to the goods identified in International Class 33 in each of the '911 and '917 Applications.

docket entry, if applicable. The Board commends the parties for their proper and accurate citations to the record in their briefs.

[4] Registration No. 3974340 (the "'340 Registration") for the BANDIT mark was issued on June 7, 2011; renewed.

[5] Notice of Opposition, 1 TTABVUE 4, ¶ 4.

[6] Answer, 6 TTABVUE. In its Order of August 30, 2022, the Board struck the following from Applicant's Answer: 1) Applicant's reservation of rights to add further defenses, 2) Applicant's first defense that the Notice of Opposition fails to state a claim upon which relief can be granted, and 3) Applicant's fourth, fifth and sixth defenses of waiver, unclean hands, laches, estoppel and acquiescence. The Board further observed that Applicant's second and third defenses were not true affirmative defenses, but rather permissible as amplifications of Applicant's denials of likelihood of confusion. 20 TTABVUE 6-11.

Opposition No. 91268314

## I.     The Evidentiary Record

The record consists of the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files of Applicant's involved applications. In addition, the parties introduced the following evidence:

### A.     Opposer's Case in Chief

- Opposer's Notice of Reliance ("ONOR") on Opposer's BANDIT registration (Trademark Status and Document Retrieval ("TSDR") record), screen captures of third-party websites, articles published online, third-party trademark registrations (TSDR records), and trademark applications filed by Applicant containing the term BANDIT (TSDR records) attached as exhibits [7 TTABVUE 2-150].
- Declaration of Opposer's counsel, Joy Durand, with dictionary definitions, a Spanish-to-English translation of "EL BANDIDO," results of a Google images search, captures of pages from Applicant's website, and captures of pages from Applicant's Twitter account attached as exhibits [7 TTABVUE 151-190].
- Declaration of the Chairman of Opposer's Board of Directors, Robert Torkelson [7 TTABVUE 191-194 (public/redacted); 8 TTABVUE 2-5 (confidential)].

### B.     Applicant's Case in Chief

- Applicant's Notice of Reliance ("ANOR") on dictionary definitions, captures of third-party websites, a pleading from and the Board's decision in Cancellation No. 92063917 (*Rebel Wine Co. LLC v. Piney River Brewing Co.*; mark: MASKED BANDIT), a Spanish-to-English translation of "BANDOLERO," trademark applications filed by Applicant containing the terms EL BANDIDO YANKEE (including the two Applications presently at issue, and others) (TSDR records), results of a Google images search, results of a USPTO trademarks database search, and third-party trademark applications and registrations for marks containing the terms "BANDIDO(S)," "BANDIT," "BANDITO(S)," "FORAJIDO" and PATRÓN attached as exhibits [11 TTABVUE 2-240].
- Declaration of Applicant's counsel, Eric Levinrad ("Levinrad Decl."), attesting to certain online searches he conducted that produced some of the materials accompanying Applicant's Notice of Reliance, and attaching as an exhibit portions of a transcript from a discovery deposition taken in another

Opposition No. 91268314

proceeding [12 TTABVUE 2-13 (public/redacted); 12 TTABVUE 2-14 (confidential)].[7]

- Declaration of a partner of PKGD Group, Jeffrey Ernst ("Ernst Decl."), Applicant's brand consultant, with pictures of both parties' products attached as exhibits [14 TTABVUE 2-16].

### C. Opposer's Rebuttal Case

- Opposer's Rebuttal Notice of Reliance ("ORNOR") on a trademark application filed by Applicant for a mark containing the term BANDIDO (not one of the two Applications presently at issue) (TSDR record), abandoned trademark applications filed by Applicant and a third-party for marks containing the term BANDIT (TSDR records), registrations owned by Opposer for marks containing the term "BANDIDOS" or "BANDIT(S)" (TSDR records), and a Spanish-to-English translation of "FORAJIDO" attached as exhibits [24 TTABVUE 2-33].

## II.  The Parties

Sutter Home Winery, Inc. ("Sutter Home") and Liberators, LLC ("Liberators") are producers, marketers and distributors of alcohol beverage products. Sutter Home and Liberators formed Opposer as a joint venture to produce and market alcohol beverage products pursuant to certain intellectual property rights and brands owned by Liberators and transferred to Opposer, including the BANDIT mark and '340 Registration therefor on which Opposer bases its rights in this proceeding.[8]

---

[7] The transcript excerpts are from the discovery deposition of Robert Torkelson taken in a related proceeding between the parties, *Rebel Wine Co., LLC v. ROAR Spirits, LLC*, Opposition No. 91270476. In its Order of August 30, 2022 in the current proceeding, the Board held that "the excerpts are not admissible under [Trademark] Rule 2.122(f) [, 37 C.R.R. § 2.122(f)]. Nor has Opposer stipulated to admission of the testimony. In view thereof, Applicant's motion [for the admission of the excerpts from Robert Torkelson's discovery deposition in the related proceeding] is **denied**. Paragraph 8 and Exhibit 18 to Mr. Levinrad's testimony declaration [discussing and attaching Mr. Torkelson's discovery deposition testimony] are **stricken** from the record."

[8] Torkelson Decl., 7 TTABVUE 192, ¶¶ 3-4.

Opposition No. 91268314

Applicant was founded by two former professional athletes (a football player and a hockey player). Opposer's only products are tequilas manufactured in Jalisco, Mexico. PKGD Group is the importer (into the United States) and vendor of record for Applicant's EL BANDIDO YANKEE brand tequilas. Tequila is a distilled spirit liquor, regulated by applicable Mexican authorities, which is made from the blue weber agave plant (agave tequilana) (the goods as described in the opposed Applications). Applicant sells its tequila products to distributors, who in turn sell those products to retail stores, bars and restaurants for ultimate sale to and consumption by the ultimate consumer.[9]

## III.   Evidentiary Issues

Before proceeding to the merits of the Opposition, we address evidentiary matters raised by the parties.

### A.   Opposer's Evidentiary Objections

With its Notice of Reliance, Applicant submitted a .pdf print of search results from the USPTO's Trademark Electronic Search System ("TESS"), which comprises a chart of pending applications and issued registrations including the term BANDIT in International Classes 32 or 33, but it is not accompanied by the actual TESS records themselves.[10] Applicant's counsel also testified to the manner of his search by which

---

[9] Ernst Decl., 14 TTABVUE 3, 6, 8-9, ¶¶ 3-5, 14-15 and 19.

[10] ANOR, 11 TTABVUE 151-154, Exh. 14. The chart Applicant provided contains application serial numbers, registration numbers (if applicable), the literal portions of the marks, a TSDR status check column, whether the applications and registrations are live or dead, and the class(es) of goods involved. The chart does not show whether any of the marks are stylized or are accompanied by design elements, and the recitations of the goods are not supplied.

Opposition No. 91268314

he obtained these TESS results.[11] Opposer objects to these TESS search results, as well as the declaration testimony of Applicant's counsel describing the nature of his search.[12] Opposer's objection is sustained.

A party that wishes to make third-party registrations of record may do so by filing, during its testimony period, plain copies of the registrations, or printouts or copies of information of the registrations from the USPTO's electronic database records, together with a notice of reliance thereon specifying the registrations and indicating generally their relevance and associating them with one or more issues in the case. Trademark Rules 2.122(e) and 2.122(g); 37 C.F.R. § 2.122(e) and 37 C.F.R. § 2.122(g). A party also may make third-party registrations of record by introducing copies of them as exhibits to testimony. *See Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1047 (TTAB 2017) (overruling objection to third-party registrations attached as exhibits to declaration testimony).

On the other hand, a party may not make third-party registrations of record simply by introducing a list that includes them. *See, e.g., Edom Labs. Inc. v. Lichter*, 102 USPQ2d 1546, 1550 (TTAB 2012) ("[W]hile the listing that applicant has submitted, of third-party marks downloaded from the USPTO's Trademark Electronic Search System (TESS), is of record, the registrations listed therein are not of record, and the list itself has little, if any, probative value."); *Lebanon Seaboard Corp. v. R&R Turf Supply Inc.*, 101 USPQ2d 1826, 1829 n.8 (TTAB 2012) ("[A]

---

[11] Levinrad Decl., 12 TTABVUE 4, ¶7.

[12] Opposer's Brief, 26 TTABVUE 11.

Opposition No. 91268314

summary of search results consisting, for example, of a listing of marks, serial or registration numbers, and status, is not an official record of the Office."). We therefore give no consideration to the TESS third-party search results or the testimony of Applicant's counsel as to how the search results were obtained.

### B.   Applicant's Evidentiary Objections

Applicant objects to portions of the declaration testimony of Robert Torkelson, Opposer's Chairman of the Board, as follows:

> In addition to producing and selling the BANDIT wine and wine-based hard seltzer, Sutter Home also owns numerous other wine brands that it sells and distributes in the United States, and also owns several spirits brands that it sells and distributes in the United States, including brands for Tequila, whiskey and rum. Sutter Home also sells and distributes an agave wine-based margarita wine cocktail.[13]

The basis for Applicant's objection: relevance, Fed. R. Evid. 402.[14]

Applicant also objects to the following testimony from Mr. Torkelson:

> [Applicant] … has also encouraged retailers to place advertisements for BANDIT alcohol beverage products in newspapers.[15]

The bases for Applicant's objections: lack of foundation as to personal knowledge and hearsay, Fed. R. Evid. 602, 802.[16]

Applicant further objects to Mr. Torkelson's testimony as follows:

> The BANDIT alcohol beverage products are sold through all outlets where alcohol beverage products are sold including retail outlets, such

---

[13] Torkelson Decl., 7 TTABVUE 192, ¶ 8.

