ROBERT A. RIVAS (State Bar No. 196744)
rrivas@wrslawyers.com
BENJAMIN J. MANDEL (State Bar No. 342091)
bmandel@wrslawyers.com
PAULO A. DE ALMEIDA (State Bar No. 279168)
pdealmeida@wrslawyers.com
WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
11400 West Olympic Boulevard, 9th Floor
Los Angeles, California 90064-1582
Telephone: (310) 478-4100
Facsimile: (310) 479-1422

Attorneys for Plaintiff ROAR SPIRITS, LLC
f/k/a EL BANDIDO YANKEE, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

ROAR SPIRITS, LLC, a Delaware limited liability company, f/k/a EL BANDIDO YANKEE, LLC,

Plaintiff,

vs.

REBEL WINE CO., LLC, a California limited liability company,

Defendant.

Case No. 4:23-cv-04809-HSG
*Judge: Hon. Haywood S. Gilliam Jr.*

**PLAINTIFF ROAR SPIRITS, LLC'S OPPOSITION TO DEFENDANT REBEL WINE CO., LLC'S MOTION FOR SUMMARY JUDGMENT**

**Date: August 15, 2024**
**Time: 2:00 p.m.**
**CrtRm: 2, 4th Floor**

Complaint Filed: September 19, 2023

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 1

A. Plaintiff Roar and its EL BANDIDO YANKEE Tequila .......... 2

B. Defendant Rebel and its BANDIT Boxed Wine .......... 5

C. There are Numerous Other Bandit Marks for Alcoholic Beverages .......... 7

D. New Survey Evidence Conclusively Shows No Likelihood of Confusion .......... 9

III. LEGAL STANDARD .......... 10

IV. STATEMENT OF DISPUTED FACTS .......... 11

V. ARGUMENT .......... 14

A. New Survey Evidence Conclusively Proves No Likelihood of Confusion .......... 14

B. There Is No Likelihood of Confusion Under the *Sleekcraft* Factors .......... 14

1. The Marks are Not Similar .......... 15

2. BANDIT is a Weak Mark .......... 20

3. The Goods are Not Related .......... 22

4. The Marketing Channels are Different .......... 22

5. Degree of Care Exercised by Consumers is Higher for Tequila .......... 23

6. There Has Been No Actual Confusion .......... 23

7. Roar Intended to Adopt its Mark in Good Faith .......... 24

8. There is No Likelihood of Expansion .......... 24

C. Balancing the *Sleekcraft* Factors .......... 24

VI. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 10

*B&B Hardware, Inc. v. Hargis Indus., Inc*., 575 U.S. 138 (2015) .......... 10

*Barbara's Bakery Inc. v. Landesman*, 82 USPQ2d 1283 (TTAB 2007) .......... 23

*Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir.1998) .......... 15

*Giersch v. Scripps Networks, Inc.*, 90 USPQ2d 1020 (TTAB 2009) .......... 21

*GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199 (9th Cir.2000) .......... 15

*In re Aquamar, Inc.*, 115 USPQ2d 1122 (TTAB 2015) .......... 16

*In re Chippendales USA, Inc.*, 622 F.3d 1346 (Fed. Cir. 2010) .......... 20

*In re Coors Brewing Co.*, 343 F.3d 1340 (Fed. Cir. 2003) .......... 21

*In re Omniome*, 2020 USPQ2d 3222, at *3 (TTAB 2019) .......... 21

*In re Thomas*, 79 USPQ2d 1021 (TTAB 2006) .......... 16

*Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150 (9th Cir. 2021) .......... 15

*Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F3d 1363, 116 USPQ2d 1129 (Fed. Cir. 2015) .......... 19

*Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323 (Fed. Cir. 2017) .......... 21

*Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334 (Fed. Cir. 2015) 18, 21

*Keebler Co. v. Murray Bakery Prods.*, 866 F.2d 1386, 9 U.S.P.Q.2d 1736 (Fed.Cir.1989) .......... 24

*Kellogg Co. v. Pack'em Enters.,* 951 F.2d 330, 21 USPQ2d 1142 (Fed.Cir.1991) .......... 24

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157 (2d Cir. 1999) .......... 10

*Network Automation, Inc., v. Advanced Sys. Concepts*, Inc., 638 F.3d 1137 (9th Cir. 2011) .......... 15

*Newsguy, Inc. v. Yomtobian*, No. C 04–0811 CRB, 2004 WL 2944051, at *4 (N.D. Cal. Dec. 20, 2004) .......... 15

*Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369 (Fed. Cir. 2005) ............ 16, 19

*Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066, (TTAB 2011) ...... 19

*Sears Mortg. Corp. v. Ne. Sav. F.A.*, 24 U.S.P.Q.2d 1227 (T.T.A.B. 1992)............ 24

*SEC v. M & A West, Inc.*, 538 F.3d 1043 (9th Cir. 2008) ............ 14

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978 (9th Cir. 2007) ............ 10

*Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150 (4th Cir. 2014)............ 10

*Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807 (9th Cir. 1999) ............ 10

*Zucrum Foods, LLC v. Marquez Brothers, Intern., Inc*., No. C 10-0123 PJH, 2011 WL 2118653, at *3 (N.D. Cal. May 27, 2011) ............ 10

**STATUTES**

15 U.S.C. § 1071(b)(1) ............ 10

15 U.S.C. § 1071(b)(3) ............ 10

Fed. R. Civ. P. 56(c) ............ 10

Fed. R. Civ. P. 56(f)............ 1

**OTHER AUTHORITIES**

Trademark Manual of Examining Procedure (TMEP) § 1207.01(c)(iii) (May 2024),............ 16

**TREATISES**

Schwarzer, Tashima & Wagstaffe, Cal Prac. Guide: Fed. Civ. Pro. Before Trial (The Rutter Group 2008) ............ 10

## I. INTRODUCTION

Plaintiff, ROAR SPIRITS, LLC ("Roar") opposes the Motion for Summary Judgment ("Motion") filed by Plaintiff REBEL WINE CO., LLC ("Rebel"). This Court should deny summary judgment because Rebel has not met its heavy burden of showing the absence of any genuine issue of material fact concerning whether the marks **EL BANDIDO YANKEE** for tequila and **BANDIT** for boxed wine are likely to cause a likelihood of confusion under Section 2(d) of the Lanham Act.

