1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    ROAR SPIRITS, LLC,                    Case No. 23-cv-04809-HSG

8                    Plaintiff,            **ORDER GRANTING DEFENDANT'S
                                           MOTION FOR SUMMARY
9            v.                            JUDGMENT, GRANTING IN PART
                                           AND DENYING IN PART
10   SUTTER HOME WINERY, INC.,             PLAINTIFF'S REQUEST FOR
                                           JUDICIAL NOTICE AND
11                   Defendant.            OVERRULING PLAINTIFF'S
                                           OBJECTIONS TO DEFENDANT'S
12                                         REPLY EVIDENCE**

13                                         Re: Dkt. Nos. 35, 38, 41

14

15           Pending before the Court are Defendant Sutter Home Winery, Inc.'s ("Defendant") motion

16   for summary judgment and associated motion to seal.  Dkt. Nos. 35 ("Mot."); 37 ("Opp."); and 39

17   ("Reply").  Plaintiff Roar Spirits ("Plaintiff") filed an associated request for judicial notice and

18   objections to Defendant's reply evidence.  Dkt. Nos. 38, 41.  For the following reasons,

19   Defendant's motion for summary judgment (Dkt. No. 35) is **GRANTED**, Plaintiff's request for

20   judicial notice is **GRANTED IN PART** and **DENIED IN PART** (Dkt. No. 38) and Plaintiff's

21   objections to Defendant's reply evidence (Dkt. No. 41) are **OVERRULED**.

22   **I.      BACKGROUND**

23           The present matter stems from a decision by the Trademark Trial and Appeals Board

24   ("TTAB") sustaining Defendant's objections to Plaintiff's trademark applications.  Mot. at 11.[1]

25   Plaintiff is a tequila manufacturer with a single distillery in Jalisco, Mexico.  Dkt. No. 1

26   ("Compl.") ¶ 15.  On June 30, 2020, Plaintiff filed two trademark applications: (1) U.S.

27   _____

28   [1] For ease of reference, the Court refers to the PDF pages rather than the document's internal
     pagination unless otherwise noted.

United States District Court
Northern District of California

Application Serial No. 90028911, which seeks to register the standard character word mark "EL BANDIDO YANKEE" (the "Word Mark") for "distilled blue agave liquor" in International Class 33, and (2) U.S. Application Serial No. 90029117, which seeks to register the composite mark "EL BANDIDO YANKEE TEQUILA COMPANY BLANCO" (the "Composite Mark") for "blue distilled agave tequilana weber liquor" in International Class 33 (collectively, the "EL BANDIDO YANKEE Applications").  Dkt. No. 1-1 ("TTAB Decision") at 51.



Defendant manufactures boxed wines and wine-based seltzers and is the owner of U.S. Trademark Registration No. 3974340 (the "BANDIT Registration") for the mark "BANDIT" (the "BANDIT Mark") for "[a]lcoholic beverages except beers" in International Class 33.  *See* Mot. at 9–10, Compl. ¶ 2.  The BANDIT Registration issued on June 7, 2011.  Compl. ¶ 2.

Defendant opposed registration of Plaintiff's marks under 15 U.S.C. § 1052(d), alleging that the marks "as applied to the goods identified in [Plaintiff's] [a]pplications in International Class 33, so resemble [Defendant's] standard character BANDIT Mark . . . as to be likely to cause confusion, mistake or deception."  TTAB Decision at 3–4.  The TTAB undertook a likelihood of confusion analysis and made findings on eight of the thirteen *DuPont* factors.  *See id.*[2]

---

[2] The thirteen *DuPont* factors are: (1) the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression; (2) the similarity or dissimilarity and nature of the goods or services as described in an application or registration or in

United States District Court
Northern District of California

United States District Court
Northern District of California

In its case-in-chief, Defendant introduced evidence including (1) a Notice of Reliance on Defendant's BANDIT Registration, screen captures of third-party websites, articles published online, third-party trademark registrations, and trademark applications filed by Plaintiff containing the term BANDIT; (2) a declaration from Defendant's counsel with dictionary definitions and screen captures of Plaintiff's website and Plaintiff's Twitter account; and (3) a declaration from Robert Torkelson, the chairman of Defendant's Board of Directors. *Id.* at 5. Plaintiff objected to portions of the declaration testimony from Mr. Torkelson on grounds of relevance, lack of foundation as to personal knowledge, and hearsay. *Id.* at 9–10. Plaintiff's objections were overruled. *Id.*

In Plaintiff's case-in-chief, Plaintiff introduced evidence including (1) a Notice of Reliance on dictionary definitions, captures of third-party websites, a pleading and TTAB decision from a separate matter, results from a Google image search, search results from the USPTO's Trademark Electronic Search System ("TESS"), and third-party trademark applications and registrations for marks containing the terms "bandido(s)," "bandit," "bandito(s)," "forajido" and "patron"; (2) a declaration from Plaintiff's counsel "attesting to online searches he conducted"; and (3) a declaration from Jeffrey Ernst, Plaintiff's brand consultant, with pictures of both parties' products. *Id.* at 5–6. Defendant objected to Plaintiff's reliance on search results from TESS and portions of counsel's declaration testifying to "the manner of his search by which he obtained the[] TESS results" based on Plaintiff's failure to comply with the required procedure under 37 C.F.R. § 2.122(e) and (g). *Id.* at 7–9. The TTAB sustained Defendant's objections and "g[a]ve no consideration to the TESS third-party search results or the testimony of [Plaintiff's] counsel as to how the search results were obtained." *Id.*

---

connection with which a prior mark is in use; (3) the similarity or dissimilarity of established, likely-to-continue trade channels; (4) the conditions under which and buyers to whom sales are made; (5) the fame of the prior mark; (6) the number and nature of similar marks in use on similar goods; (7) the nature and extent of any actual confusion; (8) the length of time during and conditions under which there has been concurrent use without evidence of actual confusion; (9) the variety of goods on which a mark is or is not used; (10) the market interface between applicant and the owner of a prior mark; (11) the extent to which applicant has a right to exclude others from use of its mark on its goods; (12) the extent of potential confusion; and (13) any other established fact probative of the effect of use. *See In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973).

1    The TTAB found the parties' goods were "legally identical," the parties had overlapping

2    "trade channels and target consumers," Defendant's mark was of "moderate commercial strength,"

3    and the parties' marks "share[d] sufficient indicia of similarity" to find them similar.  *Id*. at 51.

4    The TTAB noted that these factors "weigh[ed] in favor of a finding that confusion is likely."  *Id*.

5    The TTAB ultimately sustained Defendant's opposition with respect to the goods identified in

6    International Class 33.  *Id*. ("Upon our review of the parties' arguments and the record as a whole,

7    and balancing the *DuPont* factors for which there has been evidence and argument, we find that

8    confusion between [Plaintiff's] marks as applied to its goods is likely with respect to

9    [Defendant's] mark as applied to its goods.").

10    On September 19, 2023, Plaintiff filed a complaint seeking *de novo* review of the TTAB's

11    final decision sustaining Defendant's opposition.  Compl. ¶¶ 39–42.  Plaintiff alleges the TTAB

12    erred in finding there was a likelihood of confusion between its Word Mark and Composite Mark

13    and Defendant's BANDIT Mark.  *Id*.

14    **II.    LEGAL STANDARDS**

15        **A.    Motions for Summary Judgment**

16        Summary judgment is proper when a "movant shows that there is no genuine dispute as to

17    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

18    A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*

19    *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if there is evidence

20    in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.*

21    But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from

22    the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec.*

23    *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence

24    or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997),

25    *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).  If a court

26    finds that there is no genuine dispute of material fact as to only a single claim or defense or as to

27    part of a claim or defense, it may enter partial summary judgment.  Fed. R. Civ. P. 56(a).

28    //

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.    Review of TTAB Decisions

Under the Lanham Act, the USPTO "may refuse to register a trademark that so resembles a registered mark as to be likely, when used on or in connection with the goods of the applicant, to cause confusion . . . ." *In re St. Helena Hosp.*, 774 F.3d 747, 750 (Fed. Cir. 2014) (quotation omitted); *see also* 15 U.S.C. § 1052.  The Lanham Act also permits a party dissatisfied with a TTAB decision to initiate a civil action in federal district court for *de novo* review.  *See* 15 U.S.C. § 1071.  In such cases, "the district court acts as a quasi-appellate court to the TTAB and applies a hybrid standard of review . . . ."  *See Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 69 F. Supp. 3d 175, 193 (D.D.C. 2014).  Under this hybrid standard of review, the TTAB's factual findings are assessed under a "substantial evidence" standard, which requires "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Id.* ("Substantial evidence . . . is more than a mere scintilla of evidence.") (quotation omitted).  But if a party "present[s] new evidence and raise[s] new issues," the district court must review the TTAB's decision *de novo.  Id.* ("Importantly, the party seeking to overturn a TTAB decision may present new evidence and raise new issues, which a court must review *de novo*.")

## III.    DISCUSSION

### A.    Request for Judicial Notice

Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 999 (9th Cir. 2018) (citation and quotations omitted).  The Ninth Circuit has clarified that if a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document. *Id.* at 999.  Further, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.* As an example, the Ninth Circuit held that for a transcript of a conference call, the court may take judicial notice of the fact that there was a conference call on the specified date, but may not take

5

judicial notice of a fact mentioned in the transcript, because the substance "is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes." *Id*. at 999–1000.

Plaintiff requests the Court take judicial notice of the dictionary definitions, translations, and trademark registrations contained in Exhibits A–E attached to Plaintiff's opposition to Defendant's motion for summary judgment. Exhibit A contains printouts from SpanishDictionary.com, the Merriam-Webster dictionary, and Google Translate of definitions for the term "El." Exhibit B contains printouts from dictionary.com, Google Translate, the Merriam-Webster dictionary, wordreference.com, and the Collins English Dictionary of definitions for the term "Bandido." Exhibit C contains copies of printouts from the Merriam-Webster dictionary and the Collins English Dictionary of definitions for the term "Yankee." Courts generally find dictionary definitions appropriate for judicial notice. *See Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F.Supp.3d 139, 146 (N.D. Cal. 2020) ("Dictionary definitions are also a proper subject for judicial notice."). However, courts have denied requests for judicial notice of definitions and translations obtained from Google Translate, based on concerns with Google Translate's verified accuracy. *See Novelty Textile, Inc. v. Windsor Fashions, Inc.*, No. CV 12-05602 DDP MANX, 2013 WL 1164065, at *3 (C.D. Cal. Mar. 20, 2013) ("The court notes, first, that a translation by Google Translate is not sufficiently reliable to make it admissible."); *Se. Ready Mix, LLC v. Argos N. Am. Corp.*, No. 1:17-CV-02792-ELR, 2018 WL 8263138, at *4 (N.D. Ga. Aug. 22, 2018) ("The Court has concerns about whether Plaintiffs have provided the necessary information to take judicial notice of these documents as the translation simply comes from Google."). Accordingly, the Court **GRANTS** Plaintiff's request for judicial notice for the SpanishDictionary.com and Merriam-Webster Dictionary definitions in Exhibit A, the dictionary.com, Merriam-Webster Dictionary, wordreference.com, and Collins English Dictionary definitions in Exhibit B, and all definitions provided in Exhibit C. The Court **DENIES** Plaintiff's request for judicial notice as to the Google Translate definitions in Exhibits A and B.