[14] Applicant's Objections to Opposer's Evidence, 28 TTABVUE 2.

[15] Torkelson Decl., 7 TTABVUE 193, ¶ 12.

[16] Applicant's Objections to Opposer's Evidence, 28 TTABVUE 2.

Opposition No. 91268314

as liquor stores and supermarkets, as well as on-premise outlets where alcohol is consumed, such as bars and restaurants.[17]

The bases for Applicant's objections: lack of foundation as to personal knowledge and hearsay, Fed. R. Evid. 602, 802.[18]

"[T]he Board generally does not strike testimony taken in accordance with the applicable rules on the basis of substantive objections; rather, the Board considers such objections when evaluating the probative value of the testimony at final hearing." *Tao Licensing*, 125 USPQ2d at 1047 (quoting *Bd. of Regents v. S. Ill. Miners, LLC*, 110 USPQ2d 1182, 1194 n.19 (TTAB 2014)). We therefore overrule Applicant's objections but will weigh the relevance and strength or weakness of the objected-to testimony, including any inherent limitations therein.

## IV.    Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action, formerly referred to as "standing" by the Federal Circuit and the Board, is an element of the plaintiff's case in every inter partes case. *See Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82 (2021); *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014). To establish entitlement to a statutory cause of action, a plaintiff must demonstrate: (i) an interest falling within the zone of interests protected by the statute, and (ii) a reasonable

---

[17] Torkelson Decl., 7 TTABVUE 193, ¶ 13.

[18] Applicant's Objections to Opposer's Evidence, 28 TTABVUE 3.

belief in damage proximately caused by the registration of the mark. *Corcamore*, 2020 USPQ2d 11277, at \*4 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 109 USPQ2d 2061, 2067-70 (2014)); *Meenaxi Enter., Inc. v. Coca-Cola Co.*, 38 F.4th 1067, 2022 USPQ2d 602, at \*2 (Fed. Cir. 2022); *Spanishtown Enters., Inc. v. Transcend Res., Inc.*, 2020 USPQ2d 11388, at \*1 (TTAB 2020).

Stated another way, a plaintiff is entitled to bring a statutory cause of action by demonstrating a real interest in the proceeding and a reasonable belief of damage. *Australian Therapeutic*, 2020 USPQ2d 10837, at \*3; *Empresa Cubana*, 111 USPQ2d at 1062. There is "no meaningful, substantive difference between the analytical frameworks expressed in *Lexmark* and *Empresa Cubana*." *Corcamore*, 2020 USPQ2d 11277, at \*4. Thus, "a party that demonstrates a real interest in [oppos]ing a trademark under [Trademark Act Section 13, 15 U.S.C.] § 106[3] has demonstrated an interest falling within the zone of interests protected by [the Trademark Act] …. Similarly, a party that demonstrates a reasonable belief of damage by the registration of a trademark demonstrates proximate causation within the context of § 106[3]." 2020 USPQ2d 11277, at \*7.

Opposer established its entitlement to bring and maintain the present opposition by: (1) its assertion with proof of a claim of priority and likelihood of confusion that is not wholly without merit, *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982); and (2) making of record its valid and subsisting

Opposition No. 91268314

registration for the BANDIT mark[19] owned by Opposer on which Opposer bases its Trademark Act Section 2(d) claim, *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

## V.    Priority

Because Opposer relies on its asserted BANDIT registration that has been made of record, and Applicant did not challenge this registration by way of a cancellation counterclaim, in whole or in part, Opposer's priority is not at issue with respect to the mark and goods identified in its registration. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

## VI.    Likelihood of Confusion

Trademark Act Section 2(d) prohibits the registration of a mark that:

> [c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.

Our analysis is based on all of the probative evidence of record. *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*" – noting the factors to be considered). In making our determination, we consider each *DuPont* factor for which there is evidence and argument. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019). Varying weights may be assigned to each *DuPont* factor depending on the evidence presented. *See Citigroup*

---

[19] *See* TSDR record of Opposer's '340 Registration for the BANDIT mark. ONOR, 7 TTABVUE 9-18, Exh. A. *See also*, Torkelson Decl., 7 TTABVUE 192, ¶ 4, asserting Opposer's ownership of '340 Registration for the BANDIT mark.

Opposition No. 91268314

*Inc. v. Cap. City Bank Grp., Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993) ("[T]he various evidentiary factors may play more or less weighty roles in any particular determination.).

In applying the *DuPont* factors, we bear in mind the fundamental purposes underlying Trademark Act Section 2(d), which are to prevent confusion as to source and to protect trademark owners from damage caused by the registration of similar marks for related goods or services that are likely to cause confusion. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 224 USPQ 327, 331 (1985); *see also Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1163 (1995); *DuPont*, 177 USPQ at 566.

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). We discuss below these factors, and the other *DuPont* factors for which there is evidence and argument.

## A.  The Similarity or Dissimilarity of Opposer's Goods vs. Applicant's Goods

We now turn to the comparison of the goods at issue, the second *DuPont* factor. In making our determination regarding the similarity of the goods, we must look to how they are identified in the opposed Applications and Opposer's Registration. *See Stone*

Opposition No. 91268314

*Lion Cap. Partners, LP v. Lion Cap. LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014) (quoting *Octocom Sys., Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) ("[T]he question of registrability of an applicant's mark must be decided on the basis of the identification of goods [or services] set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which the sales of goods are directed.")); *see also Paula Payne Prods. Co. v. Johnson Publ'g Co.*, 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973) ("Trademark cases involving the issue of likelihood of confusion must be decided on the basis of the respective descriptions of goods [or services]").

Further, "the goods … of the parties need not be similar or competitive, or even offered through the same channels of trade to support a holding of likelihood of confusion." *Weider Publ'ns, LLC v. D&D Beauty Care Co.*, 109 USPQ2d 1347, 1356 (TTAB 2014), *appeal dismissed per stipulation*, No. 2014-1461 (Fed. Cir. Oct. 10, 2014). "It is sufficient that the respective goods are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same producer [or other source]." *In re Jump Designs LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006).

Moreover, with respect to likelihood of confusion, the issue is not whether consumers will confuse the products, but rather whether they will confuse the source

Opposition No. 91268314

of those goods. *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1086 (Fed. Cir. 2014) (the similarity or dissimilarity and nature of the goods "considers whether 'the consuming public may perceive [the respective goods and services of the parties] as related enough to cause confusion about the source or origin of the goods and services.'") (quoting *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002) (citing *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000)).

Applicant argues that the parties' marks "are used on widely disparate alcoholic products (tequila v. boxed wines) … as these marks are used in the real world …."[20] Doubling down on this argument, Applicant notes that (i) Opposer has never used its BANDIT mark on any goods other than wines or wine-based hard seltzers, and never with tequilas or other liquors,[21] (ii) Applicant only sells EL BANDIDO YANKEE branded tequilas and has never sold wines or wine-based hard seltzers,[22] (iii) wine and tequila are made from different processes (i.e., fermentation of grapes vs. distillation of agave plants,[23] (iv) Opposer sells its wines in tetra-pak boxes whereas Applicant sells its tequilas in bottles.[24] We have a number of problems with Applicant's arguments.

---

[20] Applicant's Brief, 27 TTABVUE 7.

[21] Applicant's Brief, 27 TTABVUE 13, n.1, 20.

[22] Applicant's Brief, 27 TTABVUE 14, 29.

[23] Applicant's Brief, 27 TTABVUE 14.

[24] Applicant's Brief, 27 TTABVUE 14-15.

Opposition No. 91268314

To begin, as Applicant concedes,[25] the scope of Opposer's registration is quite broad, reciting "alcoholic beverages except beers" as the identified goods. Applicant's "question[ing] of the nonuse of the [BANDIT] mark [as to goods other than wine or wine-based hard seltzers] constitute[s] a collateral attack on … [the] validity [or, at the very least scope, of Opposer's registration], which cannot be entertained in the absence of a counterclaim for its cancellation[,]" *Allstate Ins. Co. v. DeLibro*, 6 USPQ2d 1220, 1223 n.5 (TTAB 1988), whether in whole or in part, Trademark Act Sections 14, 18; 15 U.S.C. §§ 1064, 1068.

Affording Opposer's '340 Registration its proper scope, the recited goods are "alcoholic beverages except beers." The identified goods in the '911 Application are "distilled blue agave liquor," and the goods stated in the '917 Application are "blue distilled agave tequilana weber liquor." We find the respective goods are legally identical because "where the goods in an application or registration are broadly described, they are deemed to encompass 'all the goods of the nature and type described therein ….'" *In re Solid State Design Inc.*, 125 USPQ2d 1409, 1413 (TTAB 2018) (quoting *In re Jump Designs*, 80 USPQ2d at 1374 ); *see also Sw. Mgmt., Inc. v. Ocinomled, Ltd.*, 115 USPQ2d 1007, 1025 (TTAB 2015)).

Even without the presumption that the parties' goods are legally identical (because of how they are identified), Opposer made of record evidence that they are related, including five use-based registrations reciting Opposer's and Applicant's

---

[25] Applicant's Brief, 27 TTABVUE 7.

Opposition No. 91268314

types of goods,[26] *Joel Gott Wines LLC v. Rehoboth Von Gott Inc.*, 107 USPQ2d 1424, 1432 (TTAB 2013) ("[U]se-based, third-party registrations, although not evidence that the marks shown therein are in use or that the public is familiar with them, nonetheless also have probative value to the extent that they serve to suggest that the goods listed therein are of a kind which may emanate from a single source under a single mark."), evidence of two third parties that offer both wine and tequila for sale under the same mark (Costco/KIRKLAND and CHARBAY),[27] and another third party that offers pre-made wine-based cocktails and spirit-based cocktails under the same mark (LIQS).[28] *Hewlett-Packard,* 62 USPQ2d at 1004 ("[E]vidence, such as whether a single company sells the goods and services of both parties, if presented, is relevant to a relatedness analysis ….").