Roar furthermore requests that the Court grant summary judgment dismissing the opposition with prejudice on the ground that Rebel cannot possibly show a likelihood of confusion.[1] The marks EL BANDIDO YANKEE and BANDIT are so dissimilar that confusion is not only unlikely, but impossible. At a *minimum*, there are numerous disputes of material fact precluding summary judgment. Therefore, Rebel's motion should be denied.

## II. FACTUAL BACKGROUND

Roar is seeking *de novo* review of a decision of the Trademark Trial and Appeal Board ("Board") sustaining Rebel's opposition to Roar's two trademark applications for EL BANDIDO YANKEE (word mark) and EL BANDIDO YANKEE TEQUILA COMPANY BLANCO & Design, depicted as follows:




---

[1] *See* Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.").

(the "EL BANDIDO YANKEE" marks), both for tequila,[2] based on a finding of a likelihood of confusion with Rebel's word mark BANDIT covering "alcoholic beverages except beers," which are in fact boxed wines.

Roar submits the Board erred in finding a likelihood of confusion. **EL BANDIDO YANKEE** and **BANDIDO** are highly dissimilar, which can easily be seen in the following side-by-side comparison of the products:

**EL BANDIDO YANKEE tequila** | **BANDIT boxed wine**







When the record is reviewed *de novo* including <u>*new evidence*</u>, there is no likelihood of confusion between these marks.

**A. <u>Plaintiff Roar and its EL BANDIDO YANKEE Tequila</u>**

Launched in 2021, Roar's EL BANDIDO YANKEE tequila was created by two former professional athletes, Jim Bob Morris, a former NFL player who played for the Green

---

[2] The applications cover "distilled blue agave liquor" and "Blue distilled agave tequilana weber liquor" in class 33, which are essentially tequila.

Bay Packers, and Chris Chelios, a former NHL player who played for the Chicago Blackhawks. Declaration of Eric Lanz ("Lanz Decl."), ¶ 4. The name EL BANDIDO YANKEE is a reference to a line from the movie Butch Cassidy and the Sundance Kid in which a character in the film says "Some say it's the Bolivian Bandits, and some say it's the Bandidos Yankees." *Id*.

EL BANDIDO YANKEE is a tequila brand that is uniquely focused on sports. *Id*., ¶ 5. With sports, "we would be able to instantly connect with consumers and get our product into tons of hands immediately. Everyone at a sporting event wants to have fun, and we can help them do that," explains co-founder Jim Bob Morris in an article in *Forbes*. *Id.*, Ex. B. Roar was pouring EL BANDIDO YANKEE tequila just outside the stadium at Super Bowl XVII and up the road at the Waste Management Phoenix Open, a PGA Tour event. *Id.* EL BANDIDO YANKEE has partnered with the NFL, NBA, NHL, MLB, UFC, and NASCAR. *Id*.

In just three years, EL BANDIDO YANKEE has become a very popular tequila, with nearly 30,000 cases (with 6 bottles in each case) sold and revenues in the millions of dollars since 2021. *Id.*, ¶ 6. The business has grown rapidly, with distribution in 16 states and annual sales nearly doubling since 2021. *Id*. El BANDIDO YANKEE has won awards, and there has been extensive media coverage, including numerous articles and interviews about the brand and its founders. *Id.*, Ex. C (WGN Radio interview with Jim Bob Morris discussing the brand, his Native American heritage, commitment to diversity in the workplace, and giving back to the community through charity).

The EL BANDIDO YANKEE mark is comprised of a mixture of Spanish and English words. Specifically, "EL" is a Spanish article which translates into "he" or "the" in English. Declaration of Paulo A. de Almeida ("de Almeida Decl."), Ex. A (dictionary and translation evidence); *see also* Request for Judicial Notice, Ex. A, filed concurrently herewith. ***"EL" is not an English word*** and does not have any relevant meaning other than "he" or "the" as

translated from Spanish into English.[3]

”BANDIDO” is a Spanish word which translates into the English noun “bandit.” *Id.*, Ex. B. “YANKEE” is an English noun meaning “a person from a northern or northeastern state of the United States.” *Id.*, Ex. C. **The full phrase EL BANDIDO YANKEE translated from Spanish into English means “THE YANKEE BANDIT.”** *Id.*, Ex. D. This fictional “yankee” character is prominently depicted on Roar’s distinctive glass bottles as a stylized image of a masked figure wearing a traditional cowboy hat, as follows:







When applied to a Mexican tequila, “Yankee” is intended to be ironic. Lanz Decl., ¶ 7. Consumers would chuckle at the notion of a North American “Yankee” as the ambassador for a tequila, which is a traditionally Mexican spirit. *Id.* As such, they will perceive YANKEE as the dominant and most memorable portion of the mark. *Id*. This is especially true where YANKEE is ironic and humorous when applied to a Mexican tequila, and there is a large “yankee” design on the front of the bottle. *Id.*

Tequila is a distilled spirit liquor, regulated by the CRT in Mexico, that is made from the blue weber agave plant (agave tequilana), using a double (and sometimes triple)

---

[3] English language dictionaries provide “EL” is an abbreviation for “an elevated railway” or “elevation.” *Id*. These abbreviations are obscure. In the context of tequila, consumers are much more likely to translate “EL” into “the.”

distillation process, to create a liquor with a minimum alcohol content to qualify as Tequila in the US of 40% alcohol by volume ("ABV"). *Id.*, ¶ 8. EL BANDIDO YANKEE tequilas are manufactured by a single distillery in Jalisco, Mexico. *Id.* Roar only sells tequila under the EL BANDIDO YANKEE mark and does not have any plans to sell wine. *Id.*

EL BANDIDO YANKEE is sold in numerous large chain store retailers, such as, for example, BevMo, Total Wine and Jewel-Osco as well as by numerous independent, non-chain retail stores. *Id.*, ¶ 9. EL BANDIDO YANKEE tequilas are also sold in numerous restaurants and bars across the United States, including the world-renowned NOBU. *Id.* It is also sold in multiple sports arenas around the country. *Id.* Generally, the price range of EL BANDIDO YANKEE tequila is between approximately $39 and approximately $50 per 750 ml. bottle. *Id.*