Exhibit D contains copies of printouts from Google Translate, SpanishDictionary.com, and translate.com of the translation for "El Bandido Yankee." The Court cannot verify that the

translations obtained from Google Translate, SpanishDictionary.com, and translate.com are accurate, and accordingly, these translations cannot be said to be "from sources whose accuracy cannot reasonably be questioned." *See Novelty Textile, Inc.*, 2013 WL 1164065, at *3; *Se. Ready Mix, LLC*, 2018 WL 8263138, at *4. The Court therefore **DENIES** Plaintiff's request for judicial notice of Exhibit D.[3]

Exhibit E contains copies of trademark registrations for Registration Nos. 1,830,376 and 6,162,478, which were obtained from the USPTO's TSDR system. Courts routinely take judicial notice of federal trademark registrations. *See Autodesk, Inc. v. Dassault Sys. SolidWorks Corp.*, No. 08-04397, 2008 WL 6742224, at *2 n.1 (N.D. Cal. Dec. 18, 2008) (taking judicial notice of trademark registrations and applications publicly available on USPTO website); *Threshold Enterprises Ltd.*, 445 F.Supp.3d at 145 ("Materials in the online files of the USPTO and other matters of public record are proper subjects of judicial notice."). Accordingly, the Court **GRANTS** Plaintiff's request for judicial notice for Exhibit E.

### B.    Evidentiary Objections

The Court first addresses the parties' evidentiary objections. Plaintiff objects to Defendant's reliance on Dr. Jacqueline Chorn's rebuttal report in its reply brief, arguing that "[t]h[e] new evidence submitted for the *first time* on reply is untimely and improper." Dkt. No. 41 at 2 (emphasis in original). Defendant objects to Dr. AnnaBelle Sartore's supplemental expert report, arguing it is untimely and improper under Rule 26(e). *See* Reply at 6–7.

#### i.    Plaintiff's Objections To Dr. Chorn's Rebuttal Report

Plaintiff argues Dr. Chorn's rebuttal report should be excluded because (1) Defendant's "withholding of the evidence from its moving papers unfairly deprived [Plaintiff] of the opportunity to address it in its Opposition Brief," and (2) Dr. Chorn's critiques "constitute an improper and untimely *Daubert* motion." Dkt. No. 41 at 2. Plaintiff's objections are overruled.

---

[3] Although the Court denies Plaintiff's request for judicial notice with respect to Exhibit D, Defendant does not dispute that the English translation of "El Bandido Yankee" is "The Yankee Bandit." Moreover, even had the Court granted the requests for judicial notice it has denied, that would not change its ultimate conclusion that summary judgment in Defendant's favor is warranted.

First, Plaintiff has not been "unfairly deprived" of an opportunity to address Dr. Chorn's rebuttal report:  Dr. Sartore's supplemental expert report, which Plaintiff relies on in its opposition brief, addresses Dr. Chorn's critiques of Dr. Sartore's *Eveready* survey.  Dkt. No. 37-30 at 3 ("I understand that the methodology of my survey has been critiqued based on that suggestion that I should have used the Squirt format as opposed to the Eveready . . . I disagree with this critique . . . . The first critique deals with proximity . . . .  The second [critique deals with] commercial strength.").  Additionally, Defendant's critiques of Dr. Sartore's opening expert report do not constitute an "improper and untimely *Daubert* motion."  Defendant does not seek to exclude or strike any of the opinions provided in Dr. Sartore's opening expert report or the underlying *Eveready* survey.  Defendant instead attacks the credibility and weight Dr. Sartore's opening report should be afforded, which the Court declines to do.  *See Chavez v. Converse, Inc.*, No. 15-CV-03746-NC, 2020 WL 1233919, at *3 (N.D. Cal. Mar. 13, 2020) ("On summary judgment, the Court may not make credibility findings or weigh conflicting evidence.").  Further, the Court has not relied on Dr. Chorn's rebuttal report in resolving Defendant's motion for summary judgment.  Accordingly, Plaintiff's objections to Dr. Chorn's rebuttal report are overruled.

### ii. Defendant's Objections To Dr. Sartore's Supplemental Expert Report

Defendant seeks to exclude Dr. Sartore's supplemental expert report, arguing the report was untimely and provided to "deepen and strengthen" her opening report.  Reply at 6.  The Court agrees that by preparing and submitting Dr. Sartore's July 3, 2024 report, Plaintiff plainly failed to comply with the scheduling order, which required all expert reports to be exchanged no later than June 14, 2024.  Dkt. No. 19.  The scheduling order did not authorize sur-rebuttal reports.  Accordingly, the Court would be justified in striking the unauthorized report under Rule 37.  But because the Court's consideration of Dr. Sartore's expert reports or the *Eveready* survey would not make a difference, as explained *infra* at Section III.C.v.a., the Court terminates Defendant's objections to Dr. Sartore's supplemental expert report as moot.

### C. Likelihood Of Confusion Analysis

Defendant argues summary judgment is appropriate because "there is no dispute of material fact as to the identical nature of the goods and marketing channels, the lack of

1    sophistication of consumers, or the similarity of marks based on the registration and applications

2    at issue" and "[Plaintiff] has not and cannot provide any additional evidence related to the

3    likelihood of confusion factors which can be considered material so as to overcome a finding of

4    summary judgment."  Mot. at 9.  Plaintiff argues it has introduced new evidence showing there is

5    no likelihood of confusion, or alternatively that issues of material fact preclude summary

6    judgment:  (1) Dr. Sartore's *Eveready* survey, (2) deposition testimony from Mr. Robert Torkelson

7    (Defendant's Chairman of the Board) "in which he admits [Defendant] is not aware of any

8    instances of consumer confusion," (3) English and Spanish dictionary definitions and translations

9    for the words "EL," "BANDIDO," and "YANKEE," (4) "translation evidence showing the

10   Spanish phrase 'EL BANDIDO YANKEE' means 'THE YANKEE BANDIT' in English," (5)

11   "Internet evidence showing widespread use of third-party BANDIT Marks for alcoholic

12   beverages," and (6) third party registration evidence.  Opp. at 15.

13        "Likelihood of confusion is a question of law based on underlying factual findings."  *Bureau*

14   *Nat'l Interprofessionnel du Cognac v. Cologne & Cognac Ent.*, 110 F.4th 1356, 1365 (Fed. Cir.

15   2024).  In determining whether a likelihood of confusion exists, courts within the Ninth Circuit

16   consider the eight factors identified in *AMF Inc. v. Sleekcraft Boats*:

17        1.  strength of the mark;

18        2.  proximity of the goods;

19        3.  similarity of the marks;

20        4.  evidence of actual confusion;

21        5.  marketing channels used;

22        6.  types of goods and degree of care likely to be exercised by the purchaser;

23        7.  intent in selecting the mark; and,

24        8.  likelihood of expansion of the product lines.

25   599 F.2d 341 (9th Cir. 1979); *see also Theorem, Inc. v. Citrusbyte, LLC*, No. CV 21-4660-GW

26   (AGRx), 2021 WL 5750238, at *6 (C.D. Cal. Nov. 16, 2021) ("[T]he Ninth Circuit simply

27   condensed the thirteen-part *DuPont* criteria to arrive at *Sleekcraft's* eight factors.").  "This eight-

28   factor test . . . is pliant," and "the relative importance of each individual factor will be case-

9

specific." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). "Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Id. See also Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002) ("[W]e do not decide whether confusion is likely by considering mechanically the number of *Sleekcraft* factors that weigh in favor of either party, or by giving the same weight to a particular factor from case to case . . . . Rather . . . we consider what each factor, and—more importantly—what the analysis as a whole, reveals about . . . the likelihood of consumer confusion . . . ."). The Court begins its analysis with the four most significant factors in this case—the strength of Defendant's mark, the proximity of the goods, the marketing channels used, and the similarity of the marks.

### i. Strength Of The Mark

"The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater the likelihood of confusion." *Stark v. Diageo Chateau & Est. Wines Co.*, 907 F. Supp. 2d 1042, 1058 (N.D. Cal. 2012). The strength of a trademark is "evaluated in terms of its conceptual strength and commercial strength." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). "The weaker an opposer's mark, the closer an applicant's mark can come without causing a likelihood of confusion and thereby invading what amounts to its comparatively narrower range of protection." *In re I.AM.Symbolic, LLC*, 866 F.3d 1315, 1327 (Fed. Cir. 2017).

### a. Conceptual Strength

A mark's conceptual strength is "determined by focusing on the linguistic or graphical peculiarity of the mark considered in relation to the product, service, or collective organization to which the mark attaches." *Combe Inc. v. Dr. August Wolff GmBH & Co.*, 382 F. Supp.3d 429, 447 (E.D. Va. 2019). "From weakest to strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." *GoTo.com, Inc.*, 202 F.3d at 1207. Generally, generic marks are not protectable. *See JIPC Mgmt., Inc. v. Incredible Pizza Co.*, No. CV-0804310-MMM (PLAx), 2008 WL 11336396, at *12 (C.D. Cal. Aug. 26, 2008) ("Generic terms cannot be

protected as trademarks because 'they are common words or phrases that describe a class of goods rather than an individual product,' and thus do not relate exclusively to the product of the trademark owner."). Descriptive marks which "describe a person, a place or an attribute of the product" are only protectable "when secondary meaning is shown." *Id.* Suggestive marks and arbitrary or fanciful marks, however, "are inherently distinctive[] and protectable as trademarks." *Id.* "A suggestive mark conveys an impression of a good but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature," but "[a]rbitrary and fanciful marks have no intrinsic connection to the product with which the mark is used." *Id.* Arbitrary marks generally consist of "words commonly used in the English language," whereas fanciful marks "are wholly made-up terms." *Id.*

The parties dispute whether Defendant's BANDIT Mark is suggestive or arbitrary. Defendant argues its BANDIT Mark "must be considered a strong arbitrary mark" as it has "no suggestive or descriptive connotation as applied to . . . [alcoholic beverages except beers]." Mot. at 19. Plaintiff counters that BANDIT is a suggestive mark, because the mark "suggests the consumer will feel like a 'bandit' – perhaps getting a 'steal' of a deal when they purchase this low-priced wine in a box." Opp. at 25. Plaintiff further argues that because Defendant "does not have any 'bandit' character representing the brand[,]" Defendant's mark "appears to be suggestive of the consuming purchaser, not of any characteristic of the product itself." *Id.*

Plaintiff's argument that the BANDIT Mark is suggestive is entirely unpersuasive. The word "bandit" does not "convey an impression of a good." *JIPC Mgmt., Inc.*, 2008 WL 11336396 at *12. A "bandit" is "an outlaw who lives by plunder," Mot. at 19, and the word "bandit" does not suggest any characteristic, quality or feature of alcoholic beverages, including wine. *See, e.g., Stark*, 907 F. Supp. 2d at 1059 (finding "Stark Wine" was "neither suggestive of the goods—people do not ordinarily associate drinking wine with insanity—nor descriptive of the wine's characteristics—people will not go stark raving mad after they drink the wine"); *Globefill Inc. v. Elements Spirits, Inc.*, No. CV-02034-CBM (PLAx), 2013 WL 12109779, at *3 (C.D. Cal. Oct. 15, 2013) (finding the plaintiff's trade dress—a crystal clear skull-shaped bottle used to sell vodka—arbitrary and "conceptually strong" as there was "no 'natural connection' between

United States District Court
Northern District of California

Plaintiff's crystal head bottle and vodka").  *Cf. Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 866 (D. Minn. 2010) (finding "CRISTAL" to be a suggestive mark and not an arbitrary mark as the mark "suggests the sparkling quality of the champagne once it is released from the bottle").  Plaintiff's assertion that BANDIT "suggests the consumer will feel like a 'bandit'" is baseless, and Plaintiff does not cite to or otherwise rely on any record evidence to support its argument that BANDIT is a suggestive mark.