Finally, on Applicant's point that Opposer sells its wines in tetra-pak boxes whereas Applicant sells its tequilas in bottles,[29] "[t]he fact that the respective products of the parties are packaged … different[ly] … is immaterial" since the parties' products are legally identical. *Aloe Creme Labs., Inc. v. Helena Rubinstein, Inc.*, 188 USPQ 515, 517 n.3 (TTAB 1975).

---

[26] ONOR, 7 TTABVUE 57-74, Exh. H.

[27] ONOR, 7 TTABVUE 19-31, Exhs. B-C. Applicant seeks to counter this evidence by making of record evidence that hundreds of products are offered for sale under the KIRKLAND brand, and that the CHARBAY wine and distilled spirits products are offered under separate websites (but, yet, under the same brand). ANOR, 11 TTABVUE 38-754, Exhs. 3-5. Applicant's counter-evidence does not dissuade us from finding that the products are related.

[28] ONOR 7 TTABVUE 126-139, Exh. Q.

[29] Applicant's Brief, 27 TTABVUE 14-15.

Opposition No. 91268314

We find that the goods are legally identical, related, and thus similar under the second *DuPont* factor, therefore strongly weighing in favor of a finding that confusion is likely.

### B.   Similarity or Dissimilarity of the Parties' Trade Channels

The third *DuPont* factor assesses the similarity or dissimilarity of the parties' established, likely-to-continue trade channels. *DuPont*, 177 USPQ at 567. We observe there are no trade channel or purchaser restrictions in Opposer's Registration or the opposed Applications.

As we noted above, the parties' goods are legally identical. Thus, "absent restrictions in the application[s] and registration, [these] goods … are presumed to travel in the same channels of trade to the same class of purchasers." *Hewlett-Packard,* 62 USPQ2d at 1005 (citing *CBS, Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 199 (Fed.Cir.1983)); *Double Coin Holdings, Ltd. v. Tru Dev.*, 2019 USPQ2d 377409, at *6 (TTAB 2019) (same). The purchasers of both parties' goods, of course, are adults who consume or purchase alcohol.

Thus, Applicant's arguments and evidence that its EL BANDIDO YANKEE liquors and Opposer's BANDIT wines are promoted and sold in different retail trade channels, or in different "on-premise" trade channels (i.e., bars and restaurants), are irrelevant.[30]

---

[30] Applicant's Brief, 27 TTABVUE 19; Ernst Decl., 14 TTABVUE 6-7, 13-16, ¶¶ 14-18, Exhs. 20-21.

We find the third *DuPont* factor, presumed overlapping trade channels, weighs in favor of a finding that confusion is likely.

### C.   The Conditions under which and Buyers to whom Sales are Made, i.e. "Impulse" v. Careful, Sophisticated Purchasing

Under the fourth *DuPont* factor, we consider "[t]he conditions under which and buyers to whom sales are made, *i.e.*, 'impulse' vs. careful, sophisticated purchasing." *Du Pont*, 177 USPQ at 567. We are mindful that where, as here, the goods of the parties are legally identical and without limitation as to classes of consumers, we may presume that the targeted classes of purchasers are the same, *In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (finding Board entitled to rely on this legal presumption in determining likelihood of confusion); *Am. Lebanese Syrian Assoc. Charities Inc. v. Child Health Research Inst.,* 101 USPQ2d 1022, 1028 (TTAB 2011), and base our analysis "on the least sophisticated potential purchasers," *Stone Lion*, 110 USPQ2d at 1163.

Opposer argues that "[a]lcoholic beverage purchasers include not only sophisticated purchasers, but also ordinary purchasers with little sophistication[,]" and that "[a]s such, the applicable standard of care to be applied is that which would be exercised by the least-sophisticated consumers."[31] Applicant does not appear to have argued this point in its brief.

According to Applicant's witness, Mr. Ernst, the retail price range of Applicant's tequila charged to consumers is approximately between $39 and $50 per 750 ml.

---

[31] Opposer's Brief, 26 TTABVUE 17-18.

Opposition No. 91268314

bottle. Based on his review of Opposer's wines offered for sale through online and brick-and-mortar retailers, these products appear to be sold at retail in the range of $7 to $10 per 1 liter box, and in the range of $4 to $5 per 500 ml. box.[32] Opposer has not offered any evidence to counter Mr. Ernst's testimony as to the retail price ranges for the parties' products. Based on these price ranges, we find the relative prices of the parties' alcoholic beverage products extend from inexpensive to moderately expensive.

Based on the pricing evidence of record, and without further evidence as to the conditions under which and buyers to whom sales are made,[33] we find the fourth *DuPont* factor to be neutral.

### D.    Strength of Opposer's Mark

Before we evaluate the similarity or dissimilarity of the parties' marks, we first consider the strength of Opposer's asserted BANDIT mark. The fifth *DuPont* factor enables Opposer to prove that its pleaded mark is entitled to an expanded scope of protection by adducing evidence of "[t]he fame of the prior mark (sales, advertising, length of use);" the sixth *DuPont* factor allows Applicant to contract that scope of protection by adducing evidence of "[t]he number and nature of similar marks in use on similar goods." *DuPont*, 177 USPQ at 567.

---

[32] Ernst Decl., 14 TTABVUE 5-6, ¶ 13.

[33] Opposer argues that "[a]s the goods will be ordered by name in a bar under noisy, chaotic conditions[,] small differences in sound will not differentiate the marks." Opposer's Brief, 26 TTABVUE 23. There is no evidence of record to support this argument. "Attorney argument is no substitute for evidence." *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) (quoting *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 76 USPQ2d 1616, 1622 (Fed. Cir. 2005)).

Opposition No. 91268314

Since the strength of Opposer's mark affects the scope of protection to which it is entitled, *Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, at *20 (TTAB 2022), we thus consider the conceptual strength of Opposer's BANDIT mark based on the nature of the mark itself, and we consider its commercial strength based on marketplace recognition of the mark. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength....").

The term "BANDIT" is defined as "an outlaw who lives by plunder especially … a member of a band of marauders".[34] Opposer's BANDIT mark, "having no suggestive or descriptive connotation as applied to … [alcoholic beverages except beers,"] must be considered a strong arbitrary mark for purposes of [Trademark Act] Section 2(d) …." *In re Bercut-Vandervoort & Co.*, 229 USPQ 763, 765-766 (TTAB 1986). An "arbitrary designation [is] deserving of a broad scope of protection against the registration of any mark used for the same or related goods that may tend to diminish its commercial value and consumer acceptance." *Jules Berman & Assoc., Inc. v. Consol. Distilled Prods., Inc.*, 202 USPQ 67, 70 (TTAB 1979).

Apart from the inherent distinctiveness of BANDIT as an arbitrary mark, Opposer argues that "the alcohol consuming public has been widely exposed to … [the] mark for alcoholic beverages and Opposer has successfully prevented the registration and use of other "BANDIT" marks on alcohol …." Therefore, says Opposer, the BANDIT mark "is well known and strong among alcohol beverage consumers[,] and should be

---

[34] Definition of "BANDIT" from MERRIAM-WEBSTER, Durand Decl., 7 TTABVUE 166.

Opposition No. 91268314

afforded a "wide latitude of legal protection[.]"[35] Applicant, in response, argues that "Opposer's evidence related to … [the] purported commercial strength [of its BANDIT mark] is … deficient[,]" lacks "any context for … [its sales and advertising] numbers, such as how these claimed measures of commercial success compare with other wine producers, and regarding the reach of its advertising[,]" thus "undermin[ing] the probative value of … [Opposer's] evidence."[36]

With respect to its commercial strength under the fifth *DuPont* factor, the fame of the prior mark, we must determine where to place Opposer's BANDIT mark on the "spectrum" of marks, which ranges from "very strong to very weak." *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017). The factors that we consider as to whether Opposer's BANDIT mark has acquired commercial strength are:

> [1] the volume of sales and advertising expenditures in connection with the goods sold under the mark[], for example, and other factors such as [2] length of time of use of the mark; [3] widespread critical assessments; [4] notice by independent sources of the products identified by the mark[]; and [5] the general reputation of the products and services.

*Monster Energy Co. v. Lo*, 2023 USPQ2 87, at *22 (TTAB 2023) (citing *Weider Publ'ns*, 109 USPQ2d at 1354).

Missing from Opposer's evidence as to the commercial strength of its BANDIT mark are the following: any critical assessments of BANDIT products; any notices by

---

[35] Opposer's Brief, 26 TTABVUE 27.

[36] Applicant's Brief, 27 TTABVUE 34-35.

Opposition No. 91268314

independent sources of BANDIT products; and any third-party discussion(s) of the general reputation of BANDIT products.

Mr. Torkelson testified to Opposer's unit and dollar sales of BANDIT branded wine and wine-based hard seltzer from 2017 through 2021. He also testified to the amount Opposer spent in marketing, advertising and promoting these products over the same period of time.[37] These sales and advertising figures are confidential, so we only discuss them in general terms. While these figures are substantial, they do not compare with figures in other cases where we found fame. *See, e.g.*, *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1691 (Fed. Cir. 2018) (sales through 75 stores in 25 states and annual advertising expenditures in excess of $40 million supported finding of fame of mark); *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1375, 63 USPQ2d 1303, 1306 (Fed. Cir. 2002) (summarizing sales and advertising figures in several cases in which fame was found). Also, the problem that we have with these figures, as Applicant points out, is that we have no context by which to judge them – such as Opposer's market share or comparative sales and advertising figures for competitors within Opposer's market segment. *Id.* at 1309 ("Raw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading. ... Consequently, some context in which to place raw statistics is reasonable.").