In the retail setting, liquors such as, for example, tequila, gin, vodka and whiskey, are generally displayed separately from both wines and beers in retail stores. *Id.*, ¶ 10. Depending on the size of the store, liquors are generally displayed for sale on different shelves from both wines and beers and are often displayed on different aisles or different sections of the store altogether. *Id.* Similarly, on-line retailers of alcohol products typically have liquors listed in a different category on their websites from both wines and beers. *Id.* For example, the home page of the *Bevmo.com* website has different drop-down menus for "Wine," "Spirits," "Beer and Hard Seltzer," and other product categories, to enable customers to search for these various product types by category. *Id.* Many Seven-Eleven-type convenience stores are not even legally allowed to carry spirits such as tequila. *Id.*

**B. <u>Defendant Rebel and its BANDIT Boxed Wine</u>**

Rebel's BANDIT mark is only used for boxed wine. *Id.*, ¶ 11 (Rebel's BANDIT website). Rebel markets the BANDIT wines in tetra-pak boxes to campers, hikers and outdoor enthusiasts. *Id.* (BANDIT wines box depicting mountain range, and including statements "GO EXPLORE," and "1% FOR THE PLANET," as well as a logo for "National Parks of America, Yosemite."). Indeed, the home page of the Bandit Wines website depicts

a backpacker with a BANDIT wine box in the packet of his backpack:




*Id*. Rebel does not appear to have a BANDIT "character" on its boxes or advertising. *Id.*

In contrast with tequila, wines are produced by fermenting grapes, and no distillation process is employed in the manufacture of wines. *Id.*, ¶ 12. Additionally, wines have a far lower alcohol content than distilled liquors, typically ranging between 11% and 15% ABV. *Id*.

BANDIT wines are sold in Seven-Eleven type convenience stores, large drugstore chains such as CVS and Rite-Aid, and gas station-affiliated convenience stores, such as the Extra Mile convenience stores located at many Chevron gas stations. *Id.*, ¶ 13. BANDIT boxed wines are sold at low retail price ranges of $7-$10 per 1 liter box and $4-$5 per 500 ml box. *Id*.

Rebel's Chairman of the Board of Directors, Robert Torkelson, has admitted during his deposition that Rebel has *only* used the BANDIT mark to sell wine. de Almeida Decl., Ex. F ("Torkelson Depo.") at 13, ln. 4-10. He further admitted Rebel does not have any Mexican trademark applications covering tequila or COLA approvals, which are required to produce and sell tequila in the United States. *Id.* at 17-18, 29-30. Rebel clearly has no intention to expand BANDIT into tequila. *Id.*

Mr. Torkelson has also admitted Rebel is not aware of <u>*any*</u> instances of consumer confusion between EL BANDIDO YANKEE and BANDIT:

12 Q Okay. So -- so since your last deposition,
13 have -- to your -- has to your knowledge any confusion

14 existed between the El Bandido Yankee mark and the
15 Bandit mark?
16 [Mr. Torkelson] A **I'm not sure. Confusion from -- from the**
17 **standpoint of the consumer?**
18 Q Correct.
19 [Mr. Torkelson] A **I don't know.**
20 Q And do you know who would know that at Rebel
21 Wine?
22. [Rebel's counsel]: Bob, I mean, let me clarify. Was
23. your question: Are they aware of any?
24. [Roar's counsel]: Correct.
25. **[Roar's counsel] Q Is Rebel Wine aware of any confusion between the**
1 **El Bandido Yankee tequila mark and the Bandit wine mark?**
2 [Mr. Torkelson] A **No.**

*Id.* at 31-32. Likewise, Roar confirms there has never been a single instance of consumer confusion. Lanz Decl., ¶ 14. This is not surprising because the marks are highly dissimilar in appearance, sound, and meaning, and no consumer would ever believe EL BANDIDO YANKEE tequila is associated with BANDIT wine, or vice versa. *Id*. When Roar came up with the name EL BANDIDO YANKEE, it was not aware of Rebel's BANDIT boxed wines. *Id*.

**C. <u>There are Numerous Other Bandit Marks for Alcoholic Beverages</u>**

BANDIT is not a unique mark. Numerous other entities use the mark Bandit or equivalents such as "Bandolero" (meaning "bandit") for the sale of alcoholic beverages, including:

- Bandido de Amores (tequila)
- Bandolero
- Goofy Bandit Espressotini
- Penguin Bay Blackberry Bandit (blackberry wine)

- The Bandit – the BX Press Cidery (cider)
- Bandit Gypsy Hill Brewing (pale ale)
- Barrel Bandit (bourbon)
- Westend The Barrel Bandit (wine)
- Houghton The Bandit Shiraz and Cabernet (wine)
- Apple Bandit (ciders)
- Bandit Brewing (beers) Bandit Queen Barrel Aged Peach Sour
- Time Bandit vodka
- Bandit's Rum
- Bandit's Traditional Moonshine
- Bandit's Coffee Moonshine
- FORAJIDO (mezcal)

Lanz Decl., ¶ 15, Exs. E-T. In addition, there are at least two other registrations for similar marks covering alcoholic beverages at the United States Patent and Trademark Office:

- **BANDOLERO** (meaning "Bandit"[4]), Reg. No. 1,803,376 covering "wines and spirits; namely, tequila" in International Class 33. de Almeida Decl., Ex E (status and title copy of registration); RJN, Ex. E. This registration was not made of record before the Board and it is ***new evidence***.
- **FORAJIDO** (meaning "Bandit"[5]), Reg. No. 6,162,478 covering "Alcoholic beverages, namely, distilled spirits" in International Class 33. *Id*.

Such widespread use and registration shows BANDIT-formative marks are weak and diluted in field of alcoholic beverages.

---

[4] The English translation of "BANDOLERO" in the mark is "bandit," according to the registration.

[5] The English translation of "FORAJIDO" in the mark is "bandit", "outlaw" or "fugitive," according to the registration.