The Court finds that Defendant's BANDIT Mark is arbitrary, as the word "bandit" has no commonly known connotation to alcoholic beverages.  *See Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, 668 F. Supp. 3d 1025, 1040 (C.D. Cal. 2023), *aff'd*, No. 23-55774, 2024 WL 4750497 (9th Cir. 2024) ("Fanciful and arbitrary marks have no commonly known connotation to the product at hand.").

### b.  Commercial Strength

While conceptual strength "focuses on the linguistic uniqueness" of the mark, commercial strength focuses on "whether consumers in fact associate the [] mark with a unique source." *Combe Inc.*, 382 F.Supp.3d at 452.  In assessing commercial strength, "courts are to look to 'actual marketplace recognition,' recognizing that 'advertising expenditures can transform a suggestive mark into a strong mark.'" *Blue Bottle Coffee, LLC v. Liao*, No. 21-CV-06083-CRB, 2024 WL 2061259, at *11 (N.D. Cal. May 7, 2024) (quotation omitted); *see also ACT 898 Prods. Inc v. Kashi Beauty Supply Inc*, No. 2:22-CV-08818-JVS-MRW, 2024 WL 2983164, at *5 (C.D. Cal. Apr. 29, 2024) ("Advertising shows commercial strength because it increases marketplace recognition and can transform a suggestive mark into a strong mark.").

Defendant argues its BANDIT Mark is of moderate commercial strength and submits a declaration from Mr. Torkelson testifying to the "unit and dollar sales of BANDIT branded wine and wine-based hard seltzer from 2017 through 2021" and "the amount [] spent in marketing, advertising and promoting these products over the same period of time."  TTAB Decision at 23; *see also* Dkt. No. 36-4 ¶¶ 10–11; Mot. at 20 ("Considering the evidence of record, the TTAB found [Defendant's] BANDIT Mark to be conceptually strong but of only moderate commercial strength. The facts remain the same.").  Defendant presents sales figures, marketing expenses and

advertising expenses similar to cases in which courts have found at least moderate commercial strength. *See Blue Bottle Coffee, LLC*, 2024 WL 2061259, at *11 (finding commercial strength where plaintiff showed millions of dollars spent on advertising and marketing, millions of dollars in revenue and consistent use of the mark for over two decades). *Cf. Stark*, 907 F. Supp.2d at 1061 (finding no commercial strength where there was evidence plaintiff's companies were "struggling financially[] with little to no advertising budget"). Based on the record evidence, the Court finds the BANDIT Mark to be of moderate commercial strength.

### c.   Third Party Use

It is well established that "[u]se of similar marks by third-party companies in the relevant industry weakens the mark at issue." *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1088 (9th Cir. 2005); *see also JIPC Mgmt., Inc.,* 2008 WL 11336396, at *14. Plaintiff relies on "16 third party uses of BANDIT-formative (or equivalent) marks for alcoholic beverages, and at least two (2) other registrations for similar marks at the USPTO" to argue Defendant's BANDIT Mark is weak and only entitled to narrow protection.[4] Opp. at 25. The Court does not find Plaintiff's argument persuasive.

During the opposition proceeding before the TTAB, Plaintiff "made of record, via the results of a Google Images search, pictures of bottles with labels on them showing . . . third-party uses of the term 'BANDIT' as the names, or as part of the names, of alcoholic beverage products apparently unaffiliated with [Defendant]." TTAB Decision at 29. Plaintiff did not provide the websites underlying the images disclosed by the Google Images search" and did not otherwise provide information about "whether (i) the producer or seller of the product . . . is foreign or domestic, (ii) the images are historical or current, or (iii) the bottles and labels thereon are actual commercial products or mere mock-ups." *Id*. at 30. Because Plaintiff "d[id] not offer any basis for [the TTAB] to believe that the displayed items [were] currently offered for sale in the United

---

[4] The Court counts 16 third-party uses of "BANDIT-formative" marks for alcoholic beverages, including the two registrations for BANDOLERO and FORAJIDO. The TTAB considered FORAJIDO and 13 of the 14 third party uses in determining the strength of Defendant's mark. *See* TTAB Decision at 29. The third-party use of "Bandido de Amores" and the BANDOLERO registration were not before the TTAB. *Id*.

1  States," the evidence was given little weight.  TTAB Decision at 30.

2         Plaintiff has provided the Court with more detail regarding the websites underlying each of

3  the 14 third-party uses, but these websites still do not provide the Court with sufficient

4  information to determine whether these third-party products are sold to customers in the United

5  States or whether the products are manufactured or sold by foreign or domestic companies.  For

6  example, the website provided for The Bandit–the BX Press Cidery (https://untappd.com/b/cam

7  bium-cider-co-the-bandit/745057) provides no information about the producer or retailer or

8  whether the product can be purchased by customers in the United States.  The websites for

9  Westend The Barrel Bandit (https://www.vivino.com/US/en/westend-estate-wines-the-barrel-

10 bandit-durifshiraz/w/1382647) and Houghton The Bandit (https://www.vivino.com/US/en/hou

11 ghton-the-bandit-cabernet-sauvignonshiraz/w/2135679?year=2020) also do not provide

12 information about whether the products can be purchased by customers in the United States, but

13 both products appear to be manufactured in Australia.  Similarly, the website provided for

14 Bandit's Coffee Moonshine (https://regina.brewzer.ca/bandits-distilling/chocolate-moonshine)

15 shows the product is produced in Canada but does not show whether the product can be purchased

16 by customers in the United States.

17        Additionally, a number of these websites undermine Plaintiff's argument.  For example,

18 Bandit Gipsy Hill Brewing (https://gipsyhillbrew.com/product/bandit-2) appears to be sold by a

19 London-based company to London-based customers, and  Bandit's Rum (https://www.wine-

20 searcher.com/find/bandits+cls+dark+rum+caribbean) and Apple Bandit (https://www.wine-

21 searcher.com/find/apple+banditi+juicy+cider+netherlands) do not appear to be offered for sale to

22 customers in the United States.  *See* Reply at 17.

23 //

24 //

25 //

26 //

27 //

28 //

14



At best, Plaintiff has offered six third-party uses of "BANDIT-formative (or equivalent) marks for alcoholic beverages"—Bandido de Amores, Goofy Bandit Espressotini, Barrel Bandit, Bandit Brewing, Time Bandit vodka, and Bandit's Traditional Moonshine—but Plaintiff has not introduced any evidence "reflect[ing] the extent" of these third-party uses.[5] *Blue Bottle Coffee, LLC*, 2024 WL 2061259, at *11 ("Where the record does not reflect the extent of third-party uses, the probative value of this evidence is minimal."); *JIPC Mgmt., Inc.*, 2008 WL 11336396, at *15 ("Absent evidence of the location, extent, and length of competitors' use of similar marks, the

---

[5] The website underlying Penguin Bay Blackberry Bandit (https://bremerswineandliquor.com/shop/penguin-bay-winery-blackberrybandit/) is no longer available.

15

court is unable to evaluate whether JIPC indeed uses its mark in a crowded field."). *Cf. Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228, 1259 (9th Cir. 2022) (finding plaintiff's "Untamed" mark was not arbitrary and noting the defendant "submitted evidence of . . . 27 labels approved by the Alcohol and Tobacco Tax and Trade Bureau between December 2005 and January 2018 which feature the word 'Untamed'" and "several pieces of promotional material in which the word 'untamed' [was] used to describe alcohol"); *Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334, 1337 (Fed. Cir. 2015) (vacating the TTAB's decision that there was a likelihood of confusion between the applicant's composite mark and the opposer's family of word and composite marks and finding the TTAB erred in not considering 29 third-party marks that incorporated the phrase at issue in the same industry). The Court finds Plaintiff's evidence of third-party use to be of limited probative value.

The FORAJIDO and BANDOLERO registrations also do not diminish the strength of Defendant's BANDIT Mark. With respect to the FORAJIDO registration, the word "forajido" bears no similarity in sound to the word "bandit." Additionally, Plaintiff has not introduced any evidence as to the usage of the FORAJIDO mark. Although Plaintiff provided the Court with a link to the FORAJIDO website (https://mezcalorama.com/producto/297-forajido-mezcal-hierbamala-edition/), the Court is unable to determine whether the FORAJIDO mark is actually used in the U.S., or whether the product is manufactured or sold in the United States. *See Domaine Carneros, Ltd. V. Reve Life LLC*, 2011 WL 5014031, at *6 (T.T.A.B. Sept. 29, 2011) ("There is little, if any, probative value in third-party registrations that show marks different in appearance and/or commercial impression from those of the parties to this proceeding."). With respect to the BANDOLERO registration, the word "bandolero" is somewhat similar in sound to the word "bandit," as both words share the same first four letters. The BANDOLERO mark also appears to be used in the United States, as evidenced by the website Plaintiff provided (https://www.safeway.com/shop/product-details.960025935.html). However, Plaintiff has not provided any evidence regarding the extent to which the BANDOLERO mark is used. *See Domaine Carneros, Ltd. V. Reve Life LLC*, 2011 WL 5014031, at *6 (T.T.A.B. Sept. 29, 2011) ("[T]he third-party registrations introduced by applicant are not evidence that those marks have

United States District Court
Northern District of California

16

been used at all, let alone used so extensively that consumers have become sufficiently conditioned by their usage that they can distinguish between such marks on the bases of minute differences. The probative value of third-party trademarks depends entirely upon their usage."); *Combe Inc.*, 382 F. Supp.3d at 457–58 ("[D]efendant has presented no evidence that any other mark . . . is extensively used in commerce . . . .").  Plaintiff has not introduced evidence of third-party use sufficient to "indicate any meaningful commercial 'weakness'" in Defendant's mark, *Sw Mgmt. Inc. v. Ocinomled, Ltd.*, 115 U.S.P.Q.2d 1007, 2015 WL 4464550, at *24 (T.T.A.B. June 11, 2015), and has not otherwise raised any genuine dispute of material fact as to the strength of the BANDIT Mark.  *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1374 (Fed. Cir. 2005) ("As the Board observed, '[t]he purpose of a defendant introducing third party uses is to show that customers have become so conditioned by a plethora of such similar marks that customers 'have been educated to distinguish between different [such] marks on the bases of minute distinctions.' [Applicant's] evidence does not rise to the level of demonstrating that the single third-party use was so widespread as to 'condition' the consuming public.").