---

[37] Torkelson Decl., 7 TTABVUE 193, ¶¶ 10-11 (public/redacted); 8 TTABVUE 4, ¶¶ 10-11 (confidential).

Opposition No. 91268314

Mr. Torkelson also testified that Opposer has advertised its BANDIT alcohol beverage products in magazines, at trade shows, on the Internet, in retail outlets and through social media outlets like Twitter, Instagram and Facebook; and has encouraged retailers to place advertisements for BANDIT alcohol beverage products in newspapers. Mr. Torkelson additionally testified that Opposer's BANDIT alcohol beverage products are sold in 49 states and the District of Columbia by 88 distributors; and that the products are sold at retail in liquor stores and supermarkets, as well as at on-premise venues (bars and restaurants).[38]

Once again, the concern we have with this evidence is the absence of the "contextual evidence of the type of advertisements and promotions … [Opposer] uses to gain sales." *Omaha Steaks*, 128 USPQ2d at 1690. For example, Opposer did not provide: the names or types of newspapers or magazines in which BANDIT products are advertised, or their circulation; the length of time Opposer has promoted BANDIT products on its social media accounts, or the numbers of followers of those accounts; the number of retailers (whether brick-and-mortar or online), or the number of bars and restaurants, which carry Opposer's BANDIT products. Opposer also did not make of record samples of its advertising so that we could see how its products have been promoted in connection with the mark.

Mr. Torkelson additionally testified that the BANDIT mark has been used in the United States in association with alcoholic beverage products since 2004.[39] Mr.

---

[38] Torkelson Decl., 7 TTABVUE 193, ¶¶ 12-13.

[39] Torkelson Decl., 7 TTABVUE 192, ¶ 5.

Opposition No. 91268314

Torkelson does not state *per se* that this use has been exclusive. However, he does say that Opposer "zealously enforces its trademark rights in the BANDIT mark against similar marks for alcohol beverage products including sending cease and desist letters, filing Opposition and Cancellation proceedings with the Trademark Trial and Appeal Board, and filing complaints in federal court."[40] True, "evidence of successful enforcement frequently is submitted to show strength or fame under the fifth *DuPont* factor[,]" *Monster Energy v. Lo*, 2023 USPQ2d 87, at *44 n.83, but here Mr. Torkelson provided no specifics regarding Opposer's trademark enforcement efforts. At best, we have Opposer's pleading from another Board proceeding involving a third-party in which Opposer was the cancellation Petitioner, as well as the Board's decision in that proceeding. This evidence came from Applicant, not Opposer, and it is mentioned only in passing in Opposer's Brief.[41]

We now turn to Applicant's efforts to show that Opposer's BANDIT mark is weak in connection with the goods for which it is registered (alcoholic beverages, except beers), beginning with the third-party registrations it introduced into the record. "The existence of third-party registrations on similar goods can bear on a mark's conceptual strength. ... Specifically, third-party registrations containing an element that is common to both the opposer's and the applicant's marks can show that that element has a normally understood and well-recognized descriptive or suggestive

---

[40] Torkelson Decl., 7 TTABVUE 193, ¶ 14.

[41] ANOR, 11 TTABVUE 75-121, Exhs. 6-7, referring to *Rebel Wine Co., LLC v. Piney River Brewing Co.*, Cancellation No. 92063917 (TTAB 2018). Opposer's Brief, 26 TTABVUE 26 (same).

Opposition No. 91268314

meaning." *Spireon, Inc. v. Flex Ltd.*, 2023 USPQ2d 737, at *3-4 (Fed. Cir. 2023) (cleaned up, citing *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015) and *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015)).

Moreover:

> Evidence of composite third-party registrations is also relevant because … [s]uch registrations could … show that the [US]PTO, by registering several marks with such a common segment, recognizes that portions of such composite marks other than the common segment are sufficient to distinguish the marks as a whole and to make confusion unlikely. That is, the presence of such a descriptive or suggestive weak segment in conflicting composite marks is not per se sufficient to make confusion likely.

*Spireon,* 2023 USPQ2d 737, at *5 (citing J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:90 (5th ed. 2023)).

Applicant made of record the following active, eight use-based third-party registrations:[42]

---

[42] ANOR, 11 TTABVUE 183-98 and 209-34, Exhs. 24-26 and 28-32. We do not consider the following third-party marks, because the registrations or applications therefor have been cancelled or abandoned: EL BANDIDO NEGRO (Reg. No. 3340854), BURGER BANDIT (Reg. No. 4735916 ), INCHWORM BANDIT (Appln. Ser. No. 90380464) BANDIDOS TAQUERIA B (Reg. Nos. 4878272 and 4878273). *See* 11 TTABVUE 155-160, 173-82 and 199-08, Exhs. 15, 22, 23 and 27. A cancelled or expired registration is not evidence of any presently existing rights in the mark shown or that the registrant ever used the mark. *Action Temp. Servs. Inc. v. Labor Force Inc.*, 870 F.2d 1563, 10 USPQ2d 1307, 1309 (Fed. Cir. 1989); *Monster Energy v. Lo*, 2023 USPQ2d 87, at *4 n.5. Abandoned applications have "'no probative value other than as evidence that the applications [were] filed.'" *Edwards Lifesciences Corp. v. VigiLanz Corp.*, 94 USPQ2d 1399, 1403 n.4 (TTAB 2010) (quoting *In re Phillips-Van Heusen Corp.*, 63 USPQ2d 1047, 1049 n.4 (TTAB 2002)).

Opposition No. 91268314

| Mark | Reg. No. | Goods/Services |
| --- | --- | --- |
| AGAVE BANDIDO | 6333849 | Bar services; Café services; Catering services; Restaurant services; Mobile restaurant services; Pop-up restaurant services, Cl. 43 |
| PIZZA BANDIT | 5208214 | Restaurant and bar services, Cl. 43 |
| LOCOS BANDITOS | 5368710 | Food, namely, tea, tea extracts, tea-based beverages, coffee-based beverages, snack foods in the nature of wheat based snack food, corn based snack food; prepared and packaged meals and food package combinations consisting primarily of pasta or rice, Cl. 30 |
| BURRITO BANDITO | 4240116 | Restaurant; Restaurant services, Cl. 43 |
| FORAJIDO<br><br>(The registration contains the following English translation: "'FORAJIDO' in the mark is 'bandit', 'outlaw' or 'fugitive'.") | 6162478 | Alcoholic beverages, namely, distilled spirits, Cl. 33 |
| <br><br>(BANDITOS CANTINA) | 6182857 | Restaurant, bar and catering services, Cl. 43 |
| SALTY BANDITA<br><br>(The registration contains the following English translation: "'BANDITA' in the mark is 'small band'.") | 5582060 | Restaurants; restaurant services; restaurant, bar, and catering services; restaurant and catering services; catering in fast-food cafeterias, Cl. 43 |

Opposition No. 91268314

| Mark | Reg. No. | Goods/Services |
|---|---|---|
| **Bandidos** (BANDIDOS) (The registration contains the following English translation: " 'BANDIDOS' in the mark is 'BANDITS'.") | 5221290 | Mexican restaurant and bar services, including restaurant carryout and catering services, Cl. 43 |

Since only one of the third-party marks listed in the chart above was registered for alcoholic beverages, collectively the registrations for these marks have little probative value for the purpose of showing that Opposer's BANDIT mark is weak for "alcoholic beverages except beers." *See In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744, 1751 (Fed. Cir. 2017) (disregarding third-party registrations for goods in other classes where the proffering party "has neither introduced evidence, nor provided adequate explanation to support a determination that the existence of I AM marks for goods in other classes, ... support a finding that registrants' marks are weak with respect to the goods identified in their registrations").

Turning now to Applicant's third-party use evidence, "[t]he purpose of introducing evidence of third-party use is 'to show that customers have become so conditioned by a plethora of such similar marks that customers have been educated to distinguish between different [such] marks on the bases of minute distinctions.'" *Omaha Steaks*, 128 USPQ2d at 1693 (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005)). Third-party uses of similar marks for similar goods may bear on the commercial weakness of a mark, *Tao Licensing*, 125 USPQ2d at 1057, and may be

Opposition No. 91268314

"relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection." *Omaha Steaks*, 128 USPQ2d at 1693 (quoting *Palm Bay Imps.*, 73 USPQ2d at 1694).

In this connection, Applicant made of record, via the results of a Google Images search, pictures of bottles with labels on them showing the following 14 third-party uses of the term "BANDIT" as the names, or as part of the names, of alcoholic beverage products apparently unaffiliated with Opposer:[43]

| Name | Usage |
| --- | --- |
| Time Bandit | vodka |
| Bandit's | rum |
| Goofy Bandit | espressotini (a mixed beverage, combining vodka, espresso, Kahlua and crème de cacao) |
| Bandit's | moonshine and coffee moonshine |
| Penguin Bay Blackberry Bandit | blackberry wine |
| The Bandit – the BX Press Cidery | cider |
| Bandit Gypsy Hill Brewing | pale ale |
| Apple Bandit | ciders |
| Bandit Brewing Co. | beers |
| Bandit Queen Barrel | aged peach sour |
| Barrel Bandit | bourbon |
| Bandits Coffee, Apple Pie and Oatmeal Cookie | moonshine |
| Westend The Barrel Bandit | wine |
| Houghton The Bandit Shiraz and Cabernet | wines |

Applicant did not provide the websites underlying the images disclosed by the Google Images search. The problem we have with this evidence is that the bottle

---

[43] Google Images Search Results, ANOR, 11 TTABVUE 148-150, Exh. 13.