### D. <u>New Survey Evidence Conclusively Shows No Likelihood of Confusion</u>

Recently in May of 2024, Roar engaged Dr. AnnaBelle Sartore to conduct a consumer survey measuring whether there could be a likelihood of confusion between EL BANDIDO YANKEE and BANDIT. Declaration of Dr. AnnaBelle Sartore ("Sartore Decl."), Ex. 1 (expert report) at 1. In the *Eveready* style survey, one hundred twelve (112) qualified participants who recently purchased (or were likely to soon purchase) tequila nationwide were asked a series of open-ended questions designed to test whether they would confuse EL BANDIDO YANKEE with Rebel's BANDIT mark. *Id.*, Ex. 1 at 1. **The results showed *<u>zero</u>* instances of confusion.** *Id.* Dr. Sartore explains:

> Based upon data collected during execution of this pilot survey, no individual respondent expressed a belief that [Rebel] made or put out a tequila under the EL BANDIDO YANKEE word mark, that no individual respondent thought that the EL BANDIDO YANKEE was being made or put out with the authorization, approval or sponsorship of [Rebel], and that no individual respondent thought that EL BANDIDO YANKEE had a business affiliation or business connection with [Rebel]

*Id*. at p 1. Although it was a relatively small "pilot" survey of 112 respondents, given there was no confusion (zero instances), there would be no reason to conduct a follow-up "full study":

> While these results are based on a pilot of only one hundred twelve (112) respondents, unless there is a particular alteration in the environment, it would be my expectation, given the above-described results, that results of a full study (i.e., 200 test cell interviews and 200 control cell interviews) would not be anticipated to vary significantly from that of the pilot.

*Id*. In other words, ***no further investigation is warranted because the survey results clearly showed no likelihood of confusion between EL BANDIDO YANKEE and BANDIT***. Rebel did not engage an expert to conduct an opposing survey. The Sartore survey therefore stands unrebutted and it is highly probative to show no likelihood of confusion.

## III. <u>LEGAL STANDARD</u>

Summary judgment is appropriate only where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is a drastic remedy and is therefore to be granted cautiously: "Neither do we suggest that the trial courts should act other than with caution in granting summary judgment..." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). "Because summary judgment is a 'drastic device,' cutting off a party's right to present its case to a jury, the moving party bears a 'heavy burden' of demonstrating the absence of any triable issue of material fact." Schwarzer, Tashima & Wagstaffe, Cal Prac. Guide: Fed. Civ. Pro. Before Trial (The Rutter Group 2008), ¶14:123, citing *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.,* 182 F.3d 157, 160 (2d Cir. 1999); *see also Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In determining whether Defendants have met their initial burden, the Court must construe all evidence, resolve all ambiguities, and draw all reasonable inferences in favor of . . . the non-moving party. *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816-817 (9th Cir. 1999).

Additionally, this is an action to contest a TTAB decision pursuant to 15 U.S.C. § 1071(b)(1). In a § 1071(b) action, the district court acts as the finder of fact and has authority independent of the PTO to grant or cancel registrations. *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014).; *see also Zucrum Foods, LLC v. Marquez Brothers, Intern., Inc.*, No. C 10-0123 PJH, 2011 WL 2118653, at *3 (N.D. Cal. May 27, 2011) (finding that in a § 1071(b) action, "the district court is an appellate reviewer of facts found by the TTAB and is also a fact-finder based on new evidence introduced to the court."). The parties have the right to admit any new evidence not presented to the PTO that is admissible under the Federal Rules of Evidence and Civil Procedure. *Swatch*, 739 F.3d at 155; *see also* 15 U.S.C. § 1071(b)(3). As Rebel acknowledges, ***when a party presents new evidence***, the district court resolves the issue of registration *de novo* ***<u>without deference to the TTAB decision</u>***. *See B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 144 (2015) (emphasis added).

Here, Roar has introduced ***new evidence***, including:

- A consumer survey demonstrating no likelihood of confusion; Sartore Decl., Ex. 1;
- Deposition testimony from Rebel's own Chairman of the Board, Robert Torkelson, in which he admits Rebel is not aware of any instances of consumer confusion; de Almeida Decl., Ex. F at 31-32.
- English and Spanish dictionary definitions and translations for the words "EL," "BANDIDO," and "YANKEE"; de Almeida Decl., Exs. A-C;
- Translation evidence showing the Spanish phrase "EL BANDIDO YANKEE" means "THE YANKEE BANDIT" in English; *Id.*, Ex D;
- Internet evidence showing widespread use of third-party BANDIT marks for alcoholic beverages; Lanz Decl., ¶ 15, Exs. E-T; and
- Third party registration evidence, including one new registration the Board did not consider, namely, BANDOLERO (meaning "bandit"); de Almeida Decl, Ex. E.

The evidence shows there is no likelihood of confusion. At a minimum, there are numerous issues of material fact precluding summary judgment as explained further below.

## IV. STATEMENT OF DISPUTED FACTS

Upon reviewing the Board's decision *de novo* and the new evidence, the Court should find there is no likelihood of confusion. At a minimum, there are numerous issues of fact precluding summary judgement, including the following:

| **Rebel's Asserted Fact** | **Genuine dispute and Supporting Evidence** |
|---|---|
| There is a likelihood of confusion. Durand Decl., Ex. J at 50. | New survey evidence conclusively shows there is no likelihood of confusion. Sartore Decl., Ex 1. Rebel has also admitted there have not been any instances of confusion. |

| | |
|---|---|
| | de Almeida Decl., Ex. F at 31-32. |
| Consumers will take EL BANDIDO YANKEE "as it is;" and will not "stop and translate"; the doctrine of foreign equivalents should not apply. Durand Decl., Ex. J at 38-39. | Consumers will "stop and translate" EL BANDIDO YANKEE because the literal and direct translation is THE YANKEE BANDIT; the doctrine of foreign equivalents should apply. de Almeida Decl., Exs. A-D (dictionary definitions and translation evidence). |
| EL BANDIDO is the dominant term in Roar's marks. Durand Decl., Ex. J at 36-37. | YANKEE is the dominant and most memorable portion of the mark; Lanz Decl., ¶ 7; de Almeida Decl., Exs. A-D; BANDIDO is weak due to third party use and registration. Lanz Decl., ¶ 15, Exs. E-T (third party uses); de Almeida Decl. (third party registrations). |
| The design components merely emphasize and reinforce the meaning of "EL BANDIDO" as "outlaw." Durand Decl., Ex. J at 42-43. | The designs are dominant because there is a large "yankee" design on the front of the bottle. Lanz Decl., ¶ 7. |
| YANKEE "functions as an adjective, modifying the noun EL BANDIDO" and is therefore entitled to less weight. Durand Decl., ¶ 11, Ex. J at 37. | YANKEE does not "modify" BANDIT. YANKEE is a noun, not an adjective, and should be assigned more weight. de Almeida Decl., Ex. C. |
| The marks are similar such that confusion is likely. Durand Decl., ¶ 11, Ex. J at 43, 45 . | The marks as a whole are highly dissimilar in appearance, sound, and meaning. Lanz Decl., ¶¶ 3, 14. |
| BANDIT is a conceptually strong mark. | BANDIT does not appear to have a |