Based on the record evidence and "[v]iew[ing] the inferences reasonably drawn from the . . . record in the light most favorable to [Plaintiff]," *Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88, the Court finds there is no genuine dispute that Defendant's BANDIT Mark is conceptually strong and moderately strong commercially.  The Court finds this factor weighs in favor of finding a likelihood of confusion.

### ii.    Proximity Of The Goods

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods."  *Stark*, 907 F. Supp.2d at 1057.  "Related goods are those which would be reasonably thought by the buying public to come from the same source if sold under the same mark."  *Id.*  Generally, the more likely the public is to associate the goods or services, the less similar the marks need to be to find a likelihood of confusion.  *AMF Inc.*, 599 F.2d at 350. ("[L]ess similarity between the marks will suffice when the goods are complementary, the products are sold to the same class of purchasers, or the goods are similar in use and function,").

United States District Court
Northern District of California

1    Defendant argues that the parties' goods are "legally identical" and the goods identified in its

2    BANDIT Registration encompass the goods identified in Plaintiff's EL BANDIDO YANKEE

3    Applications.  Mot. at 14–16.  Plaintiff argues that the "purported relatedness of tequila and boxed

4    wine is a disputed fact" precluding summary judgment, Opp. at 26, but fails to identify any fact,

5    much less a disputed material fact, suggesting the products are not identical or otherwise

6    unrelated.  The Court finds Plaintiff and Defendant's goods, as identified in the BANDIT

7    Registration and EL BANDIDO YANKEE Applications, substantially overlap, which weighs in

8    favor of a likelihood confusion.

9          The goods and services recited in Defendant's BANDIT Registration are "[a]lcoholic

10   beverages except beers" in International Class 33, Dkt. No. 35-3 at 2, and the goods and services

11   recited in Plaintiff's EL BANDIDO YANKEE Applications are "distilled blue agave liquor" and

12   "blue distilled agave tequilana weber liquor" in International Class 33.  *See* Dkt. Nos. 35-4, 35-5.

13   The BANDIT Registration broadly encompasses "alcoholic beverages except beers," which

14   necessarily includes "distilled blue agave liquor" and "blue distilled agave tequilana weber

15   liquor."  *See In re Chatam Int'l Inc.*, 380 F.3d 1340, 1345 (Fed. Cir. 2004) ("Furthermore,

16   substantial evidence supports the Board's finding of a close relationship between tequila and beer

17   or ale. Indeed, the goods often emanate from the same source because 'both are alcoholic

18   beverages that are marketed in many of the same channels of trade to many of the same

19   consumers.'"); *In re Majestic Distilling Co., Inc.*, 315 F.3d 1311, 1316 (Fed. Cir. 2003) ("The

20   PTO responds, and we agree, that malt liquor and tequila are similar by virtue of the fact that both

21   are alcoholic beverages that are marketed in many of the same channels of trade to many of the

22   same consumers."); *In re Detroit Athletic Co.*, 903 F.3d 1237, 1306–07 (Fed. Cir. 2018) ("Put

23   another way, the [opposer's] clothing goods are 'very general' in nature and cover 'all types of

24   clothing,' including the clothing sold through [applicant's] sports apparel retail services."); *Paula

25   Payne Prods. Co. v. Johnson Pub. Co., Inc.*, 473 F.2d 901, 902 (Fed. Cir. 1973) ("What is more

26   significant than appellee's failure to limit the description of the goods to a particular channel of

27   trade or market, is the absence of a limitation in appellant's registration which would exclude

28   appellee's market."); *In re Solid State Design Inc.*, 125 U.S.P.Q.2d 1409, 2018 WL 287909, at *3

1   (T.T.A.B. Jan. 3, 2018) ("[W]here the goods in an application or registration are broadly

2   described, they are deemed to encompass 'all the goods of the nature and type described therein.").

3          Plaintiff asks the Court to look beyond the four corners of the BANDIT Registration and

4   EL BANDIDO YANKEE Applications and "take into consideration the real life, appreciable

5   differences between tequila and boxed wine." Opp. at. 26. Doing so would be inappropriate. The

6   law is clear that "the question of registrability of an applicant's mark must be decided on the basis

7   of the identification of goods set forth *in the application." Octocom Sys., Inc. v. Houston Comp.*

8   *Servs. Inc.*, 918 F.2d 937, 942 (Fed. Cir. 1990) (emphasis added); *see also Cunningham v. Laser*

9   *Golf Corp.*, 222 F.3d 943, 948 (Fed. Cir. 2000) ("Our precedent requires the Board to look to the

10  registration to determine the scope of the goods/services covered by the contested mark

11  . . . . Proceedings before the Board are concerned with registrability and not use of a mark.");

12  *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1267 (Fed. Cir. 2002)

13  ("'[R]elatedness of the goods' factor compares the goods and services in the applicant's

14  application with the goods and services in the opposer's registration.").

15         The Federal Circuit has specifically rejected the argument that "real-world conditions"

16  should be considered in determining the registrability of a mark. In *In re Detroit Athletic Co.*, the

17  TTAB found that the goods described in the opposer's registration—"clothing, namely athletic

18  uniforms, coats, golf shirts, gym suits, hats, jackets, sweat pants, sweat shirts, polo shirts, and T-

19  shirts"—included the goods the applicant described in its application—"on-line retail consignment

20  stores featuring sports team related clothing and apparel, retail apparel stores, retail shops

21  featuring sports team related clothing and apparel, retain sports team related clothing and apparel

22  stores." 903 F.3d at1306; *see id.* ("[T]he Board found that the clothing goods described in the

23  [opposer's] registration are broad enough to cover 'all types of clothing, which includes sports

24  teams' clothing' sold by [applicant]."). On appeal, the applicant argued that "consumers would

25  have little problem distinguishing between [its] clothing store and the [opposer's] private social

26  club," but the Federal Circuit found this argument to be "misdirected" and "largely irrelevant." *Id.*

27  at 1307. The Federal Circuit made clear that "[t]he relevant inquiry . . . focuses on the goods and

28  services *described in the application and registration*, and *not* on real-world conditions." *Id.*

(emphasis in original).  Here too, the Court's analysis is centered on the goods and services described in Plaintiff's EL BANDIDO YANKEE Applications and Defendant's BANDIT Registration.  The "real life considerations" on which Plaintiff relies have no bearing on the relatedness of the goods.  Based on the record before the Court, the Court finds Plaintiff and Defendant's goods "substantially overlap." *Id.*

Based on the record evidence and viewing the inferences reasonably drawn from the record in the light most favorable to Plaintiff, the Court finds there is no genuine dispute that Plaintiff and Defendant's goods, as recited in the BANDIT Registration and EL BANDIDO YANKEE Applications, are related.  The Court finds this factor weighs in favor of finding a likelihood of confusion.

### iii.    Marketing Channels Used

If the goods at issue are likely to travel in similar trade channels, the likelihood of confusion increases.  *See Hainline v. Vanity Fair*, 301 Fed. App'x 949, 952 (Fed. Cir. 2008).  "In the context of a registration appeal, 'the similarities in channels of trade must be analyzed based on the channels of trade contemplated by the application.'"  *Combe Inc.*, 382 F. Supp.3d at 459 (explaining that neither plaintiff's registration nor defendants' application restricted the channels of trade in which the marks would be used and it therefore "must be presumed that the parties' marks cover all channels of trade and that the parties' facilities are [] identical").  "If a registration application 'does not delimit any specific trade channels of distribution, no limitation will be applied.'"  *Id.*

Defendant argues that "[b]ecause the goods described in Roar's EL BANDIDO YANKEE Applications and Rebel's BANDIT registration are legally identical, and they contain no trade channel or purchaser restrictions, they 'are presumed to travel in the same channels of trade to the same class of purchasers.'"  Mot. at 16.  The Court agrees.  Defendant's BANDIT Registration "contains no restrictions on the channels of trade or classes of customers[,]" and consequently, its goods are "presumed to be sold in all normal trade channels to all the normal classes of purchasers."  *In re Detroit Athletic Co.*, 903 F.3d at 1308.  Generally, marketing channels for "alcoholic beverages, excluding beer" include retailers like liquor, wine, grocery and convenience

20

1   stores.  Many, if not all, of these retailers also sell "distilled blue agave liquor" and "blue distilled

2   agave tequilana weber liquor" (i.e., tequila).  Defendant's "trade channels are broad enough to

3   encompass [Plaintiff's][,]" and this factor therefore weighs in favor of finding a likelihood of

4   confusion.  *Id.*; *see also Hainline*, 301 Fed.App'x at 953 ("As the board correctly noted, to the

5   extent that Hainline's goods are legally identical to Vanity Fair's goods[,] the trade channels and

6   classes of purchasers for the respective goods likewise must be deemed to be identical.") (cleaned

7   up); *Hewlett-Packard Co.*, 281 F.3d at 1268 ("As this court has previously stated, absent

8   restrictions in the application and registration, goods and services are presumed to travel in the

9   same channels of trade to the same class of purchasers."); *In re Solid State Design Inc.*, 125

10   U.S.P.Q.2d 1409 ("Because we must deem the goods to be legally identical in part, we are

11   obligated to assume that their channels of trade are legally identical as well, even in the absence of

12   record evidence.").

13       Plaintiff argues this factor is in genuine dispute, because it has submitted evidence

14   "sufficient to overcome the presumption that all alcoholic beverages of the types at issue are sold

15   in the same marketing channels."  Opp. at 26.  Plaintiff's proffered evidence is a declaration from

16   Eric Lanz, its Chief Financial Officer, stating "EL BANDIDO YANKEE tequila is sold in

17   numerous large chain store retails, such as, for example BevMo, Total Wine and Jewel-Osco[,] as

18   well as by numerous independent, non-chain retail stores" and "BANDIT wines are sold in Seven-

19   Eleven type convenience stores, large drugstore chains such as CVS and Rite-Aid, and gas station-

20   affiliated convenience stores . . . ."  Dkt. No. 37-1 ¶¶ 9, 13.  Plaintiff argues that this evidence

21   "show[s] the goods are sold in different places" and "[c]onsumers . . . have no opportunity to

22   confuse them."  Opp. at 26.  These statements, however, are irrelevant to the Court's analysis.