Opposition No. 91268314

images say nothing about whether (i) the producer or seller of the product (if there is one) is foreign or domestic, (ii) the images are historical or current, or (iii) the bottles and labels thereon are actual commercial products versus mere mock-ups. *Compare In re Bayer AG*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007) (deeming Google search results that provided very little context of the use of ASPIRINA to be "of little value in assessing the consumer public perception of the ASPIRINA mark"), with *In re Hotels.com L.P.*, 87 USPQ2d 1100, 1105 n.7 (TTAB 2008) (although websites referenced in summary format, sufficient information was included in the summary to understand the context of usage), *aff'd*, 573 F.3d 1300, 91 USPQ2d 1532 (Fed. Cir. 2009). In short, Applicant does not offer any basis for us to believe that the displayed items are currently offered for sale in the United States.

Considering the evidence as a whole, on the "spectrum" of ranging from "very strong to very weak[,]" *Joseph Phelps Vineyards, LLC*, 122 USPQ2d at 1734, we find Opposer's BANDIT mark to be conceptually strong, but only of moderate commercial strength.

### E.   The Similarity or Dissimilarity of the Parties' Marks

We now consider the similarity or dissimilarity of the parties' marks in their entireties as to appearance, sound, connotation and commercial impression. *See Palm Bay Imps.*, 73 USPQ2d at 1691 (quoting *DuPont*, 177 USPQ at 567). "Similarity in any one of these elements may be sufficient to find the marks confusingly similar[,]" *In re Inn at St. John's*, 126 USPQ2d 1742, 1746 (TTAB 2018) (quoting *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. 2019), "but does not **necessarily** do so." *Sure-Fit Prods. Co. v. Saltzson Drapery Co.*,

Opposition No. 91268314

254 F.2d 158, 117 USPQ 295, 297 (CCPA 1958) (emphasis original). In this connection, by "commercial impression" we mean "what the probable impact will be on the ordinary purchaser in the market place …." *T. W. Samuels Distillery, Inc. v. Schenley Distillers, Inc.*, 458 F.2d 1403, 173 USPQ 690, 691 (CCPA 1972). As expected, the parties espouse diametrically opposite theories and arguments as to whether their marks are "virtually identical" to or "altogether dissimilar" from each other for likelihood of confusion purposes when evaluated by the above-named elements.[44]

"The proper test is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *In re i.am.symbolic*, 123 USPQ2d at 1751 (quoting *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (internal quotation marks omitted)). The focus is on the recollection of the average purchaser — here an adult who purchases or consumes alcoholic beverages except beers — who normally retains a general rather than a specific impression of trademarks. *In re Assoc. of the U.S. Army*, 85 USPQ2d 1264, 1268 (TTAB 2007); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975); *see also In re St. Helena Hosp.*, 113 USPQ2d at 1085 ("marks must be considered in light of the fallibility of memory and not on the basis of side-by-side comparison") (cleaned up; citation omitted).

---

[44] Opposer's Brief, 26 TTABVUE 18-25; Applicant's Brief, 24-28; Opposer's Reply Brief, 7-9.

Opposition No. 91268314

So long as we "analyze[ ] the marks as a whole[, i]t is not improper for the Board to determine that, 'for rational reasons,' … [we] give 'more or less weight … to a particular feature of the mark[s]' provided that … [our] ultimate conclusion regarding … likelihood of confusion 'rests on [a] consideration of the marks in their entireties.'" *Quiktrip W., Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 2021 USPQ2d 35, at *2-3 (Fed. Cir. 2021) (quoting *Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 56 USPQ2d 1351, 1354 (Fed. Cir. 2000) and *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985)). In this connection, it is important to remember that no element of the parties' marks can be ignored, including their design elements. *See Massey Junior Coll., Inc. v. Fashion Inst. of Tech.*, 492 F.2d 1399, 181 USPQ 272, 276 (CCPA 1974) (finding that the design portion of the challenged mark, which included a distinctive blue ribbon, created a different commercial impression than the prior mark and that the design portion could not be ignored since the marks must be considered in their entireties).

On the other hand, we do recognize (as we found above) that the goods involved here are legally identical and related. In such circumstances, "the degree of similarity necessary to support a conclusion of likely confusion declines." *Century 21 Real Est. Corp. v. Century Life of Am.*, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992).

### 1.  Applicant's Judicial Estoppel Argument regarding Opposer's Position taken in Another Board Proceeding

Applicant argues that Opposer's position taken in a different proceeding undercuts Opposition present position that the parties' marks in this Opposition are similar in appearance and sound. Applicant states:

Opposition No. 91268314

> In a different proceeding, Opposer took the position that the marks
> BANDOLERO and LA BANDALERA for tequila were "not relevant to
> this case as those are marks distinct in appearance and sound." … Given
> that Bandolero and La Bandalera (which also translate to "Bandit" in
> English), are closer in appearance and sound to BANDIT than are the
> EL BANDIDO YANKEE Marks, this constitutes an implicit admission
> by Opposer that the EL BANDIDO YANKEE Marks too, are dissimilar
> in appearance and sound to BANDIT.[45]

In its Notice of Reliance, Applicant states that these arguments and supporting

evidence (Opposer's pleading and the Board's decision in the other proceeding

involving a third-party) are offered to show that "Opposer's claims are barred, in

whole or in part, by the doctrine of judicial estoppel" and "the dissimilarity of the

marks at issue in this proceeding."[46]

In response, Opposer argues:

> [C]ounsel for Applicant makes much about Applicant's treatment of
> dissimilar, third-party marks in a prior proceeding. … Notably,
> Applicant provided no authority that such evidence has any probative
> value in this proceeding. Opposer acknowledges that it took the position
> that the marks BANDOLERO and LA BANDOLERA were distinct in
> appearance and sound from the BANDIT mark. However, such
> assertions are meaningless here. BANDOLERO and LA BANDOLERA
> are dissimilar from Applicant's EL BANDIDO Marks and Opposer's
> treatment of such marks is irrelevant.[47]

Continuing in a footnote, Opposer says:

> BANDOLERO and LA BANDOLERA are obviously different in sound
> from BANDIT, while BANDIDO sounds like BANDIT with the letter "O"
> added at the end. Furthermore, BANDIT and BANDIDO are similar in

---

[45] ANOR, 11 TTABVUE 75-95 at 90, 11 TTABVUE 96-121 at 108, Applicant's NOR, Exh. 6 at 10:2-3.
ANOR, 11 TTABVUE 75-121, Exhs. 6-7, referring to the position taken by Opposer in *Rebel
Wine Co., LLC v. Piney River Brewing Co.*, Cancellation No. 92063917 (TTAB 2018).

[46] ANOR, 11 TTABVUE 4-5.

[47] Opposer's Reply Brief, 29 TTABVUE 9.

Opposition No. 91268314

> appearance sharing the identical first five letters, differing in only the
> last two letters, unlike the appearance as between BANDIT and
> BANDOLERO and LA BANDOLERA.[48]

Applicant did not assert judicial estoppel as a defense in its Answer. However, as
noted above, Applicant submitted evidence under its Notice of Reliance relevant to
Opposer's purported contrary position in the other Board proceeding (as argued in
Applicant's Brief), Opposer clearly was on notice of the defense, and Opposer
addressed it on the merits in its Reply Brief. We thus consider the issue of judicial
estoppel to have been tried by implied consent, and the pleadings are amended to
conform to the evidence.  Fed. R. Civ. P. 15(b); *WeaponX Performance Prods. Ltd. v.
Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1036  (TTAB 2018).

"[J]udicial estoppel [i]s an equitable principle that holds a party to a position on
which it prevailed, as against later litigation arising from the same facts." *Boston
Chicken Inc. v. Boston Pizza Int'l Inc.*, 53 USPQ2d 1053, 1055 (TTAB 1999)
(citing *Data General Corp. v. GSA*, 78 F.3d 1556, 1565 (Fed. Cir. 1996). In
determining whether judicial estoppel will lie:

> the following factors are considered: (1) judicial acceptance of the
> previously asserted inconsistent position; (2) risk of inconsistent results;
> (3) effect of the pleading party's actions on the integrity of the judicial
> process; and (4) perception that the tribunal has been misled. *Water
> Technologies Corp. v. Calco Ltd.*, 850 F.2d 660, 665-66 , 7 USPQ2d 1097,
> 1101 (Fed. Cir. 1988); *Hybritech Inc. v. Abbott Lab.*, 849 F.2d 1446,
> 1454 , 7 USPQ2d 1191, 1198 (Fed. Cir. 1988). The Federal Circuit also
> requires (5) reliance by the opposing party and (6) prejudice to the
> opposing party's case as a result of the inconsistent
> position. *See Jackson Jordon, Inc. v. Plasser American Corp.*, 747 F.2d
> 1567, 1579-80 , 224 USPQ 1, 10 (Fed. Cir. 1984). Most importantly, (7)
> the party against whom estoppel is invoked must have received some

---

[48] Opposer's Reply Brief, 29 TTABVUE 9, n.2.