| | |
|---|---|
| Durand Decl., ¶ 11, Ex. J at 20. | "character" on its boxes or advertising; Lanz Decl., ¶ 11; BANDIT appears to suggest consumers will feel like an "outlaw" and is therefore conceptually "weak" or "slightly weak" at best. |
| BANDIT has "moderate commercial strength." Durand Decl., ¶ 11, Ex. J at 20. | BANDIT is commercially weak due to extensive third party use and registration Lanz Decl., ¶ 15, Exs E-T (third party uses); de Almeida Decl. (third party registrations). |
| The goods are "legally identical" Durand Decl., ¶ 11, Ex. J at 17. | The marks are used on widely disparate alcoholic beverages (tequila and boxed wine); Lanz Decl., ¶¶ 8, 11-12. |
| The goods are presumed to travel in overlapping trade channels. Durand Decl., ¶ 17-18. | The goods are promoted and sold in different trade channels. Lanz Decl., ¶¶ 9, 10-13. |
| The consumers at issue must be presumed to be unsophisticated and the targeted classes of purchasers are the same. Durand Decl., ¶ 11, Ex. J at 18. | EL BANDIDO YANKEE sells for between $39 and $50 per 750 ml. bottle, whereas BANDIT boxed wine sells for about $7 to $10 per 1 liter box, and about $4 to $5 per 500 ml. box; consumers will exercise greater care when purchasing expensive tequila vs low cost, boxed wine. Lanz Decl., ¶¶ 9, 13. |
| Balancing the *Sleekcraft* factors focusing on the purported relatedness of the goods, there is a likelihood of confusion. Durand | The differences between the marks is dispositive of no likelihood of confusion. Lanz Decl., ¶ 3. Additionally, new |

| | |
|---|---|
| Decl., Ex. J at 50. | evidence on the three factors of no actual confusion; Roar's good faith intent in selecting its mark; and no likelihood of expansion weigh in favor of Roar. Torkelson Depo. at 31-32; Sartore Decl., Ex 1; Lanz Decl., ¶ 14. All other factors are disputed. |

## V. ARGUMENT

### A. New Survey Evidence Conclusively Proves No Likelihood of Confusion

First, Roar has submitted *new* consumer survey evidence conclusively showing there is no likelihood of confusion. That survey results showed *zero* instances of confusion between EL BANDIDO YANKEE and BANDIT. ***Rebel did not conduct any opposing consumer survey***. Nor did Rebel bring a *Daubert* challenge or even take Dr. Sartore's deposition. The survey therefore stands unrebutted and demonstrates there is no *possibility* of confusion, much less a likelihood of confusion. Summary judgement should be granted in favor of Roar for at least this reason.

To the extent Rebel attempts to question the weight or credibility of the survey evidence, that is a question that is best left for the finder of fact, and inappropriate for determination on summary judgment. *SEC v. M & A West, Inc.*, 538 F.3d 1043, 1054-55 (9th Cir. 2008) ("summary judgment is singularly inappropriate where credibility is at issue"). At the very minimum, Dr. Sartore's survey creates a dispute of fact as to whether confusion is likely, precluding summary judgment as a matter of law.

### B. There Is No Likelihood of Confusion Under the *Sleekcraft* Factors

In analyzing whether there is a likelihood of confusion, courts will apply eight non-exhaustive factors, known as the *Sleekcraft* factors: (1) the strength of the mark(s); (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) degree of consumer care; (7) the defendants' intent; and (8) likelihood of expansion. *Network Automation, Inc., v. Advanced Sys. Concepts*, Inc.,

638 F.3d 1137, 1145 (9th Cir. 2011) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)).

The *Sleekcraft* analysis is ***highly fact intensive***, and courts will deny motions for summary judgment if there are disputes of material fact regarding any of the *Sleekcraft* factors. *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1169 (9th Cir. 2021) (denying summary judgment finding genuine issues of material fact, explaining "[e]ach of the *Sleekcraft* factors presents a highly factual inquiry that considers competing evidence. So too does balancing these factors to determine, under the totality of the circumstances, whether a likelihood of confusion exists"). Here, applying the *Sleekcraft* factors and **viewing the *new evidence* in the light most favorable to Roar**, **and drawing all reasonable inferences in Roar's favor**, Rebel has failed to carry its burden to establish that no genuine disputes of material fact exist as to a purported likelihood of confusion between EL BANDIDO YANKEE for tequila and BANDIT for boxed wine.

1. The Marks are Not Similar

The *Sleekcraft* factor of the similarity (or dissimilarity) of the parties' marks, is "the most crucial factor in determining the likelihood of confusion." *Newsguy, Inc. v. Yomtobian*, No. C 04–0811 CRB, 2004 WL 2944051, at *4 (N.D. Cal. Dec. 20, 2004) (Breyer, J.) (quoting Golden West Fin. v. WMA Mortgage Servs., Inc., No. C 02–5727 CRB, 2003 WL1343019, at *4 (N.D. Cal. Mar.13, 2003) (Breyer, J.)); see also *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir.2000) (noting that "the similarity of the marks [ ] has always been considered a critical question in the likelihood of-confusion analysis"). In comparing the parties' marks, the court must focus on how each of the marks are perceived by the ordinary consumer in the marketplace, taking into account similarities in the marks' appearance and pronunciation as well as their respective definitions. *See Brookfield*, 174 F.3d at 1054; *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir.1998).

Here, the Board should have first translated "EL BANDIDO YANKEE" into "THE YANKEE BANDIT" before comparing the marks. When the scope of protection afforded

to the weak portion BANDIDO is properly restricted and "THE YANKEE" is considered the dominant portion *after translation*, the marks are so dissimilar such that there is no likelihood of confusion. At a minimum, there are genuine disputes of fact regarding this *Sleekcraft* factor, which precludes summary judgment.