23   The Court once again declines Plaintiff's invitation to look beyond the four corners of the

24   BANDIT Registration and EL BANDIDO YANKEE Applications.  *See In re Detroit Athletic Co.*,

25   903 F.3d at 1308 ("[Applicant] argues that the [opposer] sells clothing only to its club members

26   and only in its gift shop located onsite . . . . Even if true, this assertion is, once again, irrelevant.");

27   *Stone Lion Cap. Partners, L.P. v. Lion Cap. LLP*, 746 F.3d 1317, 1323 (Fed. Cir. 2014) ("Even

28   assuming there is no overlap between Stone Lion's and Lion's current customers, the Board

United States District Court
Northern District of California

21

correctly declined to look beyond the application and registered marks at issue."); *Bose Corp. v. QSC Audio Prod., Inc.*, 293 F.3d 1367, 1377 (Fed. Cir. 2002) (finding the Board "correctly rejected" the argument that the opposer's products were sold on the professional market and the applicant's products were sold on the consumer market because "[r]egistrability must be determined 'on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods'"); *In re I.AM.Symbolic*, 866 F.3d at 1326–27 ("[T]he Board properly declined to import restrictions into the identification of goods based on alleged real-world conditions."); *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp., Inc.*, 648 F.2d 1335, 1337 (C.C.P.A. 1981) ("[A]ppellant's asserted restriction of sales to an exclusive boutique in Tuxedo Park, New York, are considerations similarly irrelevant to the question of registrability of appellant's mark when such limitations are not inherent in marketing of the goods or specifically set forth as limitations in the application.").[6] *See also supra* Section III.C.

Based on the record evidence and viewing the inferences reasonably drawn from the record in the light most favorable to Plaintiff, the Court finds there is no genuine dispute that Plaintiff and Defendant's goods, as recited in the BANDIT Registration and EL BANDIDO YANKEE Applications, are likely to travel in similar trade channels. The Court finds this factor weighs in favor of finding a likelihood of confusion.

### iv.    Similarity Of The Marks

"[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com,Inc.*, 202 F.3d at 1205. The similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis," and "[t]ogether with the relatedness of the services and the use of a common marketing channel, this [] factor constitutes part of the controlling troika in the *Sleekcraft* analysis." *Id*. at 1205–06. The Ninth Circuit has

---

[6] Plaintiff's suggestion that "[c]onsumers will not encounter the marks in the same places" is not only irrelevant, it is also undermined by the fact that both parties' products appear to be sold on the Total Wine website. *See* https://www.totalwine.com/search/all?text=bandit%20&pageSize=24&department=Wine&brand=Bandit&aty=0,0,1 (offering BANDIT wine products for sale); https://www.totalwine.com/search/all?text=el%20bandido%20yankee&pageSize=24&aty=0,0,1 (offering EL BANDIDO YANKEE tequila products for sale).

United States District Court
Northern District of California

1    "developed certain detailed axioms to guide this comparison: first, the marks must be considered

2    in their entirety . . . ; second, similarity is adjudged in terms of appearance, sound, and meaning;

3    and third, similarities are weighed more heavily than differences." *Id.*

4        Plaintiff argues that the TTAB erred in finding its Word Mark and Composite Mark and

5    Defendant's BANDIT Mark similar enough to support a likelihood of confusion. Opp. at 19–24.

6    Plaintiff specifically argues that the TTAB should have applied the doctrine of foreign equivalents

7    and translated "EL BANDIDO YANKEE" to "THE YANKEE BANDIT" before comparing the

8    marks, and that the TTAB erred in assigning more weight to "Bandido" instead of "Yankee" when

9    comparing the dominant portions of Plaintiff's Word Mark and Composite Mark. *Id.*

10            a.   The Doctrine of Foreign Equivalents

11        Plaintiff argues the TTAB should have "translated 'EL BANDIDO YANKEE' into 'THE

12   YANKEE BANDIT' before comparing the marks," because "[w]hen the scope of protection

13   afforded to the weak portion BANDIDO is property restricted and 'THE YANKEE' is considered

14   the dominant portion *after translation*, the marks are so dissimilar such that there is no likelihood

15   of confusion." *Id.* at 19–20 (emphasis in original). Defendant argues the doctrine of foreign

16   equivalents does not apply in this case. The Court agrees with Defendant.

17        "Under the doctrine of foreign equivalents, foreign words from common languages are

18   translated into English to determine genericness, descriptiveness, as well as similarity of

19   connotation in order to ascertain confusing similarity with English word marks." *Palm Bay*

20   *Imports, Inc*, 396 F.3d at 1377. "The doctrine should be applied only when it is likely that the

21   ordinary American purchaser would 'stop and translate the word into its English equivalent.'" *Id.*

22   "When it is unlikely that an American buyer will translate the foreign mark and will take it as it is,

23   then the doctrine of foreign equivalents will not be applied." *In re Izakaya LLC*, No. 88612441,

24   2021 WL 5411210, at *3 (T.T.A.B. Nov. 17, 2021). Plaintiff argues that "[b]ecause the

25   translation [of EL BANDIDO YANKEE] is literal and direct, consumers encountering the mark

26   will 'stop and translate' the mark into English." Opp. at 22. Defendant, however, argues that "the

27   doctrine of foreign equivalents 'does not apply when a mark is a combination of foreign and

28   English words,'" citing persuasive authority. Reply at 13.

As an initial matter, Plaintiff conclusively states that "[b]ecause the translation [of EL BANDIDO YANKEE] is literal and direct, customers encountering the mark will 'stop and translate' the mark into English." Opp. at 22. But Plaintiff does not make any arguments or introduce any evidence regarding the "portion of American consumers [] familiar with [Spanish]" or "whether this portion [of consumers] is an 'appreciable segment of American consumers.'" *Palm Bay Imports, Inc.*, 396 F.3d at 1377. Consequently, there is no record evidence suggesting that an ordinary American consumer would "stop and translate" Plaintiff's Word Mark and Composite Mark from Spanish to English.

Additionally, "[c]ourts and the [TTAB] frequently have found that consumers would not 'stop and translate' marks comprised of terms in multiple languages . . . ." *In re Izakaya LLC*, 2021 WL 5411210, at *5; *see also In re Universal Package Corp.*, 222 U.S.P.Q. (BNA) ¶ 344 (T.T.A.B. Apr. 2, 1984) ("Translation of an entire compound word mark is more likely to take place in the marketplace than is the translation of only part of the mark."). Plaintiff acknowledges that "[t]he Board has yet to apply the doctrine [of foreign equivalents] in a published decision where the wording in one or more of the marks being compared consists of a combination of English and foreign-language words or terms." Opp. at 20 n.6. Here, Plaintiff's Word Mark and Composite Mark are a combination of English and Spanish words. With respect to Plaintiff's Word Mark, there is no dispute that "El" is a Spanish word and "Yankee" is an English word. But while Plaintiff argues "Bandido" is a Spanish word requiring translation, *see* Opp. at 21, Defendant argues "Bandido" appears in an English dictionary and would therefore "be understood without any translation by the ordinary American consumer." Reply at 14.

The Court need not decide whether "Bandido" should be treated as an English or Spanish word, as the doctrine of foreign equivalents does not apply in either instance. When "Bandido" is treated as an English word, Plaintiff's Word Mark comprises two English words—"Bandido" and "Yankee"—and one Spanish word—"El." It is clear that the doctrine of foreign equivalents would not apply to such a mark. *See In re Taverna Izakaya LLC*, 2021 WL 5411210, at *5 (treating "taverna" as an English word where the record evidence showed the word was found in English language dictionaries but could also be treated as a Greek transliteration or an Italian word); *In Re*

1    *Universal Package Corp.*, 222 U.S.P.Q. (BNA) ¶ 344 (declining to apply the doctrine of foreign

2    equivalents to the mark "LE CASE" for jewelry and gift boxes); *In re Johanna Farms Inc.*, 8

3    U.S.P.Q.2d 1408 (T.T.A.B. June 30, 1988) (declining to apply the doctrine of foreign equivalents

4    to the mark "LA YOGURT").[7]

5          When "Bandido" is treated as a Spanish word, the doctrine of foreign equivalents still does

6    not apply.  Cases declining to apply the doctrine of foreign equivalents to "marks comprised of

7    terms in multiple languages" have often found that the "marks combine the different languages for

8    suggestive purposes to create a certain commercial impression."  *In re Taverna Izakaya LLC*, 2021

9    WL 5411210, at *5.  Here, too, Plaintiff appears to admit that the juxtaposition of "Bandido" and

10   "Yankee" was intended to create a "certain commercial impression."  *Id.*  For example, in arguing

11   that "Yankee" is the dominant portion of its marks, Plaintiff states that "[c]onsumers will chuckle

12   at the idea of a Northeastern American 'yankee' tequila" and further states that "[t]he concept of a

13   North 'American' or 'yankee' as branding for tequila – a traditionally Mexican spirit – is ironic."

14   Opp. at 22.  The Court is further persuaded by the fact that the TTAB has "yet to apply the

15   doctrine [of foreign equivalents] in a published decision where the wording in one or more of the

16   marks being compared consists of a combination of English and foreign-language words or

17   terms."  Opp. at 20 n.6 (citing Trademark Manual of Examining Procedure (TMEP)

18   § 1207.01(c)(iii) (May 2024)).  Accordingly, the Court finds the record "does not support a

19   finding that consumers would stop and translate" the marks and instead suggests that consumers

20   "would perceive the mark as it is."  *In re Taverna*, 2021 WL 5411210, at *5.  As such, the Court

21   declines to apply the doctrine of foreign equivalents.[8]

22              b.  Plaintiff's "EL BANDIDO YANKEE" Word Mark

23          Having found that the doctrine of foreign equivalents does not apply, the Court considers

24

25   [7] With respect to Plaintiff's Composite Mark, the analysis remains the same.  There is no dispute that "Blanco" is a Spanish word and the words "Tequila" and "Company" are English words.

26   [8] Even if the Court were to apply the doctrine of foreign equivalents, the Court would find Plaintiff's Word Mark and Composite Mark to be similar to Defendant's BANDIT Mark.  *See*

27   *Master Saddles Inc. v. Taylor*, No. 3:20-CV-3709-B, 2021 WL 1814697, at *6 (N.D. Tex. May 6, 2021) ("Under the doctrine of foreign equivalents, 'marks using foreign terms that have the same

28   meaning as senior, English-language marks should be held confusingly similar to the English marks if an appreciable segment of American consumers is familiar with the foreign language.'").