Opposition No. 91268314

> benefit from the previously taken position, *i.e.*, won because of
> it. *See Hartley v. Mentor Corp.*, 869 F.2d 1469 , 10 USPQ2d 1138 (Fed.
> Cir. 1989), *citing with approval* Jackson Jordan, *supra; Kraft, Inc. v.
> U.S.*, 30 Fed. Cl. 739, 763 (Ct. Cl. 1994).

*Boston Chicken*, 53 USPQ2d at 1055.

In *Rebel Wine Co., LLC v. Piney River Brewing Co.*, Cancellation No. 92063917
(TTAB 2018), the cancellation proceeding in which Applicant argues Opposer took an
inconsistent position (there, Opposer Rebel Wine was the "petitioner"), the
respondent in that case presented evidence of third-party uses of the marks
BANDOLERO and LA BANDOLERA for alcoholic beverages, among several other
third-party marks, in an effort to weaken the strength of Opposer's BANDIT mark.[49]
Opposer (there, petitioner) argued that BANDOLERO and LA BANDOLERA were
sufficiently different from BANDIT such that they were not relevant.[50] Although
Opposer (there, petitioner) ultimately prevailed in the cancellation proceeding,[51] it
was not successful in discounting the relevance of the third-party marks. In
particular, the Board stated:

> Overall, we find this record insufficient to "show that customers … have
> been educated to distinguish between different … [BANDIT] marks on
> the basis of minute distinctions." *Juice Generation,* 115 USPQ2d at 1674
> (internal quotations omitted). However, Respondent's evidence tends to
> show that the term BANDIT is somewhat suggestive in the alcoholic
> beverage industry. *Id.* at 1675 (third-party use and registrations may
> show that a term carries a suggestive connotation in the industry).
>
> Considering the record in its entirety as to strength, including the
> inherent distinctiveness of BANDIT and its recognition in the boxed
> wine market, counterbalanced by the number and nature of third-party

---

[49] ANOR, 11 TTABVUE 96-121 at 106-07, Exh.  7.

[50] ANOR, 11 TTABVUE 96-121 at 108, Exh.  7.

[51] ANOR, 11 TTABVUE 96-121 at 121, Exh.  7.

Opposition No. 91268314

uses, we accord Petitioner's mark a normal degree of strength overall as to its identified goods in the likelihood of confusion analysis.[52]

Reviewing the judicial estoppel factors summarized in *Boston Chicken* as they apply here: the Board did not accept Opposer's previously asserted position regarding the relevance of the BANDOLERO and LA BANDOLERA marks (among all of the third-party use evidence the respondent proffered in the other proceeding); because Applicant's marks here are different from the BANDOLERO and LA BANDOLERA marks in the prior proceeding, there is not a risk of inconsistent results; we do not observe any effect of Opposer's actions on the integrity of the judicial process; the Board has not been misled; and we do not observe any issue of reliance by or prejudice to Applicant as a result of the positions Opposer took in the prior proceeding versus the positions Opposer is taking here. Importantly, Opposer does not appear have received a benefit from the positions it took in the prior proceeding regarding the relevance of the BANDOLERO and LA BANDOLERA marks. Therefore, we find judicial estoppel inapplicable.

### 2.    Opposer's BANDIT Mark vs. Applicant's EL BANDIDO YANKEE TEQUILA COMPANY BLANCO Composite Mark

BANDIT is the only term in Opposer's mark. Because Opposer's mark is registered in standard characters, we must consider it "regardless of font style, size, or color." *Monster Energy v. Lo*, 2023 USPQ2d 87, at *35 (quoting *Citigroup*, 98 USPQ2d at 1258-59). Opposer could employ the same stylization and color scheme in the display

---

[52] ANOR, 11 TTABVUE 96-121 at 110, Exh. 7.

Opposition No. 91268314

of its mark as is shown for Applicant's composite mark. *Id.* (citing *Cunningham*, 55 USPQ2d at 1847-48).

Applicant's mark is:



The image of the masked person (which, as we discuss in detail below, is the image of "a bandit") and the words "EL BANDIDO" "constitute[] 'the dominant feature[s]' in the commercial impression created by … [Applicant's] mark." Reading from top to bottom, they appear as the first and largest image and words in Applicant's composite mark. *Palm Bay Imps.*, 73 USPQ2d at 1692. They stand out within Applicant's mark, in size, position and shading. That is, the "bandit" image and "EL BANDIDO" appear in the largest design and font size, within the center of the mark, and in the darkest print – such that it most notably catches the consumer's eye. The curved line under the words "EL BANDIDO" creates a subtle separation with the term "YANKEE," dividing the mark into the elements "EL BANDIDO" and the "BANDIT" image on one the hand, and the term "YANKEE" with the other graphical and textual material on the other.

Opposition No. 91268314

As presented, the term "YANKEE" would not be perceived as part of the dominant elements of the mark. This is true not only because of the size and shading differences between "EL BANDIDO" and "YANKEE," and the separation of the words by a curved line, but also because "YANKEE" functions as an adjective, modifying the noun "EL BANDIDO." *See, e.g.*, *Stone Lion*, 110 USPQ2d at 1161 (affirming Board' s finding that the noun LION was the dominant part of applicant's mark STONE LION CAPITAL).

In addition, if the mark is shortened by consumers, they will likely use the term "EL BANDIDO," or simply "BANDIDO," dropping the adjective "YANKEE." The record demonstrates that Applicant itself regularly refers to its products using "EL BANDIDO" and "BANDIDO(S)" on Applicant's website and on its Twitter page.[53] We thus cannot discount "the penchant of consumers to shorten marks." *In re Bay State Brewing Co.,* 117 USPQ2d 1958, 1961 (TTAB 2016). *See, e.g., Hunter Indus., Inc. v. The Toro Co.,* 110 USPQ2d 1651, 1661 (TTAB 2014) (finding "applicant's mark PRECISION would appear to prospective purchasers to be a shortened form of opposer's mark PRECISION DISTRIBUTION CONTROL.").

---

[53] Examples from Applicant's website from Mr. Durand's Decl., 7 TTABVUE 167-83, Exh. 5: are "Break Out the Bandido," "A Few Bandidos Walk into a Bar," "El Bandido Tequila," "Bandidos Drink Responsibly," "Bandidos Give Back," "Bandidos Give Boldly," "Shop Like a Bandido," "Become a Bandido," "Leave a Bandido," "El Bandido," "El Bandido Spirit," "Blushing Bandido," "Fiery Bandido," "Be a True Tequila Bandido," "#BandidoBrigade". Examples from Applicant's Twitter page, Durand Decl., 7 TTABVUE 184-90, Exh. 6: "Bandido and Happy Hour …," "Bandidos Always Ride Shotgun," "Hand Over the Bandido," "Celebrate Labor Day the Bandido Way," "Break Out the Bandido," "Out Here all you need is … an El Bandido to Appreciate the Day".

Opposition No. 91268314

As to meaning and commercial impression, Opposer made of record the MERRIAM-WEBSTER dictionary definition of "BANDIT" as "an outlaw who lives by plunder especially … a member of a band of marauders,"[54] and the results of the COLLINS dictionary online Spanish-to-English translator, translating "EL BANDIDO" as meaning "The Bandit" or "Outlaw."[55] Applicant "accept[s] the translation of BANDIDO into its English equivalent, BANDIT[.]"[56] "BANDIDO" is also an English term meaning "an outlaw especially of Mexican extraction or origin."[57]

"EL" it is not an English term, but would be recognized by English speakers when combined with a term that has the appearance of a Spanish term and has an association with Mexico, as meaning "the." Within the overall context of Applicant's mark as a whole, we afford "BANDIDO" its English meaning, with "EL" giving it a Spanish flair because of the association of Applicant's goods with Mexico. Simply, "EL" is not an unfamiliar word to U.S. consumers (for example, "El Cheapo," "El Paso," "El Dorado," and "El Niño."). *Cf. In re Johanna Farms, Inc.*, 222 USPQ 607,

---

[54] MERRIAM-WEBSTER dictionary definition of "BANDIT," Durand Decl., 7 TTABVUE 166, Exh. 4.

[55] COLLINS dictionary Spanish-to-English translation of "EL BANDIDO," Durand Decl., 7 TTABVUE 159, Exh. 2. See also translation of "el" to "the" from COLLINS dictionaries translator. Durand Decl., 7 TTABVUE 159, Exh. 2. It is well-recognized that the definite article "THE" is insignificant as a source identifier or differentiator between marks. *In re Thor Tech, Inc.*, 90 USPQ2d 1634, 1635 (TTAB 2009); *In re Narwood Prods., Inc.*, 223 USPQ 1034, 1034 (TTAB 1984); *see also In re Central Soya Co., Inc.*, 220 USPQ 914, 916 (TTAB 1984) ("The Spanish article 'La,' which means 'The,' cannot be said to have any distinguishing effect.").

[56] Applicant's Brief, 27 TTABVUE 28.

[57] MERRIAM-WEBSTER definition of "BANDIDO" (https://www.merriam-webster.com/dictionary/bandido, last viewed July 11, 2023).

Opposition No. 91268314

617 (TTAB 1984)"Th[e] commonness of the French definite article [LA] … pervades our commercial vocabulary and the advertising of certain categories of products … abounds in uses of 'la' and 'le.' Consequently, the presence of the article in LA YOGURT is not unique in any American purchaser's experience and, whether translated or not, does not, in our view, transform the generic term 'yogurt' into a term [LA YOGURT] capable of acquiring distinctiveness as a trademark.").