(a) The Board Should Have Applied the Doctrine of Foreign Equivalents

Under the doctrine of foreign equivalents, foreign words from common languages are translated into English to determine the similarity of connotation with English word marks. *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1377, 73 USPQ2d 1689, 1696 (Fed. Cir. 2005). The doctrine is applied when it is likely that "the ordinary American purchaser would 'stop and translate [the word] into its English equivalent.'" *Id.* (quoting *In re Pan Tex Hotel Corp.*, 190 USPQ 109, 110 (TTAB 1976)); *see also In re Aquamar, Inc.*, 115 USPQ2d 1122, 1127 (TTAB 2015); *In re Thomas*, 79 USPQ2d 1021, 1024 (TTAB 2006). If the translation evidence shows that the English translation is unambiguously literal and direct, with no other relevant connotations or variations in meaning, the doctrine has generally been applied.[6] *See In re Aquamar, Inc.*, 115 USPQ2d 1122, 1126-28 (TTAB 2015) (applying foreign equivalents doctrine after finding that Spanish is a common language in the U.S. and that ordinary purchasers would stop and translate mark MARAZUL into English based on evidence showing "mar azul" means "blue sea").

As to Roar's EL BANDIDO YANKEE design mark, the Board found:

> [w]e note that the terms "BANDIDO," "YANKEE,"

[6] "The Board has yet to apply the doctrine in a published decision where the wording in one or more of the marks being compared consists of a combination of English and foreign-language words or terms. In such a case, the issue would likely remain whether the ordinary American purchaser would stop and translate these combined-language marks. The sufficiency of the translation evidence, the nature of the combined foreign and English wording (i.e., whether the wording is arbitrary, suggestive, generic, etc.), and any other relevant facts and evidence should be considered in these cases." Trademark Manual of Examining Procedure (TMEP) § 1207.01(c)(iii) (May 2024), available at https://tmep.uspto.gov/RDMS/TMEP/current.

> "TEQUILA," "COMPANY" and "BLANCO" appear in an English dictionary and would be understood without any translation by the ordinary American consumer. Thus, it is inappropriate to apply the doctrine of foreign equivalents in this case, and **we find that consumers will take Applicant's composite mark as it is**.

Durand Decl., Ex. J at 41 (emphasis added). However, the Board erred in assuming consumers will take Applicant's composite mark[7] "as it is" and should have applied the doctrine of foreign equivalents and translated *before* comparing the marks.

**Roar has introduced *new evidence* demonstrating the literal and direct translation of EL BANDIDO YANKEE is "THE YANKEE BANDIT":**

- "EL" is a Spanish article meaning "the" or "he" in English. de Almeida Decl., Ex. A. "EL" is in the Spanish dictionary, but not the English dictionary. The Board erred in disregarding the fact that "EL" is a Spanish word and assuming consumers would not "stop and translate" this word upon encountering it.
- "BANDIDO" is a Spanish word, not an English word. *Id.*, Ex. B. Spanish dictionaries contain "bandido" and a translation to "bandit." *Id*. English dictionaries note the "origin" and "etymology" of "bandido" is Spanish (or Italian). Likewise, the combination EL BANDIDO is a Spanish phrase which translates into "the bandit." *See id*. EL BANDIDO is not an English language phrase.
- When the word YANKEE is added after EL BANDIDO, **the full phrase EL BANDIDO YANKEE translates from Spanish into the English as "THE YANKEE BANDIT."** There is no other intelligible interpretation of the phrase "El Bandido Yankee." For example, consumers will not perceive the mark as "*the bandit yankee*," which would not make any sense, even in English.

**Because the translation is literal and direct, consumers encountering the mark will**

---

[7] The Board discussed the doctrine of foreign equivalents with respect to the design mark, but not the word mark EL BANDIDO YANKEE.

**"stop and translate" the mark into English. Therefore, the doctrine of foreign equivalents should apply, and the marks should be compared as "BANDIT" and "THE YANKEE BANDIT"** ***after translation***. At a minimum, there are genuine issues of material fact as to (1) whether consumers would stop and translate the marks, and therefore whether the doctrine of foreign equivalents should apply; (2) what is the English translation of EL BANDIDO YANKEE?

(b) YANKEE is Dominant

After translation, THE YANKEE is the first and dominant portion of the mark, not BANDIDO. In comparing a composite mark, the court is not precluded from considering dominant "components of a mark"... as long as the court "heed[s] the common sense fact that message of a whole phrase may well not be adequately captured by a dissection and recombination." *Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334, 1340-1341 (Fed. Cir. 2015) (also acknowledging that "more weight should be given to the dominant part of the marks").

Here, *after translation*, the two words "THE YANKEE" are the first and most significant words impressed into consumers' memories. **Consumers will chuckle at the idea of a Northeastern American "yankee" tequila and remember the YANKEE portion the most. Thus, YANKEE, not BANDIDO is dominant.** At a minimum, there is a genuine dispute of fact as to whether YANKEE or BANDIDO is dominant, given YANKEE appears first in the mark after translation (i.e., THE YANKEE BANDIT).

(c) YANKEE does Not "Modify" BANDIT

The Board also erred in finding YANKEE "functions as an adjective" modifying EL BANDIDO. The word "Yankee" is a noun, not an adjective. Almeida Decl., Ex C (dictionary definition). The subject of the mark is THE YANKEE BANDIT which is featured prominently in the design on the front of the tequila bottles. The concept of a North "American" or "yankee" as branding for tequila - a traditionally Mexican spirit - is ironic. **Consumers will focus on YANKEE as the most memorable portion, chuckling at the irony of a "yankee" branded Mexican tequila.** There is *no evidence* suggesting YANKEE

"functions as an adjective, modifying the noun "EL BANDIDO." Upon *de novo* review, and in considering the new dictionary definitions and translation evidence, the Court should find that "YANKEE" is highly distinctive and dominant. At a bare minimum, this is a disputed fact, precluding a finding of summary judgment.

(d) BANDIDO is Weak and Weighs Less in the Analysis

The Board also erred in assigning more weight to the term BANDIDO in Roar's mark. BANDIDO is clearly weak and diluted due to widespread third-party use and registration. **There are at least sixteen (16) third-party uses of marks that consist of or include BANDIT (or exact translations such as BANDOLERO and FORAJIDO) for alcoholic beverages**. Lanz Decl., ¶ 15. Exs. E-T. **There are also at least two other registrations for similar marks at the USPTO**. de Almeida Decl., Ex. E.