"whether there exists a similarity in sight, sound, and meaning which would result in confusion" between Plaintiff's Word Mark and Defendant's BANDIT Mark.[9]  Compared as a whole, the Court finds "EL BANDIDO YANKEE" and "BANDIT" are similar in sound and meaning, and these similarities are likely to cause confusion among consumers.

Plaintiff primarily argues that "Yankee"—not "Bandido"—is the dominant portion of the Word Mark and should be afforded more weight in this analysis.  The Court is not persuaded.  Plaintiff first argues the TTAB "erred in finding YANKEE functions as an adjective modifying EL BANDIDO," as the "word Yankee is a noun, not an adjective."  Opp. at 22.  Defendant counters that "nouns can function as adjectives (e.g., soccer ball, tennis racket, shoe box)."  Reply at 14.  The Court agrees with Defendant.  The word "Yankee" can be used as both a noun and an adjective, and in this case, "Yankee" functions as an adjective because it describes an attribute of the "Bandido."  The dictionary definition on which Plaintiff relies is consistent with this conclusion, as it defines "Yankee" as both a noun and an adjective.  *Compare* Dkt. No. 37-25 at 3 (defining "Yankee" as "of, like, or characteristic of the Yankees"), *with id*. at 2 (defining "Yankee" as "a person from a northern or northeastern state of the United States").

Plaintiff also argues that "[c]onsumers will focus on YANKEE as the most memorable portion [of the mark]" because "[t]he subject of the mark is THE YANKEE BANDIT which is featured prominently in the design on the front of the tequila bottles."  Opp. at 22.  But once again, the issue of registrability focuses on how marks are set forth in their applications, not how the marks are used in the marketplace.  *See In re Detroit Athletic Co.*, 903 F.3d at 1303; *Combe Inc.*, 382 F. Supp.3d at 456 ("[W]hen registrability is the only issue in a case, the actual use or appearance of the marks in the marketplace is irrelevant, and it is the marks as shown in the registration applications which must be considered.").  Further, even if the Court were to consider the "design on the front of the tequila bottle," Defendant introduced evidence of Google image

---

[9] Both Plaintiff's Word Mark and Defendant's BANDIT Mark are "standard character marks, which do not limit the marks to any particular appearance or stylization in commerce."  *Combe Inc.*, 382 F. Supp.3d at 456.  As such, "the manner in which the . . . marks are currently displayed to consumers in the marketplace does not influence the similarity factor in this registrability determination."  *Id*.

United States District Court
Northern District of California

search results for the word "bandit," and this evidence makes clear that the subject of Plaintiff's design is a bandit. *Compare* Dkt. No. 35-11 (image results of the word "bandit"), *with* Mot. at 23 (Plaintiff's Composite Mark).[10]



Plaintiff's argument that "Yankee" should be treated as the dominant portion of its Word Mark is further undermined by the fact that the term "Bandido," not "Yankee," is repeatedly emphasized on Plaintiff's website. *See* Dkt. No. 35-9 at 2 ("Break out the Bandido"), 3 ("A few bandidos walk into a bar"), 4 ("Bandidos drink responsibly"), 5 ("Bandidos give back"); *see also id.* at 6-23 (emphasizing the term "bandido").

Plaintiff's final argument is that the TTAB "erred in assigning more weight to the term BANDIDO" because "BANDIDO is clearly weak and diluted due to widespread third-party use and registration." Opp. at 23. Plaintiff argues that the "sixteen (16) third-party uses of marks that consist of or include BANDIT . . . for alcoholic beverages" show "BANDIDO should be afforded less weight than YANKEE." However, as explained above, *see supra* Section III.C.i.c., these third party uses have limited probative value. Plaintiff has not introduced evidence showing the extent to which these third party marks are used, and the existence of these third party marks does not outweigh Plaintiff's clear emphasis on the word "Bandido."

Plaintiff's arguments are further undermined by guidance from the Federal Circuit that "the

---

[10] Plaintiff does not introduce evidence to rebut Defendant's argument that Plaintiff's Composite Mark more closely resembles a "Bandit" than a "Yankee."

United States District Court
Northern District of California

identity of the marks' initial two words is particularly significant because consumers typically notice those words first." *In re Detroit Athletic Co.*, 903 F.3d at 1304 ("Indeed, in view of the marks' structural similarity, the lead words are their dominant portion and are likely to make the greatest impression on consumers."). Here, the first two words of Plaintiff's Word Mark are "El Bandido," suggesting consumers will notice the word "Bandido" before the word "Yankee."[11] The Court therefore finds "Bandido" is the dominant portion of Plaintiff's Word Mark. *See Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1570 (Fed. Cir. 1983) ("Although it is not proper to dissect a mark, our predecessor court recognized that one feature of a mark may be more significant than other features, and that it is proper to give greater force and effect to that dominant feature."); *Hewlett-Packard Co.*, 281 F.3d at 1265–66 ("For rational reasons, the comparison may give more or less weight to a particular feature of the marks."). "Bandit," the only word in Defendant's mark, and "Bandido" are similar sounding words that share the same first five letters. And "Bandit" and "Bandido" are not only similar in sound, but in meaning as well. *See* Dkt. No. 35-7 (defining "bandit" as "an outlaw who lives by plunder"); Dkt. No. 35-10 (translating "bandido" to "bandit"); Dkt. No. 37-24 (translating "bandido" as a "bandit" or "outlaw"); TTAB Decision at 39 (citing https://www.merriam-webster.com/dictionary/bandido) (finding "BANDIDO" is an English term meaning "an outlaw especially of Mexican extraction or origin"). The primary difference between Plaintiff's Word Mark and Defendant's BANDIT Mark is the inclusion of the word "Yankee," but that inclusion is "insufficient to distinguish the two marks," *Cunningham*, 222 F.3d at 947, since "Yankee" just modifies the dominant term "Bandido."[12] The similarities between Plaintiff's Word Mark and Defendant's BANDIT Mark weigh heavily in

---

[11] Plaintiff argues "'YANKEE' is the first and dominant portion of the mark, not BANDIDO," Opp. at 22, but this argument relies entirely on the Court's application of the doctrine of foreign equivalents. As explained above, the Court rejects Plaintiff's argument that the doctrine of foreign equivalents applies.

[12] Plaintiff's arguments with respect to the similarity of the marks were limited to arguing that "Yankee" should be given more weight than "Bandido." Plaintiff did not otherwise argue that the inclusion of the word "Yankee" creates a connotation or commercial impression different from Defendant's BANDIT Mark. *See In re Solid State Design*, 2018 WL 287909, at *4 (applicant argued that "the marks have different connotations and commercial impressions" based on differences); *In re Dixie Restaurants, Inc.*, 105 F.3d at 1407 ("Neither the design element nor the generic term 'café' offers sufficient distinctiveness to create a different commercial impression.").

favor of finding a likelihood of confusion.

### c. Plaintiff's "EL BANDIDO YANKEE TEQUILA COMPANY BLANCO" Composite Mark

The Court also finds Defendant's BANDIT Mark and Plaintiff's Composite Mark to be similar in terms of sound and meaning. Like Plaintiff's Word Mark, the dominant portion of Plaintiff's Composite Mark is "Bandido." *See supra* Section III.C.iv.b. Although the Composite Mark includes three words not present in Plaintiff's Word Mark—"Tequila," "Company" and "Blanco"—"Bandido" remains the dominant portion of Plaintiff's Composite Mark.[13]

Courts have repeatedly found that "suggestive or descriptive" words describing the goods or services in the application may be afforded less weight. *See In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1407 (Fed. Cir. 1997) (finding "Delta" was the dominant portion of the mark "THE DELTA CAFE" as "the generic term 'café'" did not "offer[] sufficient distinctiveness to create a different commercial impression"); *Hewlett-Packard Co.*, 281 F.3d at 1266 ("The disclaimed word 'Technologies' is highly suggestive or descriptive of the data processing and data transmission services in Packard Press's application . . . . Packard Press selected the word 'Technologies' to describe or suggest the technological nature of its new services. Given the descriptive nature of the disclaimed word 'Technologies,' the Board correctly found that the word 'Packard' is the dominant and distinguishing element of PACKARD TECHNOLOGIES."). Here, the words "Tequila," "Company" and "Blanco" describe the goods listed in Plaintiff's EL BANDIDO YANKEE Applications, and as such, the Court finds the word "Bandido" is the dominant portion of Plaintiff's Composite Mark. For the reasons described above, *see supra* Section III.C.iv.b., the Court finds that the similarities between Plaintiff's Composite Mark and Defendant's BANDIT Mark weigh in favor of finding a likelihood of confusion.

Based on the record evidence and viewing the inferences reasonably drawn from the record

---

[13] Plaintiff disclaimed the words "Tequila," "Company" and "Blanco" in its application, but "it is well settled that the disclaimed material still forms a part of the mark and cannot be ignored in determining likelihood of confusion." *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1570 (Fed. Cir. 1983) ("Such disclaimers are not helpful in preventing likelihood of confusion in the mind of the consumer, because he is unaware of their existence. Therefore, the disclaimed portions of the mark must be considered in determining the likelihood of confusion.").

1   in the light most favorable to Plaintiff, the Court finds there is no genuine dispute that Plaintiff's

2   Word Mark and Composite Mark and Defendant's BANDIT Mark are similar.  The Court finds

3   this factor weighs in favor of finding a likelihood of confusion.

### v.   Evidence of Actual Confusion

5        "Evidence that use of the two marks has already led to confusion is persuasive proof that

6   future confusion is likely[,]" but "[p]roving actual confusion is difficult [] and the courts have

7   often discounted such evidence because it was unclear or insubstantial." *AMF Inc.*, 599 F.2d at

8   352.  The parties do not dispute that there is no evidence of actual confusion.  Plaintiff, however,

9   argues that "[t]he fact that there has been no confusion after years of co-existence in the

10  marketplace" compellingly suggests that "there is no indication that confusion could *ever* occur,"

11  making this factor "highly probative of an absence of a likelihood of confusion."  Opp. at 28

12  (emphasis in original).  Not so.  While evidence of actual confusion may weigh in favor of finding

13  a likelihood of confusion, the lack of such evidence is not necessarily probative.  *See FocusVision*

14  *Worldwide, Inc. v. Info. Builders, Inc.*, 859 F. App'x 573, 578 (Fed. Cir. 2021) ("Lack of actual

15  confusion tends to be more probative when the record indicates that the two marks are

16  simultaneously used over an extended period of time."); *Citigroup Inc. v. Cap. City Bank Grp.,*

17  *Inc.*, 94 U.S.P.Q.2d 1645 (T.T.A.B. 2010) ("The absence of any reported instances of confusion is

18  meaningful only if the record indicates appreciable and continuous use by applicant of its mark for

19  a significant period of time in the same markets as those served by opposer under its marks. In

20  other words, for the absence of actual confusion to be probative, there must have been a

21  reasonable opportunity for confusion to have occurred."); *Macy's Inc. v. Strategic Marks, LLC*,

22  No. 11-CV-06198-EMC, 2016 WL 374147, at *7 (N.D. Cal. Feb. 1, 2016) ("[T]his factor is

23  weighed heavily only when there is evidence of past confusion or, perhaps, when the particular

24  circumstances indicate such evidence should have been available.").