"YANKEE" is an English term meaning "a native or inhabitant of … the U.S."[58] We also do not ignore the terms "TEQUILA," "COMPANY" and "BLANCO." As previously discussed (see footnote 3, *supra*), these terms[59] are disclaimed. They are merely descriptive terms, at best. It is well-settled that disclaimed, descriptive matter may have less significance in likelihood of confusion determinations. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000) ("Regarding descriptive terms, this court has noted that the 'descriptive

---

[58]     MERRIAM-WEBSTER     definition     of     "YANKEE"     (https://www.merriam-webster.com/dictionary/Yankee, last viewed July 18, 2023).

[59] "TEQUILA" is defined as "a Mexican liquor made chiefly from the fermented sap of the blue agave that has been subjected to two separate distillations." MERRIAM-WEBSTER dictionary definition of "TEQUILA," (https://www.merriam-webster.com/dictionary/tequila, last viewed, July 18, 2023). "COMPANY" is defined as "an association of persons for carrying on a commercial or industrial enterprise." MERRIAM-WEBSTER dictionary definition of "COMPANY," (https://www.merriam-webster.com/dictionary/company, last viewed, July 18, 2023). In English, "BLANCO" means "to whiten with Blanco whitening; a substance formerly used to whiten belts or other equipment …." MERRIAM-WEBSTER dictionary definition of "BLANCO," (https://www.merriam-webster.com/dictionary/blanco, last viewed July 18, 2023). Translated from Spanish to English, "BLANCO" means "white" or "to turn white." COLLINS     dictionary     Spanish-to-English     translation     of     "BLANCO," (https://www.collinsdictionary.com/us/translator, last viewed July 18, 2023). The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format. *Threshold.TV Inc. v. Metronome Enters. Inc.*, 96 USPQ2d 1031, 1037 n.14 (TTAB 2010).

Opposition No. 91268314

component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.'"); *In re Code Consultants, Inc.*, 60 USPQ2d 1699, 1702 (TTAB 2001) (disclaimed matter, "while not ignored in the analysis," is often "less significant in creating the mark's commercial impression").

Opposer raises the doctrine of foreign equivalents. Under the doctrine, foreign words from common languages are translated into English to determine the similarity of connotation with English word marks. *See Palm Bay Imps.*, 73 USPQ2d 1696. The doctrine is applied when it is likely that "the ordinary American purchaser would 'stop and translate [the word] into its English equivalent.'" *Id.* (quoting *In re Pan Tex Hotel Corp.*, 190 USPQ 109, 110 (TTAB 1976)); *see also In re Aquamar, Inc.*, 115 USPQ2d 1122, 1127 (TTAB 2015); *In re Thomas*, 79 USPQ2d 1021, 1024 (TTAB 2006). "When it is unlikely that an American buyer will translate the foreign mark and will take it as it is, then the doctrine of foreign equivalents will not be applied." *Palm Bay Imps.*, 73 USPQ2d at 1696.

Opposer argues that the doctrine of foreign equivalents applies here, such that ordinary American purchasers would readily translate "EL BANDIDO" from Spanish to its English equivalent, "THE BANDIT," so as to come to a conclusion of their similarity in meaning and commercial impression.[60] Applicant does not argue this point in its brief. However, as explained further below, we do not believe that the doctrine of foreign equivalents applies here.

---

[60] Opposer's Brief, 26 TTABVUE 24.

Opposition No. 91268314

With respect to likelihood of confusion determinations, the doctrine of foreign equivalents generally has been applied when the wording in one mark is entirely in English and the wording in the other mark or marks is entirely in a foreign language. *See*, *e.g. In re Perez*, 21 USPQ2d at 1076 (ROOSTER vs. EL GALLO); *In re Am. Safety Razor Co.*, 2 USPQ2d at 1460 (TTAB 1987) (GOOD MORNING vs. BUENOS DIAS); *In re Hub Distrib., Inc.*, 218 USPQ 284, 284 (TTAB 1983) (SUN vs. EL SOL).

Here, we have a mix of Spanish and English wording. When one mark contains terms in different languages, "[c]ourt[s] and the Board frequently have found that consumers would not 'stop and translate' marks comprised of terms in multiple languages, often finding that the marks combine the different languages for suggestive purposes to create a certain commercial impression." *In re Taverna Izakaya LLC*, 2021 USPQ2d 1134, at *10 (TTAB 2021) (finding the doctrine of foreign equivalents did not apply as to the mark TAVERNA COSTERA – a "polygot" combining the English word "Taverna" with the Spanish word "Costera").

We note that the terms "BANDIDO," "YANKEE," "TEQUILA," "COMPANY" and "BLANCO" appear in an English dictionary and would be understood without any translation by the ordinary American consumer. Thus, it is inappropriate to apply the doctrine of foreign equivalents in this case, and we find that consumers will take Applicant's composite mark as it is.

As noted, Applicant's mark in the '917 Application also is accompanied by a prominent human image. The application contains the following partial description:

Opposition No. 91268314

"The mark consists of the upper chest, neck and head of a person that is wearing a western hat and bandana which covers the person's nose, mouth, chin and most of the neck …." (the full description of the mark is set out in footnote 3, *supra*). We find that the person in Applicant's mark is a "bandit," and that consumers would view it as such. In support of this finding, we note the results of a Google Images search using the search term "bandit" that Opposer made of record,[61] which show images very similar to the drawing in Applicant's composite mark. The following images disclosed by Opposer's images search are representative:[62]

    

"[I]t is a well[-]established principle of trademark law that a picture or design and the word which describes the design are legal equivalents that must be treated as such …" *Thistle Class Ass'n v. Douglass & McLeod, Inc.*, 198 USPQ 504, 511 (TTAB 1978). We find that: (i) the "bandit" image emphasizes and reinforces the meaning of

---

[61] Durand Decl., 7 TTABVUE 161-63, Exh. 3. Unlike Applicant's previously-discussed Google Images search results of third-party uses of the term "BANDIT" relating to names of alcoholic beverages, the results of Opposer's Google Images "BANDIT" search provide sufficient context for the limited purpose introduced by Opposer. That is, Opposer's search results show images of "bandits." *See In re New York Times Co.*, 2023 USPQ2d 392, at *22 (TTAB 2023) (accepting Google search results where "Applicant has submitted the search results for a narrow purpose, to show merely that consumers recognize its print columns as possessing their own viable and separate existence."); *In re Consumer Protection Firm PLLC*, 2021 USPQ2d 238, at *21 n.28 (TTAB 2021) ("Although it may not be appropriate in other cases, here the [Google] search results, which we consider only for what they show on their face, provide sufficient context such that we afford this evidence a modicum of probative value regarding the positions for which they were cited.").

[62] Results of "BANDIT" Google Images search, Durand Decl., 7 TTABVUE 161-163.

Opposition No. 91268314

the words "EL BANDIDO" as "outlaw," and (ii) the words and design should be taken together and combine to form the overall commercial impression of the mark because they dominate over the other elements of Applicant's mark.

Even finding that consumers will take the wording in Applicant's mark as it is, we find Opposer's mark "BANDIT" and the dominant term "EL BANDIDO" in Applicant's composite mark are similar in meaning of "outlaw," with the design element in Applicant's mark reinforcing this meaning. When we consider Applicant's composite mark as a whole, the additional terms "YANKEE," "TEQUILA COMPANY" and "BLANCO" do not sufficiently distinguish the marks, and thus we find Opposer's mark and Applicant's mark have similar commercial impressions.

In sum, the similarities between Opposer's BANDIT mark and Applicant's EL BANDIDO YANKEE TEQUILA COMPANY BLANCO composite mark, under the first *DuPont* factor, weigh in favor of a finding that confusion is likely. The marks convey the same or a very similar meaning and have very similar commercial impressions. These similarities outweigh any differences in sound or appearance of the marks. *Hancock v. Am. Steel & Wire Co. of N.J.*, 203 F.2d 737, 97 USPQ 330, 332 (CCPA 1953) (the applicant's mark TORNADO displayed in association with a pictorial representation of a whirlwind was found likely to be confused with the prior mark CYCLONE, both used for wire fencing, notwithstanding their differences in appearance and sound).

Opposition No. 91268314

### 3.    Opposer's BANDIT Mark vs. Applicant's Standard Character EL BANDIDO YANKEE Mark

Applicant asserts that the "BANDIT mark is a one-word, two syllable mark; while Applicant's [word] mark[] consist[s] of three separate words, EL BANDIDO YANKEE, containing no identical words, with the exception of 'BANDIDO' translated into English."[63] This argument is unpersuasive. Minutiae such as the number of syllables are not entirely irrelevant, but ultimately they must yield to the overall impression of the respective marks. *In re John Scarne Games, Inc.*, 120 USPQ 315, 315-16 (TTAB 1959) ("Purchasers ... do not engage in trademark syllable counting— they are governed by general impressions made by appearance or sound, or both.").

"EL BANDIDO" as the first words to appear in Applicant's word mark "constitute[] 'the dominant feature' in the commercial impression created by the mark." *Palm Bay Imps.*, 73 USPQ2d at 1692. "EL BANDIDO" also is the dominant feature of Applicant's word mark because it is the noun in the phrase EL BANDIDO YANKEE, with the term "YANKEE" functioning as an adjective, *Stone Lion*, 110 USPQ2d at 1161, and because consumers are likely to shorten Applicant's mark simply to "EL BANDIDO" or just "BANDIDO." *In re Bay State Brewing,* 117 USPQ2d at 1961; *Hunter Indus.,* 110 USPQ2d at 1661. With respect to its word mark application, in actual use Applicant could display "EL BANDIDO YANKEE" in the same manner as Applicant does in its composite mark (discussed above), emphasizing "EL BANDIDO" and minimizing "YANKEE." *Phillips Petroleum Co. v. C. J. Webb,*

---

[63] Applicant's Brief, 27 TTABVUE 27.