"Evidence of third-party use of similar marks on similar goods is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection." *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin*, 396 F.3d 1369, 73 USPQ2d 1689, 1693 (Fed. Cir. 2005) (citation omitted). Internet printouts "on their face, show that the public may have been exposed to those internet websites and therefore may be aware of the advertisements contained therein." *Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066, 1072 (TTAB 2011). The Federal Circuit has held that "extensive evidence of third-party use and registrations is powerful on its face, even where the specific extent and impact of the usage has not been established." *See Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015) (emphasis added) (citing *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015).

**As a weak term, BANDIDO should be afforded less weight than YANKEE**. The Court should find YANKEE is therefore the dominant portion of the mark. At a minimum, there is a genuine dispute whether YANKEE or BANDIDO is dominant, which precludes summary judgment.

(e) The "Yankee" Design is Dominant

YANKEE is not the only dominant portion of the mark. Roar's "Yankee" character, shown front and center on the bottle, is prominently placed and consumers will notice this immediately upon encountering the goods. **Thus, the designs are also dominant.** At a minimum, there is a factual dispute regarding the dominance of THE YANKEE and the design components vs. the wording "EL BANDIDO," which is weak and therefore weighs less in the analysis.

(f) The Marks As a Whole are Dissimilar

As a whole, the marks are highly dissimilar in appearance, sound, and meaning. EL BANDIDO YANKEE contains three separate words, and visual impressions are different owing to the spellings. Roar's design mark also contains detailed design elements which change the marks visually. Roar's mark also begins with "EL" and contains YANKEE, neither of which are present in Rebel's mark BANDIT. The marks are pronounced differently, and in different languages for the most part. Thus, they are different in sound. Last, nothing in Rebel's BANDIT mark connotes a Northeastern American "yankee" and the overall meanings are dissimilar. When they are compared ***in their entireties*** – without dissecting BANDIDO - the marks are highly dissimilar in appearance, sound, and meaning. There are, at a minimum, genuine disputes regarding these facts, any one of which precludes summary judgment.

2. BANDIT is a Weak Mark

The next *Sleekcraft* factor assesses the strength of the marks. In determining the strength of a mark, courts consider its inherent strength, based on the nature of the mark itself, and, if there is evidence in the record of marketplace recognition of the mark, its commercial strength. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 1353-54 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength (secondary meaning)").

(a) BANDIT is Suggestive and Conceptually Weak

Rebel's BANDIT appears to be a suggestive mark and conceptually weak. BANDIT

suggests the consumer will feel like a "bandit" - perhaps getting a "steal" of a deal when they purchase this low-priced wine in a box. *See In re Omniome*, 2020 USPQ2d 3222, at *3 (TTAB 2019) (citing *Earnhardt v. Kerry Earnhardt, Inc.*, 864 F.3d 1374, 123 USPQ2d 1411, 1413 (Fed. Cir. 2017)) ("a mark is suggestive if it 'requires imagination, thought, and perception to arrive at the qualities or characteristics of the goods'"); *See Giersch v. Scripps Networks, Inc.*, 90 USPQ2d 1020, 1025-26 (TTAB 2009) (DESIGNED2SELL for providing staging managers "to improve the residence's selling potential" found highly suggestive). Suggestive marks are "weak" and entitled to only a limited scope of protection. *Id*.

Unlike Roar's tequila which has a "yankee" character or mascot, Rebel does not have any "bandit" character representing the brand. Rebel's mark therefore appears to be suggestive of the consuming purchaser, not of any characteristic of the product itself. Given the widespread use of other similar marks, the term BANDIT appears somewhat suggestive in the alcoholic beverage industry. *Juice Generation, supra,* at 1675 (third-party use and registrations may show that a term carries a suggestive connotation in the industry). Therefore, the Board erred in finding BANDIT is "conceptually strong." **As a suggestive term, BANDIT is of "weak" or "moderate" conceptual strength at best.** At a minimum, the conceptual strength of the mark is in dispute, precluding summary judgment.

(b) BANDIT is Commercially Weak

The Board also erred in finding BANDIT has "moderate" *commercial* strength. "[T]he strength of a mark is not a binary factor, but varies along a spectrum from very strong to very weak." *In re Coors Brewing Co.*, 343 F.3d 1340, 1345 (Fed. Cir. 2003). *See also Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 1325 (Fed. Cir. 2017).

As discussed above, there are at least 16 third party uses of BANDIT-formative (or equivalent) marks for alcoholic beverages, and at least two (2) other registrations for similar marks at the USPTO. **Consumers are accustomed to encountering BANDIT-formative marks for such goods and will distinguish source based on even minute differences between them**. Based on the entirety of the record upon *de novo* review, the Court should

find BANDIT is "weak" or at best "slightly weak." BANDIT is therefore entitled to a narrower scope of protection, which weighs against a finding of a likelihood of confusion. At a minimum, the strength or weakness of BANDIT is heavily disputed and should not be decided on summary judgment.

3. <u>The Goods are Not Related</u>

The next *Sleekcraft* factor looks at the relatedness of the goods. Rebel relies on the breadth of the goods identification in its registration, but the Court should at least take into consideration the real life, appreciable differences between tequila and boxed wine, including their relative alcohol content, manner of production, taste, appearance, and packaging – all of which are still relevant to show that confusion is unlikely. At a minimum, the purported relatedness of tequila and boxed wine is a disputed fact which precludes summary judgment.

4. <u>The Marketing Channels are Different</u>

The next *Sleekcraft* factor assesses whether there is any overlap in the marketing channels. Rebel argues there is a "presumption" that tequila and boxed wine are sold in the same channels of trade. However, Roar has submitted evidence showing the goods are sold in different places. For example. EL BANDIDO YANKEE is sold in numerous large chain store retailers, such as, for example, BevMo, Total Wine and Jewel-Osco as well as by numerous independent, non-chain retail stores; and in restaurants such as the world-renowned NOBU; and in bars and sports arenas. Lanz Decl., ¶ 9. In contrast, BANDIT wines are sold in Seven-Eleven type convenience stores, large drugstore chains such as CVS and Rite-Aid, and gas station-affiliated convenience stores, such as the Extra Mile convenience stores located at many Chevron gas stations. *Id.*, ¶ 13. **Consumers will not encounter the marks in the same places and would have no opportunity to confuse them.** Roar submits this evidence is sufficient to overcome the presumption that all alcoholic beverages of the types at issue are sold in the same marketing channels. This factor weighs against a finding of a likelihood of confusion, or is at least in genuine dispute.