25       Plaintiff cites to one case, *Barbara's Bakery, Inc. v. Landesman*, 82 U.S.P.Q. 2d 1283,

26  1287 (T.T.A.B. 2007), in support of its argument that the absence of actual confusion is highly

27  probative.  *See* Opp. at 27.  But *Barbara's Bakery* is inapposite.  There, the TTAB found the

28  absence of actual confusion was of little probative value because it was "clearly due to the

minimal scope of the applicant's actual use of her mark in the marketplace." 82 U.S.P.Q.2d at 1287. Here, Plaintiff has not introduced any evidence showing there was a "significant opportunity for actual confusion to have occurred." *Id*. Plaintiff instead relies on conclusory statements and attorney argument. *See* Opp. at 27 (stating "[t]he absence of any confusion is particularly notable because the parties have aggressively promoted their respective brands nationwide for nearly three (3) years without any issues" and there was "ample time and opportunity for such confusion to occur"). That is not enough. Plaintiff instead "must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984). "Mere denials or conclusory statements are insufficient." *Id*.

　　　　Plaintiff also relies heavily on Dr. Sartore's *Eveready* survey, arguing it "showed zero instances of confusion" and "is highly probative to show no likelihood of confusion." Opp. at 13. Dr. Sartore surveyed 112 "qualified participants who recently purchased []or were likely to soon purchase[] tequila" and asked open-ended questions "designed to test whether [participants] would confuse EL BANDIDO YANKEE with [the] BANDIT mark." Opp. at 13. The 112 survey respondents were shown the Word Mark and asked the following 10 questions:

```
Q10.0  Who do you believe makes or puts out tequila that uses this work
       mark?  Please be as specific as possible.
Q10.1  Why do you say that?  Again, please be as specific as possible.

Q11.0  What else, if anything, is made or put out by whoever you believe makes or
       puts out tequila using this word mark?  Please be as specific as possible.
Q11.1  Why do you say that?  Again, please be as specific as possible.

Q12.0  Do you believe tequila using this word mark...
       1.  IS being made or put out with the authorization, approval,
           or sponsorship of any other company or brand?
       2.  is NOT being made or put out with the authorization,
           approval, or sponsorship of any other company or brand?
       3.  don't know or have no opinion?
Q12.1  Who do you believe gave authorization, approval, or sponsorship? Please be as
       specific as possible.
Q12.2  Why do you say that?  Again, please be as specific as possible.

Q13.0  Do you believe that whoever makes or puts out tequila using this word mark...
       1.  HAS a business affiliation or business connection with any
           other company or brand?
       2.  does NOT have a business affiliation or business connection
           with any other company or brand?
       3.  don't know or have no opinion?
Q13.1  Who do you believe has a business affiliation or business connection with
       whoever makes or puts out tequila using this word mark?  Please be as
       specific as possible.
Q13.2  Why do you say that?  Again, please be as specific as possible.
```

"Based []on the data collected during execution of the pilot survey," Dr. Sartore found no survey respondent expressed any of the following beliefs: (1) that Defendant "made or put out tequila under the EL BANDIDO YANKEE word mark"; (2) that EL BANDIDO YANKEE was "being made or put out with the authorization, approval or sponsorship of Defendant"; or (3) "that EL BANDIDO YANKEE had a business affiliation or business connection with Defendant." Dkt. No. 39-30 at 1. Plaintiff argues that these results are "highly probative to show no likelihood of confusion." Opp. at 13. The Court disagrees.

Dr. Sartore's survey is not relevant with respect to the likelihood of confusion between Plaintiff's Word Mark and Defendant's BANDIT Mark, because it does not engage with the relevant legal issue: the likelihood of confusion between the marks as they are presented in the BANDIT Registration and the EL BANDIDO YANKEE Applications.[14] The issue before the Court is whether Plaintiff's Word Mark is registrable, but this issue "must be decided on the basis of the identification of goods set forth in [Plaintiff's] application." *Octocom Sys., Inc*, 918 F.2d at 942; *see also In re Detroit Athletic Co.*, 903 F.3d at 1310 ("To the extent the Board did not expressly address each evidentiary item proffered by [plaintiff] pertaining to the [defendant's] actual services, the Board was not required to do so; again, it is the scope of the [defendant's] registration that is relevant in this context, not its actual practices."). Dr. Sartore's survey, however, tests the likelihood of confusion between the Word Mark and BANDIT Mark as they are used *in the marketplace*. This is clearly reflected by the fact that survey participants were asked questions that focused specifically on tequila, even though Defendant's BANDIT Registration broadly applies to "alcoholic beverages except beers." *See* Dkt. No. 37-29 at 7–19. This is further evidenced by statements made in Dr. Sartore's supplemental expert report. For example, in defending her use of the *Eveready* methodology, Dr. Sartore states that the *Squirt* approach is recommended when the products are sold proximate to one another, but posits that it is relevant that the goods in this case—"wine versus bottled tequila"—are not sold in proximity.[15] Dkt. No.

---

[14] Survey participants were only presented Plaintiff's Word Mark. The survey is therefore not relevant to the likelihood of confusion between the Composite Mark and the BANDIT Mark.
[15] The *Eveready* and *Squirt* survey methodologies "have become commonly used to test for confusion . . . ." McCarthy on Trademarks and Unfair Competition § 32:173 (5th ed.). When the

37-30 at 3; *see also* Dkt. No. 41 at 4 ("[H]ere, the goods (tequila and boxed wine) are not sold in proximity."); *id*. ("When the goods are not sold in proximity, as is the case with tequila and boxed wine, an *Eveready* style survey should be used."); Dkt. No. 37-29 at 1 ("I designed a survey to address the issue of likelihood of confusion with respect to Plaintiff's use of the EL BANDIDO YANKEE mark.").

Plaintiff further undermines the relevance of Dr. Sartore's *Eveready* survey in its opposition brief. Plaintiff and Defendant both appear to agree that the *Eveready* methodology is appropriate when the mark has "some level of commercial strength." Dkt. No. 37-30 at 3 ("Given what is known about [Defendant's] market place presence, I have no reason to believe that [Defendant's] mark lacks consumer recognition in a way that would justify a different survey methodology."); *see also* 5 McCarthy on Trademarks and Unfair Competition § 32:174 (5th ed.) ("Unlike the *Squirt* format, the *Eveready* survey format does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience. The *Eveready* format is especially useful when the senior mark is readily recognized by buyers in the relevant universe."). In its opposition brief, however, Plaintiff argues the BANDIT Mark is both conceptually and commercially weak, undermining the relevance of its own survey methodology. Opp. at 25 ("The Board also erred in finding BANDIT has 'moderate' commercial strength . . . . [T]he Court should find BANDIT is 'weak' or at best 'slightly weak.'").

To be clear, the Court declines Defendant's invitation to weigh the credibility of Dr. Sartore's expert reports and underlying survey. *See His & Her Corp. v. Shake-N-Go Fashion, Inc.*, 572 F. App'x 517, 518 (9th Cir. 2014) ("In resolving summary judgment motions, a court must not weigh the evidence, make credibility determinations, or draw inferences from the facts adverse to the non-moving party."). But without weighing the evidence or credibility of Plaintiff or Defendant's experts, it is clear that Dr. Sartore's expert reports and *Eveready* survey simply are

_____

*Squirt* methodology is used, the survey respondent is presented with "both of the conflicting marks," as this methodology "does not assume that the respondent is familiar with the senior mark." *Id*. § 32:174.50. When the *Eveready* methodology is used, the survey respondent is presented with only the junior mark. *Id*. § 32:174. The *Eveready* survey methodology "does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience." *Id*.

not probative as to the issues before the Court.  At best, Dr. Sartore's survey suggests a lack of actual confusion between Plaintiff's Word Mark and Defendant's BANDIT Mark.  That inference, however, is not enough to raise a genuine issue of material fact precluding summary judgment. *See Octocom Sys., Inc.*, 918 F.2d at 943 ("A factor . . . is not made material by submission of evidence on the point; rather, the factor must be shown to be material or relevant in the particular case before any evidence offered on the factor should be considered."); *In re Optical Disk Drive Antitrust Litig.*, No. 10-MD-02143-RS, 2017 WL 11673139, at *6 (N.D. Cal. Dec. 18, 2017) ("Although Acer insists that there should be no inquiry into the weight or credibility of [expert's] opinions at the summary judgment stage, an evaluation of whether there is any genuine issue of material fact in the record to support an expert's conclusions is mandatory . . . .  In its opposition, Acer points only to [expert's] opinion, an insufficient showing to meet its burden of identifying with reasonable particularity evidence precluding summary judgment."); *Knowles v. Spin Master, Inc.*, No. CV 18-5827 PA (JCX), 2019 WL 4565102, at *4 (C.D. Cal. Sept. 17, 2019) (finding that "[a]t least for the [c]ourt's resolution of the [substantially similar] extrinsic test on summary judgment," the plaintiff's expert's opinions were "not helpful to the [c]ourt"); *Johannsongs-Publ'g Ltd. v. Lovland*, No. CV 18-10009-AB (SSX), 2020 WL 2315805, at *6 (C.D. Cal. Apr. 3, 2020), *aff'd*, No. 20-55552, 2021 WL 5564626 (9th Cir. Nov. 29, 2021) (declining to consider plaintiff's expert report in deciding defendant's motion for summary judgment after finding the report was "fatally flawed" and "legally irrelevant").

Based on the record evidence and viewing the inferences reasonably drawn from the record in the light most favorable to Plaintiff, the Court finds the lack of evidence of actual confusion is not probative of the likelihood of confusion in this context.  The Court finds this factor is neutral.

### vi.    Degree Of Care Likely To Be Exercised By The Purchaser

"The next factor to be considered is the degree of care that a consumer is likely to exercise in purchasing the parties' products."  *Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, No. C 05-0587 MHP, 2005 WL 701599, at *11 (N.D. Cal. Mar. 23, 2005).  "The court views the parties' products from the standpoint of 'typical buyer exercising ordinary caution.'"  *Id.*  It is "assumed that sophisticated consumers and buyers of expensive goods will exercise greater care in their

purchases, thereby reducing the likelihood of confusion or mistake as to the origin of the goods." *Id.* "Conversely, it is more likely that consumers will be confused by two marks where the goods at issue involve relatively inexpensive, 'impulse' products to which the average, 'unsophisticated' consumer does not devote a great deal of care and consideration in purchasing." *Vigneron Partners, LLC v. Woop Woop Wines Pty Ltd.*, No. C 06-00527 JF, 2006 WL 1214859, at *6 (N.D. Cal. May 5, 2006) (citation omitted). In assessing this factor, the Board "must consider all potential customers for the [goods and] services recited in a trademark application, including ordinary consumers." *CDOC, Inc. v. Liberty Bankers Life Ins. Co.*, 844 F. App'x 357, 362 (Fed. Cir. 2021). "The appropriate level of customer care and sophistication can be proven by: (1) survey evidence; (2) expert testimony; or (3) inferences drawn by a judge based on the nature of the product or its price." *Id.*

Plaintiff argues that a buyer can be expected to exercise "greater care in his purchases" when the goods are expensive, and therefore, "consumers will exercise greater care when purchasing expensive tequila vs low cost, boxed wine." Opp. at 27; *see also id.* at 17. Defendant counters that "where, as here, the goods of the parties are legally identical and without limitation as to classes of consumers, the Court must presume that he targeted classes of purchasers are the same (i.e., all potential purchasers of all alcoholic beverages at all different price points)." Reply at 18. The Court agrees with Defendant.