Opposition No. 91268314

*Inc.*, 442 F.2d 1376, 170 USPQ 35, 36 (CCPA 1971) ("The drawing in the instant application shows the mark typed in capital letters, and under … the Trademark Rules of Practice this means that … [Applicant's] application is not limited to the mark depicted in any special form.").

"EL," not an English term, would still be recognized by English speakers when combined with a term that has the appearance of a Spanish term and has an association with Mexico, as meaning "the." In the context of Applicant's overall mark, we afford "BANDIDO" its English meaning, with "EL" giving it a Spanish flair (as we did with Applicant's composite mark). "EL" is not an unfamiliar term to U.S. consumers in their everyday vocabulary; and whether or not translated has little significance in forming the commercial impression of Applicant's mark. *Cf. In re Johanna Farms*, 222 USPQ at 617.

In sum, the similarities between Opposer's BANDIT mark and Applicant's EL BANDIDO YANKEE word mark, under the first *DuPont* factor, weigh in favor of a finding that confusion is likely. The marks convey the same or a very similar meaning and have very similar commercial impressions. These similarities outweigh any differences in sound or appearance of the marks. *Hancock v. Am. Steel & Wire*, 97 USPQ at 332.

### F.   Absence of Actual Confusion

The seventh *DuPont* factor is the "nature and extent of any actual confusion, while the eighth *DuPont* factor considers the "length of time during and conditions under which there has been concurrent use without evidence of actual confusion." *DuPont*, 177 USPQ at 567. Applicant argues:

Opposition No. 91268314

> Given that the marks have co-existed in the marketplace since June,
> 2021, a period of almost two years …, if there was a likelihood of
> confusion there surely would have been evidence of at least one
> consumer in the real world being confused between the marks and the
> origin of the products. But there is no evidence of any such actual
> confusion. This lack of evidence speaks volumes..[64]

Opposer responds:

> Applicant's argument as to the lack of actual consumer confusion is also
> unpersuasive. A lack of evidence of actual confusion carries little weight
> because "it is unnecessary to show actual confusion in establishing
> likelihood of confusion." (citation omitted) "Moreover, the lack of any
> occurrences of actual confusion is not dispositive inasmuch as evidence
> thereof is notoriously difficult to come by." (citation omitted).

> Applicant alleges that its EL BANDIDO Marks were first used in
> commerce in June 2021. … However, Opposer filed its Notice of
> Opposition in March 2021, three months before Applicant allegedly
> began using its EL BANDIDO Marks in commerce. Given that this
> Opposition was commenced prior to any use of the EL BANDIDO Marks
> by Applicant, the lack of evidence of actual confusion is meaningless.
> (citation omitted). Therefore, this [D]uPont factor is neutral.[65]

On these points – the presence or absence of actual confusion including the
opportunity for such confusion to occur – we note the opposed Applications are based
on intent-to-use with no Statement of Use (in commerce with or within the U.S.)

---

[64] Applicant's Brief, 27 TTABVUE 20. *See also* Ernst Decl., 14 TTABVUE 9, ¶ 22:

> El Bandido Yankee tequila has been sold to consumers since June 2021. During
> this time period, El Bandido Yankee has sold over 12,000 4.5L cases during
> this launch period across 12 states, including most major spirits markets –
> California, Texas, Illinois, Florida. We have not received any reports of any
> customer, retailer or distributor, or anyone else being confused as to whether
> El Bandido Yankee tequila or its products are affiliated with or associated with
> Bandit Wines. In this regard, nobody has asked me or, to my knowledge,
> anyone else affiliated with El Bandido Yankee, whether we or our tequila
> products are affiliated with or associated with Bandit Wines.

[65] Opposer's Reply Brief, 29 TTABVUE 9-10.

Opposition No. 91268314

having yet been filed. As noted by the parties' evidence and arguments above, Applicant began using its marks in 12 states within the United States in June 2021. The trial in this case (including Opposer's last opportunity to demonstrate actual confusion between the parties' marks and goods) closed in June 2022.[66]  A period of a year. Given the restricted geographical reach and limited period of time during which Applicant's marks have been in use, the absence of actual confusion in this case therefore is understandable.

"The absence of any reported instances of confusion is meaningful only if the record indicates appreciable and continuous use by applicant of its mark[s] for a significant period of time in the same markets as those served by opposer under its mark[]." *Citigroup Inc. v. Cap. City Bank Grp., Inc.*, 94 USPQ2d 1645, 1660 (TTAB 2010), *aff'd*, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011); *Gillette Can. Inc. v. Ranir Corp.*, 23 USPQ2d 1768, 1774 (TTAB 1992). In other words, for the absence of actual confusion to be probative, there must have been a reasonable opportunity for confusion to have occurred. *Barbara's Bakery Inc. v. Landesman*, 82 USPQ2d 1283, 1287 (TTAB 2007).

The absence of any reported instances of confusion therefore is not meaningful in this case. The record does not demonstrate appreciable and continuous use by Applicant of its word or composite marks for a significant period of time in the same markets as those served by Opposer under its BANDIT mark, *Citigroup*, 94 USPQ2d at 1660; *Gillette Can.*, 23 USPQ2d at 1774, such that there would have been a

---

[66] Board trial schedule of April 28, 2021, 5 TTABVUE 2.

Opposition No. 91268314

reasonable opportunity for confusion to have occurred. *Barbara's Bakery*, 82 USPQ2d at 1287.

In any event, evidence of actual confusion is not required to prove a likelihood of confusion. *See Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380  (Fed. Cir. 2002); *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 218 USPQ 390, 395-96 (Fed. Cir. 1983). We therefore find the seventh and eighth *DuPont* factors, the presence or absence of actual confusion under appropriate circumstances, to be neutral in our likelihood of confusion analysis. *Made in Nature*, 2022 USPQ2d 557, at *56-57 (where circumstances demonstrating the parties' overlapping uses of their marks in the same markets are lacking the absence of actual confusion is a neutral factor).

### G.   The Extent of Potential Confusion

The twelfth *DuPont* factor considers "[t]he extent of potential confusion, *i.e.*, whether *de minimis* or substantial." *DuPont*, 177 USPQ 567. Applicant argues that "any potential confusion between the marks would be *de minim*[*i*]*s*" based on the following premises:

- the BANDIT mark has only been used for the sale of wines and wine-based hard seltzers, while the EL BANDIDO YANKEE marks are only used for the sale of tequila.
- EL BANDIDO YANKEE tequila is sold in bottles, whereas BANDIT is a boxed wine product.
- A customer who inadvertently ordered a shot of EL BANDIDO YANKEE tequila when they thought they were ordering a glass of Bandit wine would realize immediately upon receiving their drink that they had not received what

they had ordered. No consumer could possibly receive a shot of tequila and be confused into thinking it is a glass of wine.[67]

Opposer responds:

> Applicant's contention that the extent of potential confusion is *de minimus* is unsupported. Because alcohol beverage products are frequently purchased by the public at large and are available in the general marketplace, the number of overlapping potential purchasers and potential for confusion is substantial. (citations omitted). Given that the goods here are legally identical and travel through the same channels of trade, the extent of potential confusion is substantial. This [*D*]*uPont* factor, therefore, weighs strongly in Opposer's favor.[68]

We already have addressed each of the parties' asserted arguments under the twelfth *DuPont* factor in our above discussions of the other *DuPont* factors. *See Sports Auth. Mich., Inc. v. PC Auth., Inc.*, 63 USPQ2d 1782, 1799 (TTAB 2002) (summarizing the parties' arguments and evidence as to other *DuPont* factors in coming to the conclusion that "the extent of potential confusion is *de minimis*."); *Glamorene Prods. Corp. v. Earl Grissmer Co., Inc.*, 203 USPQ 1090, 1096 (TTAB 1979) ("[T]he ultimate question is whether there is a substantial or only a *de minimis* likelihood of confusion in the future.").

The legal identity of the parties' goods, presumed overlapping trade channels and similarities between their marks support a finding that the potential for confusion is more than *de minimis*, but due to a lack of further evidence (e.g., a survey) we find the twelfth *DuPont* factor is neutral in our overall consideration as to whether confusion is likely.

---

[67] Applicant's Brief, 27 TTABVUE 29-30.

[68] Opposer's Reply Brief, 29 TTABVUE 10.

Opposition No. 91268314

### H.    Weighing the Likelihood of Confusion Factors

Weighing the *DuPont* factors for which there has been evidence and argument in this proceeding, *In re Charger Ventures LLC*, 65 F.4th 1375, 2023 USPQ2d 451, at *7 (Fed. Cir. 2023), we find the parties' respective goods are legally identical, and there is further evidence of record that they are related. The parties' trade channels and target consumers overlap. While Opposer's mark is inherently strong, it is only of moderate commercial strength. The parties' marks share sufficient indicia of similarity such that we find them similar. These are all factors weighing in favor of a finding that confusion is likely. Consumer sophistication, purchasing conditions, the absence of actual confusion, and the extent of potential confusion likely occur in the future are neutral factors based on the evidence (or lack thereof) of record.

Upon our review of the parties' arguments and the record as a whole, and balancing the *DuPont* factors for which there has been evidence and argument, we find that confusion between Applicant's marks as applied to its goods is likely with respect to Opposer's mark as applied to its goods.

**Decision**:

The Opposition as against Application Serial No. 90028911 is sustained with respect to the goods identified in International Class 33. That Application will proceed as to the unopposed goods identified in International Classes 18, 20, 21 and 25. The Opposition as against Application Serial No. 90029117 is sustained.