5. Degree of Care Exercised by Consumers is Higher for Tequila

The next *Sleekcraft* factor assesses the degree of care exercised by consumers when purchasing the goods. Rebel argues there is a presumption consumers will exercise the same degree of care when purchasing tequila and boxed wine. However, Roar's tequila has a much higher price point ($39 and $50 per 750 ml. bottle) than Rebel's boxed wine ($7 to $10 per 1 liter box, and in the range of $4 to $5 per 500 ml. box). Lanz Decl., ¶ 9. **Consumers will exercise more care in purchasing Roar's high quality, imported tequilas, which are more expensive.** "[W]hen the goods are expensive, the buyer can be expected to exercise greater care in his purchases . . . ." *Sleekcraft, supra,* 599 F.2d at 353. The Board acknowledged the "moderately expensive" price of Roar's tequila compared to Rebel's "inexpensive" boxed wine and found this factor to be "neutral." Durand Decl., Ex. J at 19. However, Roar submits the evidence of different pricing weighs *against* a finding of a likelihood of confusion, or is at least in genuine dispute.

6. There Has Been No Actual Confusion

The next *Sleekcraft* factor inquires whether have been any instances of actual consumer confusion. **The parties *agree* that there have been no instances of actual confusion.** Torkelson Depo., at 31-32; Lanz Decl., ¶ 14. Moreover, Dr. Sartore's consumer survey, which showed *zero* instances of confusion, reflects this marketplace reality. Sartore Decl., Ex 1. The absence of any confusion is particularly notable because the parties have aggressively promoted their respective brands nationwide for nearly three (3) years without any issues. EL BANDIDO YANKEE's business has grown substantially – with sales nearly doubling since inception and almost 30,000 cases sold in 16 states – and millions of consumers have been heavily exposed to both brands. **The fact that there has been no confusion after years of co-existence in the marketplace – despite ample time and opportunity for such confusion to occur – is compelling.** *Barbara's Bakery Inc. v. Landesman*, 82 USPQ2d 1283, 1287 (TTAB 2007) (for the absence of actual confusion to be probative, there must have been a reasonable opportunity for confusion to have occurred). Rebel's repeated predictions of a "likelihood of confusion" have failed to materialize and

there is no indication that confusion could *ever* occur. This factor weighs in Roar's favor, and is highly probative of an absence of a likelihood of confusion.

7. Roar Intended to Adopt its Mark in Good Faith

The last *Sleekcraft* factor assesses the defendant's intent in selecting the mark. There is no evidence of bad faith or suggesting Roar intended to select a purportedly similar mark. Roar adopted its mark in good faith with no knowledge of Rebel's BANDIT mark. Lanz Decl., ¶ 14. Rebel does not contend otherwise. This factor, which the Board did not consider, clearly weighs *against* a finding of a likelihood of confusion.

8. There is No Likelihood of Expansion

The last *Sleekcraft* factor assesses whether there is a likelihood of expansion of the parties' goods offerings. Rebel has admitted it does not have any Mexican trademark applications covering tequila or COLA approvals, which are required to produce and sell tequila in the United States. Torkelson Depo at 17-18, 29-30. **Rebel clearly has no intent to expand into BANDIT tequila. Furthermore, Roar has no intention to sell EL BANDIDO YANKEE wine**. Lanz Decl., ¶ 8. It is clear that neither party has any intention to "expand" into the other party's line of goods. This factor, which the Board did not consider, clearly weighs *against* a finding of a likelihood of confusion.

**C.** Balancing the *Sleekcraft* Factors

One factor may be dispositive in a likelihood of confusion analysis, especially when that single factor is the dissimilarity of the marks. *See, e.g., Kellogg Co. v. Pack'em Enters.*, 951 F.2d 330, 332–33, 21 USPQ2d 1142, 1144–45 (Fed.Cir.1991) (stating that "[w]e know of no reason why, in a particular case, a single *DuPont* factor may not be dispositive" and holding that "substantial and undisputed differences" between FROOTEE ICE and elephant design and FRUIT LOOPS justified a conclusion of no likelihood of confusion on summary judgment); *Keebler Co. v. Murray Bakery Prods.*, 866 F.2d 1386, 1388, 9 U.S.P.Q.2d 1736, 1739 (Fed.Cir.1989) (agreeing with the Board that the "more important fact for resolving the issue of likelihood of confusion ... is the dissimilarity in commercial impression between the marks"); *Sears Mortg. Corp. v. Ne. Sav. F.A.*, 24 U.S.P.Q.2d 1227 (T.T.A.B. 1992)

(dissimilarity between the marks APPROVAL PLUS and APPROVALFIRST dispositive). **Roar submits the EL BANDIDO YANKEE marks and BANDIT are so highly dissimilar that this single *Sleekcraft* factor is dispositive.** The overall differences between the marks are so great such that confusion is unlikely, even without assessing the other factors.

In any event, many of the other factors weigh in favor of a finding of no likelihood of confusion, including: the weakness of the BANDIT mark; no evidence of actual confusion; the differences between the goods; different marketing channels; the different degree of care consumers exercise when purchasing expensive tequila and low cost wine; Roar's intention to adopt its mark in good faith; and no likelihood of the parties' expansion into each other's line of products.

**Moreover, in the underlying case, the three factors of no actual confusion, Roar's intent in selecting its mark, and no likelihood of expansion were not before the Board. New evidence on these factors tips the balance in Roar's favor.** The Court should find these additional factors – together with the clear differences between the marks – compels a finding of no likelihood of confusion. At a minimum, there are disputes of fact relating to how the *Sleekcraft* factors should be balanced, which precludes summary judgment.

## VI. CONCLUSION

For the foregoing reasons, Roar respectfully requests that Rebel's motion be denied. In addition, the Court should find there is no likelihood of confusion and enter summary judgment in favor of Roar dismissing the opposition with prejudice.

DATED: July 25, 2024

WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP

By: /s/ Paulo A. de Almeida
PAULO A. DE ALMEIDA
Attorneys for Plaintiff ROAR SPIRITS, LLC f/k/a
EL BANDIDO YANKEE, LLC