"Because there are no limitations on price point or consumer type in either" the EL BANDIDO YANKEE Application or the BANDIT Registration, the Court presumes that the goods at issue—distilled blue agave liquor and alcoholic beverages (except beer)—are "sold at all price points and to consumers of legal drinking age that consume alcohol." *In Re Livewire Drinks, Inc.*, No. 88795611, 2024 WL 4524578, at *10 (T.T.A.B. Oct. 4, 2024). Plaintiff and Defendant's customers may therefore "include ordinary adult consumers purchasing alcohol . . . at grocery stores, supermarkets, liquor stores, drug stores, etc., as well as more discerning adult customers purchasing alcohol at higher-end specialty shops." *Id.* But consideration of this factor must be based on "the least sophisticated potential purchasers." *In Re Louis Leonetti & Brandon Leonetti*, No. 97321068, 2024 WL 5058093, at *16 (T.T.A.B. Nov. 26, 2024); *see also In Re Livewire*

*Drinks, Inc.*, 2024 WL 4524578, at *11 ("We are not persuaded by Applicant's argument [that it markets its product as a premium good]. There is no such restriction to [] 'premium' alcoholic beverages . . . in Applicant's identification of goods, and Registrant's goods also do not contain any price or quality limitations."); *Iron Balls Int'l Ltd.*, No. CANCELLATION 9207909, 2024 WL 2844425, at *26 (T.T.A.B. June 4, 2024) ("Because the respective identifications do not set particular price points, we cannot presume that the consumers of the identified beverages, including micro-brewed craft beer, will be particularly sophisticated, discriminating, or careful in making their purchases, and the record does not reflect that the relevant consumers are sophisticated.")."; *Sazerac Brands, LLC*, No. 91272260, 2024 WL 4052732, at *16 ("Clearly, there [] are great disparities between the cost of Opposer's 17- and 20-year old [] bourbons, which can cost thousands of dollars, and Opposer's standard [] bourbon, which averages around $55 per bottle . . . . The cost of Opposer's standard [] bourbon appears to be on par with or similar to the cost of Applicant's distilled spirits, which can cost up to an average of $50 per bottle. In the final analysis, however, we must look to the identification of goods in the Applications and Registrations, none of which set price points or restrict their customers to careful sophisticates.").

The Court finds that the products at issue in this case are "relatively inexpensive products" that are "likely to be purchased on impulse." *In re Majestic Distilling Co. Inc.*, 315 F.3d at 1316. Here, there is "no evidence that the least sophisticated purchasers in the alcohol-consuming general public will exercise anything other than ordinary care." *In Re Louis Leonetti & Brandon Leonetti*, 2024 WL 5058093, at *16. *Cf. CDOC, Inc.*, 844 F. App'x at 362 (finding the Board "reasonably inferred that '[g]iven the nature of the services and the personalized nature of the parties' marketing efforts, relevant purchasers will exercise a relatively high degree of purchasing care'" where the applicant submitted testimony from one of its executives stating "[p]otential customers learn[ed] about [a]pplicant and its underwriting life and health insurance and annuity services through contact with one of applicant's 'approximately 10,000 independent agents who sell life and health insurance' or '24 career agents . . . selling life and health insurance annuity products'") (citation omitted).

Based on the record evidence and viewing the inferences reasonably drawn from the record

1   in the light most favorable to Plaintiff, the Court finds there is no genuine dispute that the goods at

2   issue—distilled blue agave liquor and alcoholic beverages (except beer)—are relatively

3   inexpensive products, and Plaintiff and Defendant's consumers "include ordinary adult consumers

4   purchasing alcohol." *In Re Livewire Drinks, Inc.*, 2024 WL 4524578, at *10. The Court finds this

5   favor weighs in favor of finding a likelihood of confusion.

6          **vii.    Intent In Selecting The Mark**

7          Plaintiff argues it "adopted its mark in good faith with no knowledge of [Defendant's]

8   BANDIT Mark," and this factor therefore weighs against a finding of a likelihood of confusion.

9   Opp. at 28 ("There is no evidence of bad faith or suggesting [Plaintiff] intended to select a

10  purportedly similar mark."). Defendant argues this factor is irrelevant, stating that "[a]lthough the

11  presence of intent can constitute strong evidence of confusion, the converse 'is not true . . . .'"

12  Reply at 19. The Court agrees with Defendant.

13         In trademark infringement cases, "[w]hen [an] alleged infringer knowingly adopts a mark

14  similar to another's, reviewing courts presume that the . . . public will be deceived." *AMF Inc.*,

15  599 F.2d at 354. However, precedent suggests that this factor is seldom considered in the context

16  of an opposition proceeding, and Plaintiff has not provided authority suggesting otherwise. The

17  Court has found no authority applying this principle in the context of an opposition proceeding.

18  Further, even in the infringement context, courts have minimized the importance of the intent

19  factor. *See AMF Inc.*, 599 F.2d at 354 ("Good faith is less probative of the likelihood of

20  confusion, yet may be given considerable weight in fashioning a remedy."); *GoTo.com, Inc.*, 202

21  F.3d at 1208 ("We have previously emphasized the minimal importance of the intent factor . . . . In

22  fact, in *Brookfield*, we found that the defendant had no knowledge, actual or constructive, of the

23  plaintiff's mark yet nevertheless ruled against the defendant . . . . [E]ven if we . . . concluded that

24  [defendant] [had] no intent to copy or appropriate [plaintiff's] logo, it would prove nothing since

25  no such intent is necessary to demonstrate a likelihood of confusion. We need inquire no further

26  into [defendant's] intent.").

27         Based on the record evidence and viewing the inferences reasonably drawn from the record

28  in the light most favorable to Plaintiff, the Court finds that Plaintiff's intent in selecting the mark

United States District Court
Northern District of California

37

1    is not probative of the likelihood of confusion in this context.  The Court finds this factor is

2    neutral.

3           **viii.**    **Likelihood Of Expansion Of The Product Lines**

4          Plaintiff argues Defendant "clearly has no intent to expand into BANDIT tequila" and

5    "[Plaintiff] has no intention to sell EL BANDIDO YANKEE wine," and this factor therefore

6    weighs against a finding of a likelihood of conclusion.  Opp. at 28.  Plaintiff's argument is based

7    in part on Defendant's admission that "it does not have any Mexican trademark applications

8    covering tequila or COLA approvals, which are required to produce and sell tequila in the United

9    States." *Id.*  Defendant counters that because its registration is "for alcoholic beverages except

10   beers, it has the right to use the BANDIT mark for . . . [t]equila."  Reply at 19.  The Court agrees

11   with Defendant.

12         The fact that Defendant does not presently have any Mexican trademark applications or

13   COLA approvals does not mean Defendant can never or will never do so.  Defendant, as the

14   owner of the BANDIT Registration, is entitled to use its mark on "alcoholic beverages except

15   beer," which necessarily includes tequila.  Plaintiff has not provided any authority to suggest that a

16   trademark owner's decision not to fully utilize the scope of its registration weighs against a

17   finding of likelihood of confusion.  *Cf. Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp., Inc.*, 648

18   F.2d 1335, 1337 (C.C.P.A. 1981) ("Finally, appellant asserts that the board ignored 'a record

19   which indicates appellee's specific lack of interest in collateral exploitation of its own famous

20   mark.' Lack of present intent to expand use of one's mark is not an overriding consideration.").

21         Based on the record evidence and viewing the inferences reasonably drawn from the record

22   in the light most favorable to Plaintiff, the Court finds that the likelihood of expansion of

23   Defendant's product lines is not probative of the likelihood of confusion in this context.  The

24   Court finds this factor is neutral.

25         **ix.**    **Weighing the Likelihood of Confusion Factors**

26         The Court finds that the first, second, third, fifth and sixth *Sleekcraft* factors—strength of

27   Defendant's mark, proximity of the goods, marketing channels, similarity of the marks, and degree

28   of care likely to be exercised by the consumer—weigh in favor of finding a likelihood of

United States District Court
Northern District of California

confusion, and the fourth, seventh and eighth *Sleekcraft* factors—evidence of actual confusion, intent, and likelihood of expansion—are neutral.  Accordingly, the Court concludes as a matter of law under the applicable standard that Plaintiff's Word Mark and Composite Mark "so resemble" Defendant's registered BANDIT Mark, "as to be likely, when used on or in connection with [Plaintiff's] goods . . . , to cause confusion."  15 U.S.C. § 1052(d); *see Bad Elf, LLC v. FLEX Ltd.*, No. 2022-1839, 2023 WL 5199483, at *2 (Fed. Cir. Aug. 14, 2023) ("The Board balanced the factors and determined that '[a]lthough we find that the relevant consumers are likely to exercise some degree of care, this is outweighed by the strong similarity and identical nature of the marks, the relatedness of the goods and services, and overlapping established, likely-to-continue channels of trade.'"); *In re Oxiteno S.A. Industria e Comercio*, No. 2022-1213, 2023 WL 2422439, at *2 (Fed. Cir. Mar. 9, 2023) (affirming the Board's refusal to register a mark for chemical products after the Board found that "[a]lthough the consumers were sophisticated . . . [t]he strong similarity of the marks for related goods, which move in the same channels of trade to the same classes of customers renders confusion likely").

## IV.    CONCLUSION

Defendant's motion for summary judgment (Dkt. No. 35) is **GRANTED**.  Plaintiff's request for judicial notice (Dkt. No. 38) is **GRANTED IN PART** and **DENIED IN PART** and Plaintiff's objections to Defendant's reply evidence (Dkt. No. 41) are **OVERRULED**.  The clerk is directed to enter judgment in favor of Defendant and close the file.[16]

**IT IS SO ORDERED.**

Dated:    2/18/2025

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[16] On October 29, 2024, Defendant filed four motions in limine, and on November 12, 2024, the parties submitted a "joint stipulated request for summary bench trial"  Dkt. Nos. 50–53, 64. Having granted summary judgment in Defendant's favor, the Court terminates the motions in limine and stipulation and proposed order as moot.

United States District Court
Northern District of California